1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                                DISTRICT OF NEVADA

8                                        * * *
                                          )
9    LAURA LEIGH,                         )
                                          )
10              Plaintiff,                 )              3:10-CV-0597-LRH-VPC
                                          )
11   v.                                   )
                                          )              ORDER
12   KEN SALAZAR, et al.,                 )
                                          )
13              Defendants.               )
     _____     )

14

15          Before the court is plaintiff Laura Leigh's ("Leigh") amended motion for a preliminary

16   injunction (Doc. #16[1]) on remand from the Ninth Circuit Court of Appeals (Doc. #59).

17   **I.      Facts and Procedural Background**

18          **A.  Parties**

19          Plaintiff Laura Leigh ("Leigh") is a photo-journalist and author for Horseback Magazine

20   who covers stories concerning wild horses and their management by private agencies and the

21   government, including the Bureau of Land Management ("BLM").

22          Defendant Ken Salazar ("Salazar") is the former Director of the U.S. Department of the

23   Interior; Bob Abbey ("Abbey") is the national Director of the BLM; and Ronald Wenker

24   ("Wenker") is the Nevada State Director of the BLM.

25   _____

26          [1] Refers to the court's docketing number.

**B.  Factual History**

The Wild Free-Roaming Horses and Burros Act, found at 16 U.S.C. §§ 1331-1340, grants the BLM jurisdiction over all wild horses and burros on federal lands. It is the prerogative of the BLM that if it finds "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, [the BLM must] immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2).

The BLM controls wild horse overpopulation by conducting horse gathers in which it uses helicopters to herd the horses toward a temporary gather corral, or trap. Once the horses are secured, the horses are separated and moved by pick-up or semi-trailer to a temporary holding facility, where some are prepared for adoption, or to a long-term holding facility. Generally, the BLM allows the public to observe gather activities, but places restrictions on public observation.

In September 2010, the BLM conducted a wild horse gather in Lincoln County, Nevada within the Silver King Herd Management Area, known as the Silver King Wild Horse Gather ("Silver King Gather"). The goal of the gather was to remove 546 excess wild horses from the area to bring the herds within the appropriate management levels and maintain a thriving natural ecological balance. During the gather, the BLM scheduled two public observation days for groups of up to ten (10) observers. The Silver King Gather was scheduled to run from September 14, 2010 through October 1, 2010.  Upon completion of the Silver King Gather, 504 horses were removed.

**C.  Initial Procedural History**

On September 22, 2010, while the gather was underway, Leigh filed a complaint for preliminary injunctive and declaratory relief against defendants, prospectively challenging the decision of the BLM to limit and restrict her access to, and observation of, various aspects of the gather in violation of the First Amendment. Doc. #1. The allegations in Leigh's complaint are based solely on the BLM's historical actions in limiting access at prior gathers and do not identify, at any point, any direct restriction, action, or course of conduct by the BLM that the BLM intended to employ at the Silver King Gather that would constitute an alleged restriction on her First

Amendment rights. *Id.* Leigh's complaint alleged three causes of action: (1) declaratory relief that the BLM's unidentified but allegedly intended course of conduct and restrictions on access violate her First Amendment rights; (2) preliminary and permanent injunctive relief prohibiting the BLM from restricting Leigh from accessing and observing the Silver King Gather, along with other forms of affirmative relief;[2] and (3) declaratory relief that the BLM's unidentified, but allegedly intended gather plan is arbitrary and capricious, and a violation of her First Amendment rights to observe government activities. *Id.*

On September 24, 2010, ten (10) days into the gather's scheduled time, Leigh filed a motion for a temporary restraining order. Doc. #6. In her motion, Leigh sought a cessation of all gather activities at the Silver King Gather and immediate and full access to the Silver King Gather, any previously gathered horses including tracking information, and all post-gather holding facility locations. *Id.* Leigh's motion was based on her belief that she would be discriminated against at the Silver King Gather for her previous reporting on the BLM's activities at other gathers and because of alleged prior discrimination at other gathers not on the Silver King Herd Management Area. *Id.* Importantly, Leigh failed to identify any actual restrictions to her access or discrimination imposed by BLM employees at the Silver King Gather. *See* Doc. #6, Exhibit 2, Leigh Decl.

The following day, on September 25, 2010, Leigh filed a supplement to her motion for a temporary restraining order. Doc. #11. In that motion, Leigh provided several declarations from various members of the public who had attended a gather conducted by another federal department on the Sheldon National Wildlife Refuge in northern Nevada and complained of a lack of access to

---

[2] In her complaint, Leigh requests over a dozen additional items of affirmative relief, which can be broadly categorized and summarized as follows: (1) requiring the BLM to create a system to track the location of all horses gathered by the BLM, including those horses captured at other gathers outside the Silver King Herd Management Area; (2) requiring the BLM to provide the public with access to information about the horses captured at all wild horse gathers - including tracking and adoption information, as well as information about the horses' injuries and/or deaths - without the need to file a Freedom of Information Act ("FOIA") request; and (3) requiring the BLM to provide access to the horses after the gather at post-gather holding facilities, whether on private or public land. *See* Doc. #1; *see also requested injunctive relief* Doc. ##5, 9, 15, 16.

1  those gather activities. *Id*. However, once again, Leigh failed to identify any restriction or limitation

2  imposed by the BLM for the Silver King Gather.

3       On September 27, 2010, the court denied Leigh's initial motion for a temporary restraining

4  order without prejudice. Doc. #13. In that order, the court found that Leigh failed to establish that

5  she was likely to succeed on the merits of her First Amendment claim and that she would suffer

6  irreparable harm in the absence of injunctive relief because she made no showing that the BLM

7  placed barriers on her access to, and observation of, the Silver King Gather, the only wild horse

8  gather challenged in her complaint. *Id*. Specifically, the court found that Leigh failed to adduce

9  "evidence of any restriction to her access on public property to the Silver King Gather," or that "she

10  [was] likely to be restricted from observing this particular gather." *Id*.

11      **D.  Observation of the Silver King Gather**

12       After the court's denial of her initial motion for a temporary restraining order, Leigh

13  attended the Silver King Gather and participated in the September 28, 2010 observation day. While

14  at the Silver King Gather, BLM staff and on-hand law enforcement officers imposed viewing

15  restrictions on Leigh and other members of the public which included requirements that: (1)

16  observers be restricted to two designated viewing areas; and (2) that they remain seated and quiet

17  during certain parts of the gather, particularly when the helicopter was herding the wild horses

18  directly into the trap.  Snow fencing was also used on the sides of the trap corrals, which resulted in

19  Leigh and other members of the public having a limited view of the recently captured horses.

20       On October 1, 2010, following her observation of gather activities, and on the same day the

21  Silver King Gather was scheduled to end, Leigh filed an amended motion for a temporary

22  restraining order (Doc. #15) and amended motion for a preliminary injunction (Doc. #16). On

23  October 4, 2010, and after the gather activities at Silver King had been completed, Leigh filed a

24  supplement to her motions. Doc. #17. The BLM responded on October 15, 2010, (Doc. #22) and

25  Leigh replied on October 21, 2010 (Doc. #25).

26  ///

In Leigh's amended motions, she sought affirmative relief from the court to require the BLM to provide her with unrestricted access to the roundup of all horses captured from the Silver King Herd Management Area. *See* Doc. #16 ("Specifically, this case seeks access to all aspects of how the government Defendants handle the horses taken from Silver King, from the time of their capture to their ultimate disposition and demise."). Further, Leigh sought her previously identified other affirmative relief including a BLM created tracking system, additional public information about the horses and the gather, and public access to post-gather holding facilities with unobstructed viewing of the horses. *Id*.

For the first time, however, Leigh's motions were based on actual conduct by the BLM that occurred *at* the Silver King Gather. *See* Doc. ##15, 16. Leigh alleged that she was precluded by the BLM from having "any reasonable view of gather activities" which included "observing the horses close enough to assess independently, the captured horses' health, their condition and their welfare" because of "[b]arriers and distance requirements." Doc. #16. Leigh identified these barrier and distance obstructions as the use of snow fencing on the trap corrals and having to remain in one of two designated viewing areas which she stated were one quarter (1/4) of a mile away from the trap location for the first area and thirty-five (35) feet away from the trap location for the second area. Doc. #16, Exhibit 1, Leigh Decl., ¶9. Further, Leigh claimed that she had not received "press access" equivalent to what other reporters had received at prior gathers even though she was the only member of the press at the September 28, 2010 observation day. *Id*. at ¶5.

**E.  The Court's Initial Hearing**

On November 16, 2010, the court held its initial evidentiary hearing on Leigh's motions. Doc. #35. At the hearing, the court heard testimony from the following individuals:

- Laura Leigh, the plaintiff in this action;

- Chris Hanefield, a public affairs specialist with the BLM during the Silver King Gather;

- Elizabeth Slagsvol, a member of the public and horse advocate who attended the Silver King Gather on the September 28, 2010 public observation day;

- Debbie Coffey, a member of the public who has attended several wild horse gathers, including the Silver King Gather; and

- Deniz Bolbol, a member of the public who has attended several wild horse gathers, including the Silver King Gather.

The testimony was limited to the BLM's activities and conduct at, and the attending witnesses' access to, the Silver King Gather. The court also admitted three pages of photographs taken by Leigh at the Silver King Gather. Doc. #36. At the conclusion of the hearing, Leigh requested post-hearing briefing on certain issues identified by the court and to further develop her arguments in support of her amended motion for a preliminary injunction. *See* Doc. #37, p.140-143.

On December 1, 2010, two weeks after the hearing on Leigh's motions, the parties filed their supplemental briefs on the motions. Doc. ##38, 39. Responsive briefs were filed by the parties on December 9 and 11, 2010.  Doc. ## 40, 41.

**F.  Court's Order Denying Leigh's Motions**

On April 13, 2011, the court issued its order denying Leigh's amended motions. Doc. #52. In that order, the court split its focus between Leigh's two main categories for injunctive relief: (1) her access to gather activities; and (2) her other post-gather affirmative relief which included her request for access to care facilities, internal agency information, and the creation of the tracking system. *Id*. at 4-7. In addressing Leigh's first category of injunctive relief, her access to the Silver King Gather, the court made two distinct findings. First, the court found that Leigh's request for preliminary injunctive relief was moot as the gather had already been completed a month prior to the hearing on the motions. Doc. #52, p.4. Second, the court found alternatively - in the event that Leigh's request for injunctive relief at the Silver King Gather was not moot - that Leigh had failed to establish that "she was denied access to the Silver King Gather, or that other members of the media were treated more favorably." *Id*. at 5. Further, the court found that "the evidence before the court established that Leigh was provided comparable access to, and observation of, the Silver King Gather as other members of the public and media." *Id*. Based on these findings, the court concluded

6

that Leigh was not likely to succeed on the merits of her First Amendment claims and, therefore, she was not "entitled to her requested injunctive relief concerning access to the Silver King Gather." *Id*.

As to Leigh's second category of injunctive relief, her post-gather affirmative relief, the court likewise found that Leigh had failed to show that she was likely to succeed on the merits of her First Amendment claim "as it [related] to access to facilities, agency information, or the creation of a tracking system." Doc. #52, p.6. Specifically, the court found that Leigh had failed to provide the court with any legal authority to support her requested affirmative relief or establish any disparate treatment by the BLM in its conduct towards her compared to other members of the press. *Id*. Accordingly, the court denied Leigh's amended motions for injunctive relief.

**G.  The Ninth Circuit Appeal and Opinion**

On April 28, 2011, Leigh appealed the denial of her motions to the Ninth Circuit Court of Appeals (the "Ninth Circuit"). Doc. #54. On February 14, 2012, ten months after the denial of Leigh's motions, the Ninth Circuit issued its appellate order. Doc. #58. Two months later, on April 16, 2012, the Ninth Circuit issued its final, amended appellate order reversing this court's order denying Leigh's motions (Doc. #52) and remanding Leigh's amended motion for a preliminary injunction (Doc. #16) for further proceedings. Doc. #59.

In its amended order, the Ninth Circuit made several findings. First, it held that Leigh's request for injunctive relief was not moot because "the BLM's Record of Decision authorizes the BLM to gather additional Silver King horses through 2013" and because "Leigh's preliminary injunction motion [concerned] 'all horses captured from Silver King,' and [was] in no way limited to the 2010 gather." *Leigh v. Salazar*, 677 F.3d 892, 896 (9th Cir. 2012). Thus, the Ninth circuit concluded that "[a]lthough the preliminary injunction does not apply to horse gathers conducted in other locations, it is not moot as applied to future gathers in Silver King." *Id*.

Second, the Ninth Circuit similarly held that Leigh's request for access to the horses after they were gathered was not moot because she had requested *unrestricted* access to post-gather

holding facilities. *See Leigh*, 677 F.3d at 897.[3] Although Leigh testified that she had participated in several public tours of holding facilities, and acknowledged that the BLM planned to offer additional tour dates, the Ninth Circuit found that "this limited access does not render Leigh's entire request moot because it does not provide her with the *unrestricted* access to the holding facility that she seeks in her preliminary injunction motion." *Id.* However, the Ninth Circuit did limit Leigh's post-gather access claim to the only holding facility identified in her opening appellate brief, the Indian Lakes Short-Term Holding Facility, also known as Broken Arrow, in Fallon, Nevada. *Id.* Further, the Ninth Circuit held that Leigh had waived her two remaining forms of affirmative relief - requiring the BLM to create a horse tracking system, and requiring the BLM to provide the public with access to information about horses without filing an FOIA request - by failing to raise them in her appellate brief. *Leigh*, 677 F.3d at 897.

Finally, the Ninth Circuit found that this court erred in denying Leigh's motions by failing to apply the qualified right of access balancing test set forth in *Press-Enterprise Co. v. Superior Court* ("*Press Enterprise II*"), 478 U.S. 1, 8-9 (1986). *Leigh*, 677 F.3d at 894. As such, the Ninth Circuit remanded Leigh's amended motion for a preliminary injunction to this court to conduct the analysis required by *Press Enterprise II* and "consider in the first instance whether the public has a First Amendment right of access to horse gathers, and, if so, whether the viewing restrictions are narrowly tailored to serve the government's overriding interests." *Id.* at 894.

**H.  The Court's Second Hearing**

In accordance with the Ninth Circuit's opinion, the court set a telephonic status conference for May 30, 2012, for the purpose of scheduling a hearing to address Leigh's remanded motion. Doc. #63. However, on May 25, 2012, at the request of the parties, the status conference was continued until July 16, 2012. Doc. #64. Then on July 11, 2012, the parties filed a joint motion to continue the status conference. Doc. #65. The request was granted and the status conference was

---

[3] Leigh has subsequently clarified that she does not seek unrestricted access to wild horse traps, temporary holding pens and short term warehousing facilities. Doc. #76.

again continued until August 9, 2012. Doc. #66.

On August 9, 2012, the court held its first telephonic status conference to set a date to hear evidence concerning Leigh's remanded motion for a preliminary injunction. At the hearing, the parties informed the court they had scheduled settlement discussions for August 22, 2012, and hoped that they could reach a resolution of this dispute without further action by the court. *See* Doc. #67. The court continued the status conference until September 18, 2012, after the initial settlement meeting. *Id.*

On September 18, 2012, the court held its second telephonic status conference with the parties. At this hearing, the parties advised that they were still in settlement negotiations and requested additional time to continue their discussion. *See* Doc. #68. The court granted the parties' request and continued the status conference another month until October 18, 2012. *Id.* Prior to the scheduled October 18th hearing, the parties filed a stipulation to continue the hearing until October 29, 2012, (Doc. #70) which was granted by the court (Doc. #71).

On October 29, 2012, the court held a third telephonic status conference. At that hearing, the parties informed the court they were close to reaching a settlement and requested a short continuance to finalize settlement negotiations. *See* Doc. #72. The court granted the parties' request and continued the status conference until January 8, 2013, but also ordered that if a settlement was not reached, then the hearing on Leigh's remanded motion for a preliminary injunction would commence on February 19, 2013. *Id.*

On January 8, 2013, the court held a fourth telephonic status conference with the parties. At that hearing, the parties informed the court that settlement negotiations had been exhausted and that a settlement could not be reached. *See* Doc. #74. Based on the parties' representations, the court confirmed the hearing on Leigh's remanded motion for February 19, 2013.

On February 19 and 20, 2013, after ten (10) months of continuances by the parties, the court held an evidentiary hearing on Leigh's remanded motion for a preliminary injunction to specifically address the *Press Enterprise II* factors. *See* Doc. ##75, 77. At the hearing, the court heard

testimony from the following witnesses:

- Terry Farley ("Ms. Farley"), a full-time writer and journalist who has written over thirty (30) books about wild horses and has been attending wild horse gathers since 2001;

- Sally Summers ("Ms. Summers"), the founder of Horse Power, a non-profit organization that focuses on the preservation of wild mustangs and burros in the State of Nevada;

- Robert Bauer ("Mr. Bauer"), an individual who has attended several prior gathers in different states;

- Elyse Gardner ("Ms. Gardner"), an individual who has attended several prior gathers and adopted a wild mustang from one of them and who currently sponsors other individuals interested in adopting wild horses;

- Laura Leigh, the plaintiff in this action;

- Alan Shepard ("Mr. Shepard"), the State of Nevada BLM Program Lead who oversees state compliance with national policy and program directives;

- Ben Noyes ("Mr. Noyes"), the Wild Horse and Burro Specialist for the Ely District of the BLM who presided over and managed the Silver King Gather;

- Patricia Bute ("Ms. Bute"), an employee of the BLM who was the public information officer for the Silver King Gather;

- Lili Thomas ("Ms. Thomas"), the Wild Horse and Burro Specialist for Reno, Nevada who operated as the Contracting Office Representative ("COR") for long-term holding contract facilities; and

- Heather Emmons ("Ms. Emmons"), a public affairs officer with the BLM who handled public outreach and media relations for the Silver King Gather.

The testimony at the hearing was limited solely to the public's historical right of access to wild horse gather activities; the role the public plays in the function of gather activities; and the viewing and access restrictions by the BLM at the Silver King Gather and at the Broken Arrow temporary

holding facility. The court also admitted several items of documentary evidence including:

- the U.S. Department of Interior's Observation Protocol and Ground Rules for the Silver King Wild Horse Gather, Exhibit 500;

- the Protocol and Ground Rules for the Silver King Wild Horse Gather on Non-Observation Days, Exhibit 501;

- a BLM news release dated February 1, 2013, Exhibit 502;

- a U.S. Department of Interior, Bureau of Land Management internal memorandum, Exhibit 503;

- several photographs taken at the Silver King Gather by testifying witness Ben Noyes of the BLM, Exhibit 504;

- several photographs taken at the 2010/2011 Calico Gather by testifying witness Heather Emmons, Exhibit 505;

- a book entitled "Phantom Stallion" written by testifying witness Terri Farley, Exhibit 2;

- several photographs taken by plaintiff Leigh at the Silver King Gather - previously submitted and admitted by the court at the November 16, 2010 hearing, Exhibit 3 & 4; and

- an Email dated September 1, 2010, concerning the BLM's proposal to terminate public tours at the Broken Arrow facility, Exhibit 5.

**I.  The Court's Present Order**

This order follows the foregoing factual and procedural background. The court must now decide a motion that was filed two and a half years ago. This action began with the filing of Leigh's complaint and a motion for a temporary restraining order that was denied by the court. Then, Leigh filed her amended motions for which the court held its initial hearing. The essence of that hearing did not concern future roundups in the Silver King Herd Management Area,[4] but concerned only the September 2010 roundup.

---

[4] At no time has the court been advised of any further proposed gathers at Silver King.

The quandary now facing the court is that it must determine whether to grant preliminary injunctive relief to future gathers in the Silver King Herd Management Area based solely on the BLM's past restrictions. The court does not have any evidence before it that another gather will take place, or what viewing and access restrictions would be imposed by the BLM if one was planned. Thus, the court is limited to determining whether the restrictions placed on Leigh and the members of the public at Silver King in September 2010 would be unconstitutional if the same restrictions were applied to a future gather at the same location providing the same viewing areas. This order can really only provide guidance to the parties for future possible restrictions at a future unknown gather based solely on the evidence of the limited viewing restrictions placed on Leigh and other members of the public in September 2010, and only for the specific trap location used at the 2010 Silver King Gather.

## II.   Legal Standard

### A.  Preliminary Injunctive Relief

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winters v. Natural Res. Def. Council*, 129 S. Ct. 365, 376 (2008) (*citing Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). A court may grant a preliminary injunction upon a showing of: (1) irreparable harm to the petitioning party; (2) the balance of equities weighs in petitioner's favor; (3) an injunction is in the public's interest; and (4) the likelihood of petitioner's success on the merits. *See Winters*, 129 S. Ct. at 376 (citations omitted).

Generally, "[t]he sine qua non of [a court's injunctive] inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). However, a plaintiff may be awarded a preliminary injunction by establishing "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor" so long as the plaintiff satisfies the additional *Winters*

1  factors including irreparable harm. *Alliance for Wild Rockies v. Cottrell*, 622 F.3d 1045, 1050 (9th
2  Cir. 2010).

3      To establish irreparable harm, a plaintiff must show that an irreparable injury is *likely*, not
4  merely *possible*, before a preliminary injunction may be issued. *American Trucking Ass'ns v. City*
5  *of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (reversed on other grounds *American Trucking*
6  *Ass'ns v. City of Los Angeles*, 596 F.3d 602 (9th Cir. 2010)) (emphasis added).

7      **B.  First Amendment Right of Access to Government Activities**

8      The First Amendment prohibits any law "abridging the freedom of speech, or of the press."
9  U.S. Const. Amend. I. Although the First Amendment does not enumerate special rights for
10  observing government activities, the Supreme Court has continually recognized that newsgathering
11  is an activity protected by the First Amendment. *See e.g., Branzburg v. Hayes*, 408 U.S. 665, 681
12  (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be
13  eviscerated.").

14      To provide necessary First Amendment protections, the Supreme Court has recognized a
15  qualified right of access for the press and public to observe government activities. *Leigh*, 677 F.3d
16  at 898. Specifically, in *Press Enterprise II*, the Supreme Court articulated a two-part test for right
17  of access claims. "First, the court must determine whether a right of access attaches to the
18  government proceeding or activity by considering (1) 'whether the place and process have
19  historically been open to the press and general public' and (2) 'whether public access plays a
20  significant positive role in the functioning of the particular process in question.' Second, if the
21  court determines that a qualified right applies, the government may overcome that right only by
22  demonstrating 'an overriding interest based on findings that closure is essential to preserve higher
23  values and is narrowly tailored to serve that interest.'" *Leigh*, 677 F.3d at 898 (quoting *Press*
24  *Enterprise II*, 478 U.S. at 8-9).

25  ///
26  ///

13

III.     **Discussion**

At the Silver King Gather, the BLM placed certain viewing restrictions on plaintiff Leigh and other members of the public at the September 28, 2010 public observation day. These restrictions included (1) having to remain within the designated viewing areas during the duration of gather activities and (2) using snow fencing on the jute wings and trap sides.

For the September 28, 2010 public observation day, the BLM designated two viewing areas where members of the public, including Leigh, viewed the gather activities. All members of the public, including Leigh, were required to stay within the boundaries of the designated areas throughout the course of that day's gather activities. The first designated area sat on a high ridge next to where the trap was located and overlooked the jute wings which were at the bottom of the ridge, about 300 feet from the observation area. This location provided a view of the initial stages of gathering activity and allowed members of the public to observe the helicopters driving the horses for several minutes prior to being funneled into the jute wings. However, this first location did not provide a view of the actual holding corral, or trap.

To allow observation of the horses once inside the holding trap, a second, lower observation area was designated by the BLM. The second location was further down the ridge and closer, and overlooked the entire holding corral, the entirety of which was covered in snow fencing. This second location was roughly 100 feet away from the trap and allowed members of the public to see horses inside the trap. However, the location was not close enough, and did not provide an unobstructed view because of the snow fencing, so that Leigh could identify horses by their individual markings or observe any injuries.

All observers were restricted to the first viewing location when the helicopter was in the air and the horses were being driven. However, when the helicopter was not in the air and the horses were in the corral, observers were allowed to move to the second, lower observation area to observe the horses in the corral until such time as gather activities resumed. The issue in this action is whether these viewing restrictions were unconstitutional. The court shall address both *Press*

*Enterprise II* factors below.

**A.  Public Right of Access and Positive Role in Function**

Initially, the court must determine whether wild horse gathers have historically been open to the press and general public and whether public access plays a significant positive role in the function of those gather activities. *See Press Enterprise II*, 478 U.S. at 8-9.

The court has reviewed the documents and pleadings on file, as well as the testimony of the witnesses at the two hearings in 2010 and 2013, and finds that historically, subject to a variety of restrictions, the press and general public have had access and a right to be present at wild horse gathers on public land.[5] Further, the court finds that public access contributes to the purpose and functioning of the gathers. These findings are supported by the testimony at the hearings as well as the BLM's own policy directives of holding guided public observation days of gather activities subject to limitations based upon considerations of safety and non-interference. For example, at the February 2013 hearing, Ms. Farley testified that she has been attending wild horse gathers throughout Nevada and California since 2001, and that in her experience these gathers have been open to the public. Ms. Summers similarly testified that she has been attending wild horse gathers for several years and that the public has always had access to view gather activities. Similar testimony was elicited from Mr. Bauer, Ms. Gardner and plaintiff Leigh.

Further, the evidence before the court establishes that public access to gather activities plays an important role in the function of the gather, namely protecting the interests of the overpopulated horses and news gathering for the benefit of the public. Perhaps no function is better fulfilled by public access than in the realm of post-gather adoptions of wild horses. Ms. Gardner testified about her own experience in adopting one of the wild mustangs after she attended a horse gather - one of many examples testified to at the hearing. Because of that experience, Ms. Gardner testified that

---

[5] The court focuses and limits its findings and conclusions of historical public access to gather activities conducted on public lands. The court views gathers conducted on private land, which was not an issue at the Silver King Gather, to include other issues and factors including the rights of third-parties who are not currently before the court.

she has continued to visit wild horse gathers to help facilitate and sponsor future adoptions. Moreover, as plaintiff Leigh testified, public access allows individuals to report on the government's activities as well as the health and condition of the gathered horses.

Finally, the court notes that both Mr. Shepard and Mr. Noyes testified on cross-examination that they believed the public has a right of access to gather activities and that public access plays a significant role in the function of those gathers and their purpose. Moreover, in a formal policy memorandum issued by the BLM dated January 23, 2013, the BLM sets forth its national policy for the public and media to attend and observe gather operations on public land. Ex. 503. Thus, the court finds that, subject to limitations, wild horse gathers have historically been and remain open to the press and general public and public access plays a significant positive role in the function of gather activities. As such, the public has a right of access to gathers upon public lands.

**B.  Narrowly Tailored Restrictions**

Because the court has found that there is a public right of access to wild horse gathers and that public access plays a significant role in the functioning of gather activities, the court must now determine whether the viewing restrictions imposed on Leigh were narrowly tailored to serve the government's overriding interests. *See Press Enterprise II*, 478 U.S. at 9. Under the narrowly tailored framework, "a court cannot rubber-stamp an access restriction simply because the government says it is necessary." *Leigh*, 677 F.3d at 900. Rather, courts "have a duty to conduct a thorough and searching review of any attempt to restrict public access." *Id*.

In this action, the government has identified two important overriding interests: (1) the effective and efficient gather of the horses; and (2) the safety of all individuals including those involved in gather activities, members of the viewing public, and the horses themselves. Based on the record before the court, the court finds that these overriding interests of the government were appropriately served by the viewing restrictions placed on Leigh and other members of the public as addressed below.

///

1    In his testimony before the court, Mr. Shepard identified that the BLM's major concern is

2  an effective and efficient gather. To conduct an effective and efficient gather, in this case of over

3  five hundred wild horses, the BLM's critical determination is that of the placement and location of

4  the trap. This is because a good trap location is essential to ensuring the overall success of the

5  gather. According to Mr. Shepard, the BLM and its contractors consider a good trap location as one

6  that is hidden from the horses' view until they are close to, or already within, the jute wings so that

7  they cannot change direction and escape. Both Mr. Shepard and Mr. Noyes testified that within

8  each herd management area, the natural topography, terrain, vegetation and access play an integral

9  role in trap placement, such that all other concerns become secondary. And the Silver King Gather

10  was not an exception to these considerations. Thus, based on the natural terrain at Silver King, the

11  trap was placed near a small hill and ridge so that horses being driven along the ridge by the

12  helicopter would not see the trap until they were already inside the jute wings.

13    The locations of the viewing areas, the first on the ridge overlooking the jute wings and the

14  second overlooking the trap itself, naturally arose from the trap's placement. Several BLM

15  employees testified that these viewing locations allowed for the public to see the horses, but kept

16  the public hidden so that the horses would not spook or be diverted away from the trap area. Mr.

17  Shepard, in particular, testified about the need to keep the public hidden from view for the same

18  reasons that the trap must be hidden, so that the horses do not become spooked or shift away from

19  the trap location, or even worse, drive the herd towards the public. Different placement of the

20  viewing locations - closer to the trap and in the open, for example - would have defeated the

21  purpose of hiding the trap and would have frustrated the purpose of the gather. The court finds that

22  the evidence elicited from the BLM employees supports the court's finding that the placement of

23  the designated viewing areas above and away from the jute wings and trap was narrowly tailored to

24  allow for the effective and efficient gather of horses.

25    Additionally, when testifying about the designated viewing areas, the BLM employees

26  continuously cited the need for safety - not just of the viewing public, but also of the BLM

employees and contractors, and the horses themselves - in placing the viewing public away from and above the horses, hidden from view. It is undisputed that the Silver King Gather used helicopters to drive the horses and that the use of helicopters involves unique and inherent safety concerns. For example, Mr. Shepard testified that the BLM placed the viewing locations above the gather path and away from the helicopter's flight path because of the danger of flying debris that can be picked up by the helicopter's draft. Further, Mr. Shepard testified that because the Silver King Gather was using helicopters, the BLM had to abide by FAA regulations which included a minimum safe distance for non-essential personnel - i.e., the viewing public - from the helicopter's flight path. Mr. Shepard testified that the two designated viewing locations complied with his understanding of these FAA guidelines.

Finally, the remaining BLM employees cited other safety hazards present at the Silver King Gather which necessitated keeping the general public a safe distance away from the horses. These other hazards included the use of large equipment including semi-trailers and truck trailers, failure of the trap or holding pens to contain the horses, and the unpredictability of the wild horses themselves. An additional hazard arises from the wranglers, who are on horseback, their horses and equipment, and the need to pursue or cut off any escaping wild horses. The court finds that the placement of the viewing areas sufficiently accounted for these safety concerns and did so in a reasonable and narrowly tailored way to still allow the public to observe the gather activities and the horses after having been gathered.

As to Leigh's challenge about the use of snow fencing, the court finds that it was likewise narrowly tailored to serve the government's overriding interest of safety. Mr. Shepard testified that the BLM uses snow fencing on the holding pens and trap walls to provide a visual barrier between the horses and contracting personnel working on the other side of the trap. This visual barrier helps calm the horses so that they do not become spooked and run into the holding panels or gates and injure either themselves or the individuals on the other side of the fencing. Further, Mr. Shepard testified that the snow fencing also helps minimize interaction between the horses held in separate

holding pens allowing for calmer horses and smoother gather operations.

The court finds that these limited viewing restrictions were narrowly tailored to serve the government's overriding interests of safety and the effective and efficient conclusion of gather activities. Therefore, these restrictions did not infringe on Leigh's First Amendment rights of access to government activities. The court notes that because of these restrictions Leigh was not able to take the pictures she wanted, and was not provided an unobstructed view of the horses close enough to identify them by their markings. However, in light of the aforementioned concerns present at the Silver King Gather, these limited restrictions were reasonable. Therefore, the court finds that Leigh's First Amendment rights were not violated by the restrictions to her access at the Silver King Gather.

Finally, the court recognizes from the testimony provided that all wild horse gather locations are different and present unique challenges to the BLM and its contractors based on the natural topography and terrain of the location. Thus, the court cannot define in broad terms what constitutes reasonable access for future wild horse gathers. To define what would be reasonable or constitutional access as to future gathers would require both speculation and judicial activism, which is not the role of the court. Rather, the court can only pass on whether there has been a constitutional violation which infringes upon speech or public access, and here, there has been no constitutional violation.

### C. Post-Gather Holding Facilities

Leigh also challenges certain observation restrictions placed on public access to the Indian Lakes Road Short-Term Holding Facility, also known as Broken Arrow, in Fallon, Nevada, including limited public observation days and the inability to walk around at the facility.

There is an important distinction between gathers conducted upon public property where the public ordinarily enjoys full access and follow-up activities conducted by private contractors on private property. The Broken Arrow facility is a privately owned and operated facility which operates under contract with the Government.  As such, the public has not had a right of access

relative to Broken Arrow and other such facilities. Moreover, the owners and operators of the Broken Arrow facility are not before the court and the court is without jurisdiction over them.

There also are concerns relative to the security of such short term holding facilities and their exposure to those who may be intent on either destroying or disrupting them.  In the late 90's, the working portion of the holding facility in Burns, Oregon, was destroyed by what was believed to have been a bomb.  Additionally, many horses were released. Since then, in another holding facility in Litchfield, California, a fire bomb exploded in the hay storage portion of the facility and resulted in the destruction of all hay being stored therein.  A second undetonated bomb was discovered under the office trailer on the property. And, in another facility operated by the BLM in Palomino Valley, Nevada, fences were cut and horses were subject to escape.  Such safety threats and disruption obviously lead to restrictions upon public access to such facilities.

With regard to the Broken Arrow facility, limited public tours have been provided by the BLM with two BLM employees assigned to conducting such tours. Tours were discontinued at the Broken Arrow facility in the second half of 2010, and in 2011 and 2012 there were only seven tours, each tour lasting no more than two hours.  The touring group of up to fifteen members is escorted by a BLM employee who does not work at the facility and who guides the attending public through the facility in a structured presentation.  It also appeared to the court that there was vacillating interest in such tours, with at least some of the seven Broken Arrow tours in 2011 and 2012 involving only two or three persons, some of whom had previously attended a tour.  Such tours are also expensive to the Government.  Under its contract with the Broken Arrow operators, the BLM incurred nineteen hundred dollars ($1,900) in expense for each tour conducted, including those where only two or three people attended.

Based upon the threshold criteria under *Press Enterprise II*, the operation of the short term holding facilities - which include Broken Arrow - have not been open to the press and general public, and, as such, no qualified right of access arises. Accordingly, Plaintiff's First Amendment claims to such access, while clearly understandable and worthy of great respect, must fail.

1    IT IS THEREFORE ORDERED that Plaintiff's Remanded Amended Motion for

2  Preliminary Injunction (#16) is DENIED.

3    IT IS SO ORDERED.

4    DATED this 19th day of July, 2013.

5

6                                                    _____
                                                     LARRY R. HICKS
7                                                    UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

21