1

1        UNITED STATES DISTRICT COURT
               DISTRICT OF NEVADA
2     BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4  LAURA LEIGH,                    :
                                   :
5        Plaintiff,                :No. 3:10-cv-597-LRH-VPC
                                   :
6     vs.                          :
                                   :
7  KEN SALAZAR, et al.,            :
                                   :
8        Defendants.               :
   _____  :
9

10

11     PARTIAL TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING

12              (Testimony of Terri Farley,
                Sally Summers, Robert Bauer,
13              Elyse Gardner, Laura Leigh)

14

15                  February 19, 2013

16

17                   Reno, Nevada

18

19

20

21

22

23  Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
                           Certified Realtime Reporter
24                         400 South Virginia Street
                           Reno, Nevada  89501
25                         (775) 329-0132

2

```
 1    APPEARANCES:

 2    For the Plaintiff:      GORDON COWAN
                              Attorney at Law
 3                            Reno, Nevada

 4

 5    For the Defendants:     ERIK PETERSEN
                              U.S. Department of Justice
 6                            Washington, DC

 7                            NANCY S. ZAHEDI
                              Department of the Interior
 8                            Sacramento, California

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                        I N D E X

2    PLAINTIFF'S WITNESSES:                        PAGE:

3    TERRI FARLEY

4         Direct by Mr. Cowan                          4

5         Cross by Mr. Petersen                        39

6    SALLY SUMMERS

7         Direct by Mr. Cowan                          43

8         Cross by Mr. Petersen                        60

9    ROBERT BAUER

10        Direct by Mr. Cowan                          61

11   ELYSE GARDNER

12        Direct by Mr. Cowan                          74

13        Cross by Mr. Petersen                       102

14        Redirect by Mr. Cowan                       104

15   LAURA LEIGH

16        Direct by Mr. Cowan                         109

17        Cross by Mr. Petersen                       150

18

19

20   EXHIBITS:

21      PLAINTIFF'S                      FOR ID/RECEIVED

22         2- "Phantom Stallion" book          18

23         3- Photos                          125

24         4- Photos                          125

25

4

1          RENO, NEVADA, FEBRUARY 19, 2013, 9:18 A.M.

2                          --oOo--

3                    P R O C E E D I N G S

4

5                       **TERRI FARLEY,**

6           called as a witness on behalf of the

7           Plaintiff, having been first duly sworn,

8            was examined and testified as follows:

9

10                  **DIRECT EXAMINATION**

11  BY MR. COWAN:

12  Q.    Good morning, Ms. Farley.  How are you?

13  A.    I'm good.

14  Q.    I'm sorry.  It's Mrs. Farley; Yes?

15  A.    Whatever.

16  Q.    Can you just -- well, let me ask you this.  Do you

17  reside in Nevada?

18  A.    I do.

19  Q.    How long have you lived here?

20  A.    Thirty-five years.

21  Q.    Okay.  And what is your occupation?

22  A.    I am a full-time writer and journalist.

23  Q.    Okay.  What kind of stuff do you write?

24  A.    I've written 36 books about wild horses; 24 of

25  those are fact-based fiction that take place in the Calico

5

1    Range in Nevada.

2         And I also write for -- nonfiction for a variety of

3    magazines, most recently Nevada Magazine.

4    Q.    Okay.  And can you tell the Court, please, how many

5    books authored by you that have been sold and where?

6    A.    My -- I'm very fortunate that my publisher is

7    HarperCollins, and my books are in many countries around

8    the world.  And they've sold well over two million copies.

9    Q.    Okay.  Are one of the books that you've sold in

10   front of you today?

11   A.    Yes.

12   Q.    And do you have a circulation number for this

13   particular book?

14   A.    It's the best selling, so it's someplace in that

15   two million.  It's leading the herd.

16   Q.    All right.  And is it published in languages other

17   than in English?

18   A.    Yes.  Most recently Hungarian.

19   Q.    How many languages?

20   A.    I think 27.

21   Q.    All right.  And so do you have knowledge, then,

22   that your books are distributed, in essence, worldwide?

23   A.    Yes, they are.

24   Q.    The information that you obtained, let's say, in

25   this book that's in front of you -- by the way, let me

6

1   ask.  Is this your first book that was published?

2   A.    This is my first book for young readers.

3   Q.    Okay.  Not the first book you published?

4   A.    No.

5   Q.    All right.  First book for young readers for --

6   involving wild horses?

7   A.    Yes.

8   Q.    All right.  And can you tell the Court the

9   background of how you became involved in writing this

10  book?

11  A.    Well, as a child, I was involved in Wild Horse

12  Annie's letter-writing campaign.  And I've always cared

13  about horses, wild or domestic.

14          And when I moved to Nevada, I met Wild Horse Annie,

15  very shortly before her death.  And I thought that this

16  was a story that needed to be revitalized.  Because when I

17  was a little girl, most of the action adventure stories

18  that had horses in them featured boys as the main

19  characters.  I shifted to a sort of a female Indiana Jones

20  who is 13 years old for mine.

21          But because my background is in journalism and a

22  master's in journalism, I did want it to be fact based.

23  So I did a lot of research on the range and with BLM.

24  Q.    Okay.  And is this book a work of fiction?

25  A.    It is.

7

1    Q.    Okay.  Is it based on events that you personally

2  observed?

3    A.    Many of them.

4    Q.    All right.  And when you were making these

5  observations, can you give us a rough timeframe when you

6  were out there on the range?

7    A.    I was out on the range on my own quite a bit in the

8  Calico area at the edge of the Black Rock Desert.

9          I also went out to two Calico complex roundups with

10  BLM as my guide.  We would -- would you like me to go on

11  from there?

12    Q.    Sure.

13    A.    Okay.

14    Q.    Go ahead.

15    A.    We usually met at Brunos, the restaurant in

16  Gerlach, restaurant/coffee shop.  And Maxine Shane and

17  Bryan Fuell and Tom Seley and various other people were

18  out there, and we met there.  We had biscuits and gravy

19  and coffee and kind of -- they laid out the day for me.

20          And then I would ride in one of their trucks out to

21  the capture site outside of Gerlach.

22    Q.    Okay.  Let me just ask you a couple of -- when you

23  say "their trucks," you mean a BLM truck?

24    A.    Yes.

25    Q.    All right.  And then the individuals that you

8

1    identified, like Tom Seley and others, can you tell us who

2    they are?  Who they're related with?

3    A.    Maxine Shane was the communications officer.  Her

4    name is on most of the press releases you'll see from

5    the '90s into the mid 2000, like 2008, I think.  And she

6    was very helpful to me.

7         And she hooked me up with some of these other

8    people.  And I can't tell you exactly what their titles

9    are.  I don't recall.  I know that Bryan is still out in,

10   I think, Elko working.  Tom may have retired.  I'm not

11   sure.

12   Q.    All right.  So they're BLM employees?

13   A.    Yeah.  But they're all BLM employees.  And now in

14   management positions.

15   Q.    Can you tell the Court just your experience, in

16   terms of whether it was pleasant or difficult?

17             MR. PETERSEN:  Objection, Your Honor.

18   Relevance.  Your Honor, the plaintiff in this case needs

19   to show that there's been historical access to gathers and

20   that there's been public benefit.  I don't see where this

21   line of questioning is going to either of those points.

22             THE COURT:  All right.  Would you rephrase your

23   question, Mr. Cowan, and then I'll rule on it.

24             MR. COWAN:  Okay.

25

9

1    BY MR. COWAN:

2    Q.    Was your -- well, let me back up with a preparatory

3    question; and that is, what timeframe are we talking about

4    during this meet?

5    A.    2001/2002.

6    Q.    Okay.  All right.  And so during this period of

7    time, did you have any -- well, describe, again, for the

8    Court, if you will, whether or not this was a good or

9    pleasant experience for you as a member of the public.

10                MR. PETERSEN:  Objection, Your Honor.  Same

11   basis.

12                THE COURT:  I appreciate your objection.  But

13   I'll allow some limited discussion concerning why she was

14   there and what her personal enjoyment was because I think

15   it bears upon the issues related to public access.

16                MR. PETERSEN:  Thank you, Your Honor.

17                THE WITNESS:  The BLM was aware of my project.

18   They knew that I was writing both nonfiction and fiction

19   for a wide audience.  And they allowed me access to them

20   verbally during our breakfast meetings.

21           And then when we went out to the range -- and all

22   of these gathers were on public lands.  They didn't give

23   me an escort.  They pretty much turned me loose with my

24   notebook and camera.  And I was allowed to -- you know,

25   clearly if you know anything about horses, you don't stand

1    in the mouth of the trap.  But, you know, they thought

2    that I would stay a reasonable distance from the action.

3    I did.

4         When there was trouble -- and there was trouble.

5    One -- the first drive there had been heavy snowfall.

6    When the helicopter got down low behind the horses, it

7    created a blizzard, and the horses scattered from the

8    mouth of the trap.  When trouble happened, usually someone

9    from BLM would explain to me what was going on.  And I

10   took notes.

11        Now, yes, it was an interesting experience.  I

12   didn't approve of everything they were doing.  They didn't

13   agree with my viewpoint.  But it was very civil and

14   collegial, almost.

15        And at the time, the horses were brought in at a

16   trot.  And my impression, and I've got it in my book, was

17   that, more than anything, these horses had been gathered

18   that morning, and they were looking back at the helicopter

19   with annoyance.  They did not look panicked.  They were

20   not at a dead run.  They were not lathered up.

21        And so -- and then after -- I was there all day.

22   The horses also were not -- they were just put into the

23   trap and left there, and horses were added to that group

24   as the day went on.  And the horses were not divided into

25   gender groups.  They were just left there.

1        And I was told that they were often left there in
2   these pens on the range up to 48 hours.  I can attest to
3   24 hours because I was there overnight in Gerlach, and the
4   horses were still out there.
5   Q.    Okay.  And so when you're able to describe some of
6   this stuff, like helicopter raising some snow up off the
7   ground, how far were you from the trap?
8   A.    Not far at all.  It varied because I was, let's
9   say, from ten feet to two blocks, two city blocks away,
10  depending on where I wanted to be, as long as I was not --
11  I don't recall ever being reprimanded for being in the
12  wrong place at the wrong time.
13  Q.    Okay.
14  A.    So my access was unlimited.  I saw what happened to
15  the horses.  And later -- I guess I'll contrast that, how
16  it is now.
17        But there was nothing to -- there were not trucks
18  in my way.  There were not panels against the fences.
19  They were the green pipe fences that, you know, the horses
20  are herded into.  And then the jute.
21        But, I mean, there was no obstruction of my view.
22  And if I wanted to get up higher, I was not reprimanded
23  for doing so.
24  Q.    All right.  And so your access that you described,
25  did it cause any animals to get hurt?

12

1   A.    No.

2   Q.    The access you described, did it cause any

3   employees to become injured or hurt?

4   A.    No.  I'm sure I would have been reprimanded, if

5   that were the case.

6   Q.    The access that you described, did it cause any

7   members of the public to become injured or come in harm's

8   way?

9   A.    No.

10  Q.    All right.  And did you appreciate the access that

11  you had during that time?

12  A.    Absolutely.  Although, like I said, BLM employees

13  and I had differing opinions on things, I was treated as a

14  professional.  And, in fact, I dedicated my first book to

15  three of these BLM employees.

16        And I have to tell you that if I felt I had been --

17  my access had been blocked in a way that I was not seeing

18  the true story, or that I saw intentional abuse of the

19  horses, I would not, would not have dedicated my first

20  book to them by name.

21  Q.    Okay.  So in the book that is in front of you, the

22  one that you're --

23        MR. PETERSEN:  Your Honor, with the Court's

24  indulgence, I'll reiterate my objection.  This is

25  irrelevant testimony.

13

1          THE COURT:  Well, let him finish his question,

2   and then I'll rule on the objection.

3   BY MR. COWAN:

4    Q.    All right.  Can you tell me the individuals that

5   you dedicated the book to that are actually mentioned in

6   the book?  And I would refer you to the copyright page.

7    A.    Yes.  Many people helped turn Phantom Stallion from

8   a dream into a book.  And then I list several people,

9   including Maxine Shane, Tom Seley, and Bryan Fuell.  And I

10  say that they provided inspiration and expertise.

11   Q.    And that's because you had -- was that because you

12  had reasonable access to the trap at the time?

13   A.    Yes.  I don't -- I wouldn't have been able to write

14  what I did -- well, the way I like to write, as I say,

15  fact-based fiction.  I didn't create this out of my

16  imagination.

17   Q.    Okay.

18   A.    I was able to do it so that readers would see a

19  valid picture of what's going on.

20   Q.    Okay.

21          THE COURT:  Mr. Petersen, I anticipate that

22  your objection is to the admission of the book.  It

23  strikes me that the -- Mrs. Farley's testimony indicates

24  that there's both fact and fiction, and there's

25  obviously -- I would assume that it's interlaced in that

14

1   fashion throughout the book.

2        And so I would be disinclined to admit it, if

3   that's what your proffer's going to be, Mr. Cowan, because

4   it strikes me that it's difficult to separate the fact

5   from the fiction.  We have the witness' testimony here as

6   to what she did and didn't see and what her access.

7        And she'll be subject to cross-examination.  But

8   the book's not subject to cross-examination.  And in light

9   of the fact that it contains some fictional material, I

10  would be disinclined to admit it.

11       If you can establish a greater foundation than

12  that, or, Mr. Peterson, if you want to add a greater

13  objection to it, I'll let you do that.

14            MR. PETERSEN:  Yes, Your Honor.  Well, thank

15  you for that.

16       I also would object to the continuing testimony

17  which, as far as I can tell, is attempting to establish a

18  comparison between how one person was treated in 2012,

19  which, of course, was eight years before the gather in

20  question.

21       Again, what the plaintiff has been tasked by the

22  Ninth Circuit to establish is the history of public

23  access, which, at least with regard to this individual,

24  has been established in the early 2000s, and whether or

25  not that was a public benefit.

15

1          Any sort of questioning relating to how close she

2     got to a particular horse, or anything like that, is

3     irrelevant to today's inquiry.

4               THE COURT:  Well, my view is, is that the

5     extent of her access is a topic for today as it would be

6     relevant to the issue before the Court concerning access

7     questions.  And I would allow her to testify to that.

8     Although she certainly has testified to a good significant

9     part of it.

10          But I'll just let you go forward, Mr. Cowan, with

11    what you wish.

12          And, Mr. Petersen, you can object as you wish.

13    Maybe we need some greater focus here as to what we're

14    objecting to and what the issue is.

15    BY MR. COWAN:

16    Q.   Can you tell us, Ms. Farley, your impression of the

17    public benefit that this book has given the public or your

18    follow -- let me back up.

19          Do you have a following that buys these books?

20    A.   I'm very fortunate to have a large following of

21    children, their parents, teachers, librarians.

22          And, you know, one of the reasons I feel

23    comfortable being here is because my readers worldwide

24    place a great value on the wild horses.  Some of it is

25    what they've learned from my work; some of it, I think, is

16

1    almost intrinsic.  The wild horse is an iconic symbol of

2    the American West.

3          So they are horrified that the people who are

4    supposed to be protecting these horses are not.  They --

5                MR. PETERSEN:  Objection, Your Honor.

6    Speculation.

7                THE COURT:  Sustained.  That's speculation --

8                THE WITNESS:  Okay.

9                THE COURT:  -- and it's not qualified.

10               THE WITNESS:  The mail I get indicates that

11   they like it when --

12               MR. PETERSEN:  Objection, Your Honor.  Hearsay.

13               THE COURT:  Same.  Same ruling.

14               THE WITNESS:  Okay.

15   BY MR. COWAN:

16    Q.   What's your impression on that?

17               MR. PETERSEN:  Objection, Your Honor.

18               THE COURT:  I'll allow her to -- limited

19   testimony concerning her personal impression based on what

20   she's received.

21               THE WITNESS:  Over a hundred e-mails a week

22   have told me that children and other members of the public

23   put a great -- have great interest in wild horses of the

24   west.

25          And I'm here because they're not all here.  And I

17

1    am out there on the range because they can't all be out on

2    the range.

3    BY MR. COWAN:

4    Q.    Has this book been distributed in Washoe County

5    schools?

6    A.    Yes.

7    Q.    What grades?  If you know?

8    A.    Usually third and fourth grade up.

9    Q.    Okay.  Have you given talks or -- as an author, to

10   children in Washoe County?

11   A.    Nationwide and in Canada.

12   Q.    Okay.  Have you utilized this book here --

13   A.    Yes.

14   Q.    All right.

15   A.    And the role of the BLM in the books -- there's 24

16   books -- changes as it goes on.

17        One thing I didn't mention is that one of the main

18   characters, the lead BLM character, is named after Bryan

19   Fuell.  It -- she was something else.  I can't remember

20   her name.  And she turned into Brenna because of how much

21   he helped.  And he had some -- some real-life changes I

22   made to the plot line on his recommendation.

23        Yeah, the books -- as I said, I'm very fortunate.

24   They're a lot of places.

25   Q.    Okay.

1          MR. COWAN:  Your Honor, I would offer it.  I

2   would offer it on the fact that it's not being offered for

3   the truth of it but rather that it's a book that it's

4   almost a literally classic among children, beginning with

5   Washoe County and, as the witness has said, worldwide, who

6   sit and read this and understand that this is -- this is

7   an introduction to an iconic symbol of the American West,

8   the American wild horse.

9          It's for that purpose.  Not for the truth of the

10  content of it.  And we've established she's the author.

11          THE COURT:  All right.

12      Mr. Petersen?

13          MR. PETERSEN:  As long as the book's not being

14  entered for a factual basis, we don't have an objection.

15          THE COURT:  And the Court would concur with

16  that.  I will admit the book.  But I will state expressly

17  that it is not -- and it is not being admitted for the

18  truth of any matter asserted within the book.  It's being

19  admitted for purposes of relevancy to public interest,

20  which has certainly been established by Ms. Farley's

21  testimony.

22                  (Plaintiff's Exhibit No. 2,

23                   received into evidence.)

24          MR. COWAN:  All right.  Thank you, Your Honor.

25

1    BY MR. COWAN:

2    Q.    Now, do you have -- have you been out to the range

3    to view wild horses other than the experience that you've

4    described to the Court involving Calico?

5    A.    Yes.

6    Q.    Okay.

7    A.    I have -- most of my experience has been on the

8    Calico Range because that's where my books take place.

9    I've also viewed the Twin Peaks roundups.

10         Of late, in January of 2010, I went back for a

11   roundup in the Calico complex.  And the only thing that

12   was the same was that we met at Bruno's.  The public was

13   met by armed rangers.  There -- we were not -- we did not

14   go inside the BLM.

15         There was a clipboard with names of people who were

16   allowed to be there.  If your name was not on the

17   clipboard, even if you had driven all the way out to

18   Gerlach, there was great discussion about whether -- who

19   could stay and who had to go.

20         We were told that -- we were warned that we were to

21   stay in our private vehicles.  We would convoy out to

22   private land where the horses were gathered.  This was

23   near the Soldier Meadows Ranch.

24         And there were white, I assume, BLM vehicles,

25   unmarked vehicles, that were interspersed through the

1    convoy of cars.  And any time the cars paused, the last

2    white trucks at the end of the line parked facing each

3    other at the end, so that no one could backtrack.  No one

4    could get off the road.

5         We were at all times -- before we even got in our

6    personal cars to go out to the gather site, the BLM

7    staffer in charge was in constant radio contact with the

8    independent contractors.  And I was standing close enough

9    that I could tell he was getting his directions from the

10   independent contractor, where we could go and when we

11   could go, when we had to move, stop, *et cetera*.

12        In addition, there were two helicopters rather than

13   the one.  And this is an area of rural Nevada that I have

14   ridden on horseback.  I spent a week a few years back,

15   actually in 2008, I believe, a week at the Soldier Meadows

16   Ranch.  And I had ridden that area.

17        That's one reason I was very frightened about this

18   roundup.  The terrain is terrible.  But that's not what

19   I'm here to testify about.

20        The choppers brought the horses in.  There were two

21   instead of one.  They were brought in at a full gallop.

22   The horses were lathered.  Their mouths were open.  Their

23   eyes were wide.

24        Even if you didn't know about horses, the red

25   nostrils and the clots of foam flying from their mouths,

21

1   the falling on the ice, it was a very high-stress

2   situation.

3            MR. PETERSEN:  Your Honor, objection.  This,

4   again, goes to relevance.  But in this case it's not about

5   a difference of the number or amount of access that a

6   person was given, but rather the witness is testifying to

7   the specifics of a horse gather that we're not here to

8   deliberate on.

9            THE COURT:  Mr. Cowan?

10            MR. COWAN:  Well, if it's a historical access,

11   the Ninth Circuit didn't say that we were limited here

12   today just to Silver King, but to historical access.

13   She's talking about her observations at another roundup.

14            THE COURT:  I'll allow the testimony to stand

15   where it is.

16       But I would caution you, Mr. Cowan, this is a

17   distinct roundup to what we have before the Court.

18   There's been no nexus between that one and this one.  And

19   so until there is, I would consider it to be inappropriate

20   to go into that.

21   BY MR. COWAN:

22    Q.   Well, then let me ask you this, then, ma'am.

23       Were there some of the same individuals, management

24   and persons from the BLM, present in your later voyage out

25   to the roundups as who you met at prior roundups?

22

1          MR. PETERSEN:  Your Honor, same objection.

2          THE COURT:  Sustained.

3          MR. COWAN:  I'm sorry.  Was that sustained,

4     Your Honor?

5          THE COURT:  It was sustained.

6          MR. COWAN:  Okay.  Thanks.

7     BY MR. COWAN:

8     Q.    So you had an impression over time, based on your

9     attendance at other roundups, that access had changed?

10    A.    Access had changed.  And speaking as somebody with

11    journalism background, I would say the presence of armed

12    guards, who made it very clear we were under observation,

13    had a chilling effect on the journalists who were there,

14    and certainly a -- from the people I talked with, a

15    frightening effect on some of the members of the public,

16    especially some of the older couples that were there.

17    Q.    Okay.  And so as a journalist who has written books

18    on this very subject, did you have an impression as to any

19    reason why your access had changed over time?

20    A.    I asked.  Because I thought that was part of the

21    story.  And I wasn't given anything specific.  They said

22    that there had been a terrorist threat --

23          MR. PETERSEN:  Objection, Your Honor.  Hearsay.

24          THE COURT:  Sustained.

25          MR. COWAN:  Okay.

1  BY MR. COWAN:

2  Q.    Any other information regarding -- well, let me ask

3  this.

4        Based on what you saw at other roundups, did you

5  report what you had seen to the public?

6  A.    Yes.

7  Q.    Okay.  How so?

8  A.    I -- are you asking me about the past roundups or

9  the comparison of the two?

10  Q.    The past roundups and also comparison.

11  A.    Yeah.  I reported fully on both of them.  And, in

12  turn, I was interviewed by the press as well.  And, you

13  know, but I was mainly there to write about it.  And it

14  had changed seriously.

15  Q.    And did you receive feedback from those -- the

16  public that you reported to or --

17  A.    Yes.

18  Q.    Okay.  And could you describe for us, just in

19  general, what some of the feedback was?

20  A.    I would say for the most part, because my earlier

21  books had been fairly positive, I mean, one of the main

22  characters is a manager of a -- a woman who is the manager

23  of a facility much like Palomino Valley, because I had

24  been fairly positive or at least even-handed about the

25  BLM, when I started writing about the real BLM and what

24

1    was going on on the range, there was a certain amount of

2    confusion from my readers.

3    Q.    Okay.

4    A.    As there was for me.

5    Q.    All right.  Did you -- well, when you looked back

6    on your conduct, your personal conduct, and you take a

7    personal inventory of how you -- how you were -- how you

8    presented yourself out there, could you put your finger on

9    any issue regarding your personality, or otherwise, that

10   you could conclude caused a change in their treatment of

11   you?

12   A.    No.

13   Q.    Okay.  Was it your impression that there was a

14   general attitude change towards those who came out to look

15   at horses?

16   A.    Yes.  We weren't allowed anyplace near the corrals.

17   And, again, this was all control -- before the BLM

18   staffers had been in touch with us, during the second

19   roundups at Calico and then at Twin Peaks, it seemed that

20   BLM was the filter for orders from the independent

21   contractors.

22   Q.    Okay.  And did that change?

23   A.    That was a huge change.

24   Q.    Okay.  Have you been to holding facilities where

25   they ship horses?

25

1    A.    Yes.

2    Q.    Your -- could you describe for the Court what your

3    access was, historically, at holding facilities and where

4    they were?

5    A.    Palomino Valley has always been pretty easy to work

6    with.  John Neill, you know, is -- when he was there, was

7    pretty easy to work with.

8         I had one really unpleasant experience at

9    Lichfield, during the Twin Peaks -- just before the Twin

10   Peaks roundup.  I adopted two horses from the Calico

11   roundup, and I had taken them to a sanctuary in

12   Shingletown by Mt. Shasta.  And I was driving back on

13   August 10th, 2010, which was the date that the Twin Peaks

14   roundup was supposed to start.

15        What I didn't know was that some legal action

16   delayed it for a day.  I did not know that.  I was making

17   arrangements to move the two Calico mustangs.  And since

18   you drive practically right by, I mean, you're, like, a

19   couple miles from Lichfield when you go through

20   Susanville, I decided to see if the facility was open and

21   to go in and see the horses they brought in.

22        I drove down there.  The gates to Lichfield were

23   wide open.  Nothing was happening.  I didn't see a soul,

24   and I didn't see horses.  So I did one lap in the public

25   area, turned around, and headed on toward home.

1          And I was about two or three miles down the road

2     when two white trucks with flashing lights pulled me over.

3     Two armed men, which I believe were rangers, BLM

4     rangers --

5               MR. PETERSEN:  Objection, Your Honor.

6     Speculation.

7               THE WITNESS:  Well, they identified themselves

8     as BLM.

9               THE COURT:  All right.  Go ahead.

10              THE WITNESS:  One came to the driver's side

11    window.  One stood on the other side of my car looking in

12    my windows into my back seat.  They requested

13    identification.

14         I asked why I had been pulled over.  And they said

15    because I had been in the Lichfield area.  I told them the

16    gates were open; I was under the impression a roundup had

17    taken place; and I wanted to see the horses.

18              They said the roundup was cancelled.

19              And I said, "Last I heard it was supposed to start

20    today."

21              They wanted to know why I was there, what right I

22    had to be there.

23              And finally for, I guess, credentials I pulled out

24    the two red tags that had been around my horses' neck and

25    said, "I just adopted two Calico horses.  I'm interested

1  in wild horses.  I was just checking to see -- to look at

2  the horses."

3       And they let me go.  But I have never been pulled

4  over and questioned like that for no reason.  I hadn't

5  broken any rules.  And they treated me like -- well,

6  again, let's go back to the chilling effect.

7       So that made me have a lot of interest in the Twin

8  Peaks roundup.  And I came back several times after that.

9  Q.   Okay.  Did you understand Lichfield was open to the

10 public at the time?

11 A.   Yes.  The gates were open.  And most wild horse

12 facilities, like Palomino Valley, like Lichfield, are open

13 to the public.  And there's usually someone in the office

14 that you can talk with if you do have questions.

15      And, again, because I thought the roundup was

16 taking place, I expected a lot of activity.

17 Q.   Okay.  Did you do anything while you were at

18 Lichfield to cause the rangers to come after you, that

19 you're aware of?

20 A.   Not that I'm aware of.

21 Q.   Did you get out of your car?

22 A.   No.

23 Q.   When you were in your car, were you driving in

24 areas that the public was entitled to be?

25 A.   It appeared so to me.

28

1    Q.    All right.  Did you report this experience to the

2    public, your viewers, your listeners?

3    A.    Not for a while.  And the reason I didn't is

4    because I was afraid that my access would be restricted to

5    the roundups.

6    Q.    Wait a minute.  Are you saying that because of how

7    you're being treated that you're concerned that your

8    access will be further limited if you report what you

9    actually see --

10             MR. PETERSEN:  Objection --

11   BY MR. COWAN:

12   Q.    -- as a journalist?

13             MR. PETERSEN:  -- leading.

14             THE COURT:  Sustained.

15   BY MR. COWAN:

16   Q.    Do you have an impression that your access would be

17   limited, for any reason, based on how you were treated?

18   A.    Yes.  Especially since most of the roundups now are

19   held on private land.  So there's a very easy, convenient

20   way to block reporters because private land you're

21   trespassing.

22   Q.    Okay.  I just want to understand this.

23        In other words, are you saying that where the traps

24   are located, are they on private land?

25   A.    Quite often.

1    Q.    All right.  But horses are, at least as far as you

2    can know, you can tell me if I'm right or wrong, they're

3    coming off BLM public lands into the private land traps?

4    A.    They are herded -- my observation -- and, you know,

5    I don't have a GPS in my brain.  But what I've been told

6    by BLM communications people, they're coming off private

7    land.  They are herded into the jute trap, the mouth of

8    the traps.

9          And those traps are on private land often.  Now,

10   it's not a hundred percent, but it's often.  And then the

11   horses are often held in holding pens that are also on

12   private land.  So access is restricted by the property

13   owners.

14   Q.    Okay.  Did you have any other discussions --

15              THE COURT:  Mr. Cowan, I'm going to ask if

16   you'll move the microphone a little closer to you because

17   some of our recording equipment is not picking it up

18   completely.

19   BY MR. COWAN:

20   Q.    Okay.  Do you recall any other discussions or

21   comments with the BLM rangers that had pulled you over at

22   Lichfield?

23   A.    They told me -- and when I asked -- just a second.

24   I've got a quote.  One of the -- the ranger who was

25   speaking to me on the driver's side explained that they

30

1    had been expecting trouble at Lichfield.  But he wouldn't

2    be more specific.

3    Q.    Okay.  And trouble is not your name; correct?

4              MR. PETERSEN:  Objection.

5              THE COURT:  Sustained.

6              MR. COWAN:  I will withdraw that.

7    BY MR. COWAN:

8    Q.    Did you feel intimidated when you were out at --

9    out there?

10   A.    I was out in the middle of -- there's kind of an

11   open area between Susanville and the next town.  And it --

12   yeah, I did.  It's -- it's intimidating.  I'm not used to

13   being approached by armed men and questioned.

14   Q.    You're a woman by yourself; yes?

15   A.    There was a photographer with me.

16   Q.    Okay.  And is it a remote area?

17   A.    Somewhat.  It's rural.

18   Q.    Okay.

19        Just a moment, Your Honor.

20        Have you had other experiences with roundups and

21   the BLM or holding facilities and the BLM?

22   A.    I've been to several -- probably seven or eight

23   roundups, mostly Calico and then Twin Peaks.  So those are

24   the two areas where I've been most often and where I've

25   dealt with BLM on a -- during the gathers.

31

1      I mean, I've had phone communication with -- when

2   Maxine Shane was in communication --

3           MR. PETERSEN:  Objection, Your Honor.

4   Relevance.

5           THE COURT:  That would need to be identified as

6   to time and place before it would be relevant so --

7           MR. COWAN:  Okay.

8   BY MR. COWAN:

9   Q.    So your conversations with Maxine Shane, when did

10   this occur?

11   A.    And Jolin.  They continued -- they started probably

12   in late 1990s and pretty cordial through 2007, '8.

13        After Maxine retired, things got tense.  And I

14   got -- you know, as things changed within BLM and public

15   access, Maxine retired.  And I have been in touch with

16   Jolin -- and I can't remember her last name.  Is it Orley?

17   Something like that.

18        But the brainstorming, the what if this happened in

19   a story, what would BLM really do, that pretty much was

20   cut off.  It become a very -- I had to call for specific

21   questions for specific nonfiction publications.

22   Q.    Okay.  And then other than at Lichfield, do you

23   have experiences elsewhere at horse -- BLM horse holding

24   facilities?

25   A.    Just Palomino Valley and -- I think just Palomino

32

1    Valley and Lichfield.

2    Q.    Had you ever been to Broken Arrow?

3    A.    Oh, of course.  Sorry.  I wasn't considering --

4    that's not a -- well, that's one of those that's on

5    private land.  And that's another one of those things that

6    changed as time went on.

7          Broken Arrow is the facility where they kept the

8    Calico horses and where I first saw the two horses that I

9    ended up adopting.  A 10-year-old mare I adopted was in a

10   corral for young stallions.  And I thought she was a

11   stallion and hadn't been gelded yet.  She was later moved.

12         But, yes, I spent -- I don't know how many times I

13   went out to Broken Arrow.  Probably 10, 12.  A lot of

14   times.  A lot of times.  And originally we were allowed to

15   walk around.  Then it became very restricted.

16         And now on the few public viewing days that they

17   have, the public is confined to a little truck, a little

18   trolley car that goes around.  And you go where you're

19   allowed to go.

20   Q.    Okay.  And so what was the benefit to you, as a

21   member of the public, in visiting Broken Arrow?

22   A.    Well, it was huge.  For one thing I would like to

23   say that all BLM employees are angels, and for the most

24   part, most BLM people that I've dealt with have had some

25   pride in their jobs.

33

 1          But the private facilities are run by private

 2     people.  They're private contractors.  I mean, by

 3     definition they have a contract with the government, and

 4     they get paid.  They are not -- I mean, that's -- that's

 5     by definition what they are.

 6          Those of us who were watching the horses, who had

 7     seen them captured, I think we're a little more watchful.

 8     We saw --

 9               MR. PETERSEN:  Objection, Your Honor.

10               THE COURT:  Sustained.

11          You can testify concerning your personal reactions

12     and how you treated things and the reasons why.  But as to

13     others, you should not be testifying --

14               THE WITNESS:  All right.  Thank you.

15          One of the things we were very careful about doing

16     while we were out there was looking for individual

17     horse --

18               MR. PETERSEN:  Objection, Your Honor.  She's

19     referring --

20               THE WITNESS:  Okay.

21               MR. PETERSEN:  -- to the "we."

22               THE COURT:  Sustained.

23               THE WITNESS:  It's the royal we.  I'm sorry.

24               THE COURT:  All right.

25               THE WITNESS:  One of the things I did was take

34

1    notes and document horses we had -- I had seen with

2    injuries.  I wrote down if they were in medical pens, if

3    the injuries looked like they were improving, if those

4    were in crowded areas, if -- you know, the horse that I

5    ended up adopting, once I established that she was a mare,

6    making sure she was moved from a group of stallions and

7    just trying to talk with -- on the day that the public --

8    days that the public were allowed there, there was usually

9    a BLM representative.

10         We were allowed to talk to that representative and

11   strongly discouraged from talking with anyone -- with the

12   owner of the facility or the people who were working at

13   the facility.  But we tried to get -- I tried to get

14   information from John Neill or Dean Bolstad, whoever was

15   out there, about individual horses that I felt were in

16   distress.

17   BY MR. COWAN:

18   Q.    As a journalist, did you report to your

19   constituents, the public, about your observations?

20   A.    Yes.

21   Q.    Okay.  And as a member of the public, did you

22   benefit, as well, by your observations there?

23   A.    I did.  Because my eyes were opened -- not in a

24   good way -- to how much of a business this had become.  It

25   had gone from BLM acting -- maybe not agreeing with me,

35

1   but acting in what I thought was stewardship of the land

2   and the horses, to something like starting on the range a

3   factory processing these horses.

4       They would be galloped in, not walked in, not

5   trotted in, not loped in.  They were at a full panicked

6   gallop.  They're separated out of --

7           MR. PETERSEN:  Objection, Your Honor.  This has

8   nothing to do with public access.

9           MR. COWAN:  Your Honor, it's her impressions

10  about how she benefits.  She's making a distinction

11  between what she was allowed to see, in general terms,

12  back historically --

13          THE COURT:  Overruled.  I'll allow the

14  testimony.

15          THE WITNESS:  It just showed me how much things

16  had changed.  The horses were processed.  The mares were

17  separated from foals.  The stallions were separated from

18  their bands.  It was cacophonous with the horses, you

19  know, trying to get back into their family groups.

20      And when I saw where they ended up, often the

21  conditions were not good.  These are -- you know, it's a

22  cliche, but these are my tax dollars paying for what's

23  being done to these animals.  And I have a right to see

24  what's happening.  What I saw was appalling.

25

36

1    BY MR. COWAN:

2    Q.    Okay.

3    A.    And a huge change.

4    Q.    And so additional benefits to you, I just want to

5    be clear, did you say that as your result of observing

6    horses in -- at the -- at Broken Arrow, you ended up

7    adopting a horse or two from that?

8    A.    Yes.

9    Q.    Personally?

10   A.    Yes.

11   Q.    And so you're aware of an adoption program that the

12   BLM has, and you went through that process?

13   A.    Absolutely.  One is a sale authority mare, the

14   older horse I mentioned.  And that means she could have

15   been sold without limitation.

16         And one was a young sorrel that I adopted.

17   Q.    Okay.  And then do you have some riding experience

18   as well?

19   A.    I can usually stay on.  That's about it.

20   Q.    Have we discussed the extent of your access to wild

21   horse roundups and the extent of your access to holding

22   facilities?  Yes?

23   A.    Yes.

24   Q.    Okay.  There's one more thing.  And that is a place

25   they call temporary holding after they bring wild horses

37

1    in.

2         Do you have experience with observations of that as

3    well?

4    A.    I do.

5    Q.    Could you just tell the Court what that is?

6    A.    Temporary holding is usually -- the horses are --

7    on the range, they are funneled into a jute, like a

8    channel.  They are channeled into this, into corrals,

9    where they are divided into gender groups.  The foals are

10   all together.  But the mares are together, the stallions

11   are together.

12        And then they move those horses -- like I said

13   before, they used to keep them in family groups and let

14   them settle down while the horses are hot off the range.

15   I mean, their nostrils are still red and they're lathered.

16   They are herded into metal trailers.  And then they are

17   taken, in my experience, generally, to private ranches or

18   private ranch lands where there are pens set up for the

19   horses.  Sometimes you're allowed in; sometimes you're

20   not.

21        One of the worst ones I saw was from the Twin Peaks

22   roundup.  And we were given -- I'm sorry.  I was standing

23   on, like, a viewing platform, probably twice as long as

24   this -- this testifying box, with other members of the

25   public and could see into the corrals somewhat.  Mainly I

1  could see the stallion corrals where stallions were doing

2  the only thing they knew how to do, they -- without their

3  families, they were fighting.  Horses were going -- they

4  were so crowded, horses were going down.

5       The problem was there were panels on the side of

6  that so you couldn't identify individual horses.  And we

7  couldn't -- I couldn't get close enough to see the feet of

8  the horses.  I mean, you could see a brown horse.  And as

9  my husband likes to say, all horses are brown.  But you

10  could see a brown horse.  You couldn't see markings.

11       So if I wanted to check on a horse later, as I did

12  at Broken Arrow, it was almost impossible to write down

13  distinguishing marks.  So those horses could disappear.

14  Q.    Okay.  And I'm just going to go back to your having

15  adopted and your familiarity with the adoption program

16  that BLM has.

17  A.    Uh-huh.

18  Q.    Do you believe others -- well, let me back up.

19  Were you aware of others, friends of yours or

20  acquaintances, who adopted horses based on their

21  experience in seeing or viewing facilities?

22  A.    Yes.  Most people pick their horses that way.

23  There is an Internet adoption.  In fact, I had to bid on

24  my horses on the Internet, like eBay.

25       But for the most part, in my experience, people

39

1    like to see the horse.

2    Q.    So the adoption process, is that a benefit not just

3    to the public but to the BLM's program as well?

4    A.    Absolutely.

5              MR. COWAN:  Thank you, Your Honor.

6              THE COURT:  All right.

7              MR. COWAN:  Thank you, ma'am.

8              THE COURT:  Cross-examination?

9              MR. PETERSEN:  Thank you, Your Honor.

10

11                    **CROSS-EXAMINATION**

12   BY MR. PETERSEN:

13   Q.    Thank you, Mrs. Farley.  Just a few questions for

14   you.

15         You had made a statement, and it was hard for me to

16   track of which gather you were talking about.  But you

17   said that -- the gather you were talking about, the

18   terrain was terrible.

19   A.    What was terrible?

20   Q.    The terrain --

21   A.    Yes.

22   Q.    -- was terrible?

23   A.    That was Calico.

24   Q.    Calico.  In what year, do you recall?

25   A.    This was 2010, in January.

40

1   Q.    And was that -- the terrain was --

2   A.    January 10th.

3   Q.    And was the terrain terrible for the entire gather

4   or just at the one trap you were viewing?

5   A.    Well, the terrain that they were bringing horses in

6   at that point had -- was a -- I mean, they do move the

7   traps around.  The trap was in that area for some time.

8         And what I mean by terrible is I had ridden a

9   saddle horse near this -- well, down this area, and there

10  was shale the size of dinner plates which had been snowed

11  on, thawed, refrozen, and there was snow over it.  And

12  horses were brought down at a gallop.

13  Q.    Have you had at gathers, either this gather or a

14  different gather, different trap site, where the terrain

15  has been not terrible, or even decent?

16  A.    Yes.

17  Q.    Thank you.  You stated that most of the roundups

18  are on private land.  What data were you basing that

19  statement on?

20  A.    That the traps -- I'm talking about the horses

21  are --

22  Q.    Most of the roundups?

23  A.    No.  The gathers, as I said, took place -- I was

24  told by BLM that they were brought in from public lands,

25  then the traps and the holding pens were on private land.

41

1        I base that on the fact that we were told -- that I

2    was told I could not go over there without the property

3    owner's permission because I would be trespassing.  I was

4    no longer on --

5    Q.    Are you referring to one gather or most of the

6    gathers that BLM does?

7    A.    This was Calico in 2010.  And this was Twin

8    Peaks -- okay.  So January of 2010, Calico.  August 10th,

9    2010, Twin Peaks.  And that was for the holding facility.

10   That was on private land.

11   Q.    And is that experience your basis for the statement

12   that most of the traps that BLM uses are on private land?

13   A.    In my experience, since we're limiting it to my

14   experience, yes.

15   Q.    Okay.  So just two or three examples out of 50,

16   100, 150?  But most --

17   A.    Out of the seven or eight roundups that I've been

18   to, it's become increasingly common to put them on private

19   land, yes.  At least that's what I'm informed by BLM.

20   Again, I don't have a GPS in my head.

21   Q.    Okay.  Were you at Silver King gather?

22   A.    At what?

23   Q.    Were you at the Silver King gather that --

24   A.    No, I was not.

25   Q.    -- took place in 2010?

42

1    A.    No.

2              MR. PETERSEN:  Okay.  Thank you.

3              THE COURT:  Mr. Cowan, redirect?

4              MR. COWAN:  No, Your Honor.  No questions.

5              THE COURT:  All right.

6         Mrs. Farley, you may step down.  Thank you.

7              THE WITNESS:  Thank you very much.

8              THE COURT:  This probably is a good time to

9    take an early morning break.  Let's reconvene -- I'm

10   looking at the clock in the back of the courtroom.  We'll

11   reconvene at 10:35.

12             THE CLERK:  Please rise.

13                  (A recess was taken from

14                   10:20 a.m. until 10:38 a.m.)

15             THE COURT:  Have a seat, please.

16        Let's see.  Next witness, Mr. Cowan.

17             MR. COWAN:  Thank you, Your Honor.  I'd like to

18   call, please, Ms. Sally Summers.

19

20                       **SALLY SUMMERS**,

21          called as a witness on behalf of the

22          Plaintiff, having been first duly sworn,

23          was examined and testified as follows:

24

25             THE WITNESS:  Yes, I do.

43

1              THE CLERK:  Please be seated.

2         Please state your name for the record, and spell

3    your last name for the record.

4              THE WITNESS:  Okay.  Sally, S-a-l-l-y, Summers,

5    S-u-m-m-e-r-s.

6              THE CLERK:  And please tell us your city and

7    state of residence.

8              THE WITNESS:  Washoe Valley, Nevada.

9              THE CLERK:  Thank you.

10

11                   **DIRECT EXAMINATION**

12   BY MR. COWAN:

13   Q.    Good morning, ma'am.

14         Can you tell us how long you've lived -- you're

15   from Nevada?

16   A.    Yes.

17   Q.    How long have you lived in Nevada?

18   A.    Forty-five years.

19   Q.    Can you just tell us about yourself, your

20   background, please?

21   A.    In Nevada, in 1971, I adopted my first Mustang and

22   have been actively involved most of my life.

23         Had a career in broadcasting.  And every

24   opportunity I had to help the wild ones, I was on it.

25         Went through UNR in nonprofit certification and

44

1    grant writing and everything that was needed for a career

2    change in philanthropy and founded Horse Power, a

3    nonprofit organization that has close to 5,000 license

4    plates on the streets of Nevada.

5    Q.    Okay.  So are we talking about those license plates

6    that -- like, the rodeo license plate, there's a license

7    plate that depicts wild horses?

8    A.    And burros.

9    Q.    I'm sorry.  Wild horses and --

10    A.    Don't forget the burros.

11    Q.    Yes?

12    A.    Yes.

13    Q.    Okay.  And how is it that you're involved in that,

14    just from a general standpoint?  Please tell the Court.

15    A.    Well, at this point I'm a private contractor as

16    well.  I'm also on the board and am the founder.  So

17    basically I do the windows and the bathrooms.

18    Q.    Okay.  But how many licensed -- how many wild horse

19    license plates are currently issued by the State of

20    Nevada, if you know?

21    A.    It's close to 5,000 if not over 5,000 at this

22    point.

23    Q.    Okay.  And what is your role in -- with Horse

24    Power?

25    A.    Oh, I've got many roles.  One is being accountable

45

1   to the 5,000 people that have those license plates, to be

2   sure that the laws are upheld to protect the wild horses

3   and burros.

4       We take people out on the range to introduce them

5   to how magnificent they are on the range, to document the

6   conditions of the range, water and feed.  Sometimes to

7   take them during the roundup.  And then the sad part is

8   taking them back afterwards.

9   Q.   Okay.  When you say sad, what do you mean?

10   A.   It's silent.

11   Q.   All right.

12   A.   Life is gone.

13   Q.   But sticking back to the wild horse -- the Horse

14   Power issue, is there a philanthropic purpose or a

15   designation of funds that come from the sale of those

16   license plates?

17   A.   Yes.  Our basic mission is to financially aid those

18   organizations, groups, or individuals that rescue wild

19   horses, burros, second-chance horses, and mules.  We take

20   care of all of equine in Nevada as much as we can.

21   Q.   Okay.  So does it all start with the access to wild

22   horses?

23   A.   Yes, it does; and actually have been able to

24   suggest some adoptions through access.

25   Q.   Okay.  Well, that was my next question; that is, do

46

1    you help with adopting horses that are removed from public

2    lands by the BLM?

3    A.    Yes.

4    Q.    Tell us about that, please.

5    A.    We have a list of what some people are looking for.

6    And if it's viewed out on the range, and then later if I'm

7    able to view that they're in good shape and have good

8    legs, I'll recommend the adoption of that animal.

9    Sometimes it happens, and sometimes it doesn't.

10         Then they will go out to the facility and view the

11   animal.  And we help transport as well.

12   Q.    Okay.  And just describe -- when you say you help

13   transport, just tell me what you mean.

14   A.    Well, we were down at the Tonopah site adoption and

15   transported four animals to various places that were

16   adopted.

17         We've taken people out to Palomino Valley that had

18   pre-chosen some horses and picked up those horses for them

19   and delivered them.

20         And we help rescue wild horses that have been

21   adopted and, unfortunately, need to be removed from that

22   particular facility to a better facility.

23   Q.    Okay.  And the cost of the transportation, that's

24   not saddled by the person accepting the adopted horse?

25   A.    No.  Horse Power provides the gas for the

47

1    transportation and the use of the stock trailer.  The

2    truck is -- what's left of it is mine.

3    Q.    All right.  Okay.  Have you personally adopted

4    horses?

5    A.    Yes, I have.  The first one I adopted many, many

6    years ago from Palomino Valley went out to -- in fact, we

7    were collecting the signatures for the license plate at

8    the time.  And she chose me.

9          And the next one I adopted was a little burro that

10   had been gathered from the Wheeler Pass area in Las Vegas.

11         And then I adopted two out of Broken Arrow, a birth

12   control mare and her colt.

13         And then last, but not least, was a curly colt from

14   Palomino Valley.

15   Q.    Okay.  And do you have an estimate of how many

16   horses you have helped adopt out from the BLM?

17   A.    I'd say roughly 10, 10 or 12, maybe a dozen.

18   Q.    All right.

19   A.    There might be more that I don't know about.

20   Q.    All right.  Now, have you attended BLM roundups?

21   A.    Yes, I did.

22   Q.    Okay.  Can you tell the Court your earliest venture

23   into a BLM roundup?

24   A.    Yes.  And I was reluctant to go because of what I

25   had heard.

1        The first one was in Calico.  And it became

2   necessary for us to start bringing people out to the range

3   that were unable to get there otherwise.  So I went to the

4   Calico range.

5        And I also was a correctional officer, and I was

6   really -- I felt like I was being treated like a criminal,

7   with armed guards at the front and armed guards at the

8   back to escort us out.  And that was just amazing to me.

9        And there was no reason for it.  Nobody that I had

10  known had stepped out of line.  We were situated in an

11  area that was -- I was able to view over the top of the

12  collection, the end of the collection.  We were able to

13  hear the wranglers talking.  That's how close we were.

14  Q.    You mean able to hear them verbally, without a

15  radio?

16  A.    Uh-huh.  Yes.

17  Q.    All right.  And so tell the Court, please, your

18  observations of what you could see and view with respect

19  to the roundup, the horses, the trap, *et cetera*?

20  A.    Well --

21            THE COURT:  Do we have a date and time of this?

22            MR. COWAN:  Yes.  Let me back up.

23  BY MR. COWAN:

24  Q.    Can you tell us when this -- the roundup that we're

25  talking about, this Calico --

49

1    A.    That was December of 2010.

2    Q.    All right.  So can you tell us your experience

3    there?

4    A.    Of the -- being somebody that rides and has

5    animals, I was looking at the lava rock, knowing how badly

6    that would cut anything I rode out there.

7          And we were situated on the hill looking down.

8    Normally in an area like that, you would hear the

9    helicopter, the noise bouncing off the canyon walls, and I

10   was unable to hear that at all.

11         And the horses appeared, like, out of nowhere, and

12   then the helicopter was right on top of them.  They were

13   shuffled into the trap.  They remained in the chutes for a

14   short time and then loaded onto the stock trailers.  And

15   you could see the steam rising off these horses in the

16   stock trailers.

17   Q.    Steam from what?

18   A.    The horses -- well, they were lathered up.  They

19   were sweating.  And it was extremely cold.

20   Q.    Okay.  And so let's stick on topic, and let's talk

21   about what you could see, visualize, that type -- your

22   access, your visual observations, what you could --

23   A.    Oh, yes.  Well, I could see the use of the whips

24   with the plastic bags on the ends, that they were

25   utilizing them as well as the hot shots.

50

1          And a number of the horses were -- as they were

2    moving them through the chutes, trapped in the gates.

3    Q.    Okay.

4    A.    A leg or, you know, a neck, or something like that.

5    Q.    Okay.  So based on this observation at this time

6    during this roundup, are you able to identify horses by

7    particular markings?

8    A.    Yes.

9    Q.    All right.  And when I refer to a roundup, that's

10   not just one day, that's a series of days?

11   A.    It's a series -- I went back to Calico a number of

12   times.

13   Q.    All right.  At that same time?

14   A.    Yeah.  For the same roundup.

15   Q.    All right.  All right.  Now, have you been to other

16   roundups?

17   A.    Yes, I have.  I have been up to the High Rock

18   roundup, which was a terrain that was a very soft and

19   sandy area.  However, coming out of the rocks there

20   were -- there was a great deal of black obsidian up there,

21   which is what was used for arrows.

22             THE COURT:  Time and date on that?

23             THE WITNESS:  That would have been 2011 to -- I

24   actually went up there a couple of times.  It was either

25   in June or in the fall.

51

1    BY MR. COWAN:

2    Q.    All right.  How many roundups have you been to?

3    A.    About eight.

4    Q.    All right.  In the history -- your experience out

5    there, has your access to viewing these roundups changed

6    over time?

7    A.    Oh, yeah.  To the point where it's why even bother

8    to go.  And it's -- you know, when I'm going out with

9    Horse Power's intent and their money, I have to be frugal.

10   And if we can't view the horses and see what's going on

11   and I can't recommend to people that are looking for

12   adoption, there's no sense in going.

13   Q.    Okay.  Let's just talk about some facts about how

14   it's changed, okay?  Just a few specifics, not much, if

15   you could for the Court, please.

16   A.    Well, prior -- well, during the Calico, it seemed

17   that there were steps that were taken.  And we were held

18   back more and more -- further away from the traps, away

19   from the temporary holding.

20   Q.    As Calico was ongoing?

21   A.    Yes.

22   Q.    Okay.  And just one more question there.

23         How long was the Calico roundup?  How long did it

24   last, if you know?

25   A.    I think it ended in February.

52

1    Q.    Roughly a couple --

2    A.    It started in December.

3    Q.    Roughly a couple months?

4    A.    Yes.

5    Q.    All right.  So I'm sorry.  I interrupted.

6    A.    The first time out, after the horses were

7    collected, we were taken over to temporary holding.  And

8    we were able to view the horses.  We were able to, you

9    know, push the hay towards them without startling them and

10   have access -- I was -- I have a particular -- I love the

11   curly horse, so I was looking for a number of curlies down

12   there.

13        And, anyway, we were able to be that close, that we

14   could observe them and hear them breathing.

15   Q.    Okay.  That close, do you have an estimate

16   distance-wise?

17   A.    Well --

18   Q.    A reasonable distance?

19   A.    Three feet, four feet at the -- you know, we were

20   right on -- we were able to take pictures right there.

21   Q.    All right.

22   A.    And then the temporary holding that, at a later

23   date, was similar distance.

24   Q.    All right.  And then was there any kind of fencing

25   involved or in the way of your viewing horses in temporary

53

1    holding?

2    A.    No.  We were able to -- at that time, we were able

3    to see what was going on and if they had cuts.  There were

4    a number of foals that were limping.  And we were

5    concerned about them.  Those were the ones that died

6    later.

7    Q.    All right.  But you were at least able to see what

8    was going on; yes?

9    A.    Yes.

10   Q.    All right.  And then, as you said, as the Calico

11   roundup progressed, things became tighter; yes?

12   A.    Yes.

13   Q.    And I'm sorry if I didn't use the right words.

14         But did you have an impression -- do you have a

15   personal impression as to what caused that change?

16   A.    Well, I was told the same thing everybody else was,

17   that there had been terrorist threats over the phone.

18         And I asked, "Well, where did they come from?

19   Where are they?"  And --

20              MR. PETERSEN:  Objection --

21              THE WITNESS:  -- they said --

22              MR. PETERSEN:  -- hearsay.

23              THE WITNESS:  -- "Washington, DC."

24              THE COURT:  Wait a minute.

25              THE WITNESS:  And I --

54

1          THE COURT:  Wait.

2          THE WITNESS:  Sorry, sir.

3          THE COURT:  We have an objection.

4      Mr. Petersen, do you want to explain your

5  objection.

6          MR. PETERSEN:  Yes, Your Honor.  She's

7  referring to what someone allegedly told her over the

8  phone, not her own statement or own impressions.

9          THE WITNESS:  That's not correct, sir.

10          MR. PETERSEN:  Then I misunderstood the

11  witness.

12          THE COURT:  All right.  I'll allow her to

13  explain what she heard and why she was acting on that,

14  only for the purpose of why she was acting on that.

15          THE WITNESS:  It was a BLM employee that told

16  us that.  And me that.

17  BY MR. COWAN:

18  Q.   All right.  Have you -- now, let's make a

19  comparison to, let's say, more recent roundups, like

20  today.  What's -- what's your access now?

21  A.   It's extremely limited, to the point that we can't

22  afford the long lenses to take with us so that we might

23  get a glimpse of a horse.  And it is -- it's a waste of

24  time.

25  Q.   Well, let's get to the bottom of the issue.  What's

1    the issue?  What's keeping you from looking at them?  What

2    is it?

3      A.    The way that we are positioned.  We're kept behind

4    a burlap perimeter.  And we're not allowed to go beyond

5    that.  We're escorted if we need to use the rest room.  We

6    have people standing by while we're -- there's no -- it's

7    invasion of privacy.  You don't have any privacy at all.

8      Q.    Okay.  Are there obstructions in the way?

9      A.    Trucks, trailers, you know, whatever they can put

10   in front of it, they do.

11     Q.    All right.  And is it to the extent that Horse

12   Power is considering reducing its ability to go to

13   these --

14     A.    It already has.

15     Q.    -- roundups with clients?

16     A.    Yes, it already has.

17     Q.    Okay.  Now, has -- can you just tell us, also,

18   similar difference, in your experience, at temporary

19   holding facilities?  How has that changed?

20     A.    Well, there are times when we're not even allowed

21   to view them because the land owner doesn't want anybody

22   on their property on Saturdays or this, that, or some odd

23   reasons.

24     Q.    All right.  But then are there times where you are

25   able to view them?

56

1    A.    Yes.  But it's limited.

2    Q.    Okay.  And tell the Court, please, what the

3    limitations are.

4    A.    Well, because of the fencing, the plastic fencing

5    that's very thick, I guess that's the snow fencing, being

6    able to even see in there or detect if there are hooves in

7    there that are cracked or bleeding is almost impossible.

8          We were allowed at one point, because we had -- oh,

9    because the LA Times reporter was there, we were allowed

10   to get in the back of a pickup truck and view over a

11   certain area.  But it was very limited.  It was only the

12   stallions we were able to see.

13   Q.    Okay.  And but for the LA Times reporter, your

14   impression was you would not have been allowed to do that?

15   A.    Exactly.

16   Q.    And then are you -- today at temporary holding

17   facilities, are you able to identify horses, particular

18   markings?

19   A.    No.

20   Q.    Okay.  Now, what about the facilities that the BLM

21   ships horses to?  Let's start with Broken Arrow.

22         Have you -- do you have an experience,

23   historical -- from a historical perspective --

24   A.    Yes.

25   Q.    -- of Broken Arrow looking at horses?

57

1    A.    Yes.

2    Q.    Okay.  Tell the Court, please.

3    A.    When it was first opened, which was limited, we

4    were allowed to walk through, take pictures, and get tag

5    numbers so that if we had potential adopters we could

6    alert them and send them a picture, like this is the horse

7    you're looking for.

8          And slowly but surely that ability shrank and

9    shrank and shrank.  And the employees out there became

10   harsher.

11   Q.    Well, what is it that's -- when you said the

12   ability to observe is shrinking, or shrank and shrank,

13   just some facts to support that.  What are we talking

14   about?

15   A.    Well, to begin with, we were allowed to view -- go

16   down all of the aisles and view all of the horses,

17   including the ones that were in the medical facility.

18         And there are some old horses.  And, you know, when

19   you get old, you die.  So that's understood.  There were

20   some very traumatized animals in there as well.

21         And then it was reduced to what it is now, which

22   is --

23   Q.    You mean access?

24   A.    Access.

25   Q.    Okay.  Go ahead.

58

1    A.    I'm sorry.  Access is reduced to a trip in the back

2    of a trolly, I think as described before.  It's very

3    crowded.  It moves only if you ask -- will ask to stop

4    will they stop.

5          And getting pictures of horses that we might be

6    able to adopt is difficult.  I was able to facilitate,

7    hopefully, the adoption of a couple of horses from

8    October.

9    Q.    Okay.  So has the limited access at, for instance,

10   Broken Arrow that you're experiencing more recently, has

11   that had some detrimental effect on your ability to help

12   with adoptions?

13   A.    Yes.

14   Q.    Tell the Court, please.

15   A.    Yes.

16   Q.    Tell the Court --

17   A.    Yes, it has.

18   Q.    How?

19   A.    Well, not being able to see what's out there and

20   knowing what people are looking for, in particular the

21   curly horses in the United States, there are a number of

22   people that love them, I'm unable to get any information

23   to them.

24         If I hadn't had the pictures of the curly horses

25   while I was out there in October, we would have been

59

1    denied that they were even out there.  So because we were

2    able to take pictures, we can say yes, we have pictures.

3    These horses are there.  So it's been dramatically cut.

4    Q.    Okay.  Do you have an impression or a thought why

5    your access has been limited?  Broken Arrow?

6    A.    There are a number of diseases that run through

7    Broken Arrow.  And I believe that because by law, now,

8    they have to open the facility twice a year, that there

9    are times when there are many sick animals out there they

10   don't want us to see.  And I think that they're being kept

11   from us.

12          There are a number of horses that are -- sale

13   authority horses, that are available for $10 or more or

14   have the three strikes, and they are shipped out in large

15   quantities.  And I don't believe they want us to know that

16   either.

17                MR. PETERSEN:  Speculation.

18                THE COURT:  Sustained.

19                MR. COWAN:  Okay.  You mean about the part

20   where "I don't think that they want us to know that," is

21   that, Your Honor, the sustained objection?

22                THE COURT:  She can't testify as to their

23   reasons.

24                MR. COWAN:  Right.  Okay.

25                THE COURT:  She can testify what personally

60

1    occurred with her.

2                MR. COWAN:  All right.  Thank you.  That's all

3    I have.

4                THE COURT:  Cross-examination?

5                MR. PETERSEN:  One moment, Your Honor.

6

7                       **CROSS-EXAMINATION**

8    BY MR. PETERSEN:

9     Q.    Hello, Ms. Summers.  You gave us a bit of your

10   background, which I appreciate.

11         I wonder, are you a trained veterinarian?

12    A.    No.

13    Q.    No.  Okay.  And in your testimony about the various

14   gathers that you had been to, it got, at least for me, a

15   little muddled.

16         Could you clarify, at least, have you -- the

17   gathers that you were testifying to on the stand today,

18   were they gathers that occurred in 2009 and beyond?

19    A.    From 2009 until current.

20    Q.    To current.  So that would be a yes?

21    A.    Yes.

22                MR. PETERSEN:  Thank you.

23                MR. COWAN:  Thank you, Your Honor.  That's all

24   I have.

25                THE COURT:  All right.

61

1          Ms. Summers, you can step down.  Thank you.

2          Your next witness?

3              MR. COWAN:  Mr. Robert Bauer.

4

5                      **ROBERT BAUER**,

6            called as a witness on behalf of the

7            Plaintiff, having been first duly sworn,

8            was examined and testified as follows:

9

10             THE WITNESS:  I do.

11             THE CLERK:  Please be seated.

12         Please state your full name for the record,

13   spelling your last name.

14             THE WITNESS:  Robert Bauer.  Last name

15   B-a-u-e-r.

16             THE CLERK:  Can you please tell us your city

17   and state of residence.

18             THE WITNESS:  New Albany, Indiana.

19             THE COURT:  Go ahead.

20

21                  **DIRECT EXAMINATION**

22   BY MR. COWAN:

23   Q.    Good morning, Mr. Bauer.

24   A.    Good morning.

25   Q.    You're not from Nevada, are you?

62

1    A.    No, sir.

2    Q.    Are you from Indiana?

3    A.    Yes.  Yes.

4    Q.    How long did it take you to get out here?

5    A.    It's about a 2,100 mile trip.  It's usually an

6    all-day flight.  Or if I drive it, it's about a three-day

7    trip, using my own funds, of course.

8    Q.    Okay.  And do you have experience in observing BLM

9    roundups?

10   A.    Yes, sir.

11   Q.    Okay.  And have you always traveled from Indiana to

12   come west to Nevada or other western states to view BLM

13   roundups?

14   A.    I was present for the September 2009 roundup up in

15   the Pryor Mountains.

16   Q.    Okay.  And where are the Pryor Mountains?

17   A.    They're located southern Montana, northern Wyoming.

18   It crosses over the border, over the state line.

19   Q.    Okay.  And why were you there?

20   A.    I went out there initially to experience the wild

21   horses.  I had never experienced them in the wild before.

22   And so I had a very beautiful experience out in the wild

23   observing them in balance with everything else, and then,

24   subsequently, a BLM roundup several days later.

25   Q.    In other words, when you went out there, was it

63

1    your intent to see a BLM roundup, or was your intent to

2    just be out in the wild with wild horses?

3    A.    I went out there to be out with the wild horses.

4    But I was aware of the roundup and stayed for it.

5    Q.    Okay.  Okay.  And just tell the Court just your

6    personal experience before we get to the roundup.  What

7    caused you to become interested in wild horses as a result

8    of this experience?

9    A.    Up in the Pryor Mountains, we had very close and

10   beautiful encounters with the wild horses out in the wild

11   in balance with everything around them.  There was no

12   aggression.  There was no danger.

13        I saw how it was without man's intervention, and

14   then, subsequently, saw what occurred during the BLM

15   roundup during the time and realized I couldn't turn my

16   back on it after that.

17   Q.    Okay.  So let's get a timeframe.  Pryor Mountains.

18   Was this your first roundup?

19   A.    Yes.

20   Q.    What's the date, roughly?

21   A.    September 2009.

22   Q.    All right.  And can you just tell the Court,

23   please, your observations relative to your access to see

24   and view wild horses as they're being managed or rounded

25   up?

64

1    A.    We were able to view the horses very clearly when

2    they were coming in to the trap.  You could distinguish

3    between gender.  You could distinguish age markings, *et*

4    *cetera*.  This was clear.

5          They did allow certain individuals to go back in

6    close proximity with the wild horses after they had been

7    gathered.  However, there were -- obviously they -- during

8    the roundup, there was a breakup of the social structure,

9    by virtue of the fact that they would separate mares from

10   their foals, stallions from their band, *et cetera*.  There

11   was obviously chaos.  There's no question about it.

12   Q.    But, nevertheless, you were able to observe it --

13   A.    Yes.

14   Q.    -- without obstructions?

15   A.    Yes.  We were -- I mean, the BLM individuals were

16   there.  And we obeyed by the rules.  We stayed behind a --

17   a barrier but were allowed to -- as long as we stayed low,

18   we were able to look over it and see the horses very

19   clearly as they were coming in.

20   Q.    Okay.  At the temporary holding -- do they have a

21   temporary holding facility at that roundup as well?

22   A.    They held them there.

23   Q.    And did you have access there?

24   A.    Certain individuals were allowed to get close, yes.

25   They allowed certain individuals to get back there, a main

1  observer, another individual also.

2  Q.    Okay.  Individuals who are members of the public?

3  A.    Yes.

4  Q.    All right.  And when you say close, what do you

5  mean?

6  A.    Well, they were up to the pens.

7  Q.    All right.  And you saw this?

8  A.    Yeah.  I watched them get in there.  And I watched

9  them -- they were escorted back there by BLM individuals,

10  but they were allowed very close access to observe the

11  animals after they were rounded up.

12  Q.    All right.  Now, did you have any experience with

13  any facilities that they had shipped the Pryor horses to?

14  Yes or no?

15  A.    The Pryor Mountain horses?

16  Q.    Yes.

17  A.    No, not after that, no, I did not.

18  Q.    Okay.  So then what was your next experience with a

19  wild horse roundup?

20  A.    I was able to document the Calico Mountain complex

21  before, during, and after the Calico Mountain roundups of

22  late December 2009 into February of 2010.

23  Q.    Okay.  And so can you tell us your experience

24  there -- well, let me back up.

25        How many days were you there at Calico?

66

1    A.    I was only able to -- based upon my schedule, I was

2    only able to get out there -- oh, just for the roundup

3    you're talking about?

4    Q.    Yes.

5    A.    Okay.  I was only able to get out there for three

6    or four particular days.

7    Q.    All right.

8    A.    Based upon my schedule.

9    Q.    Okay.  All on the same trip?

10   A.    No.  No.  I had to make several trips out.

11   Q.    From Indiana?

12   A.    Yeah, from Indiana.

13   Q.    Why did you do that?

14   A.    Because I wanted the public to know what was going

15   on.

16   Q.    Okay.  So tell us your experience, in terms of what

17   you were able to -- well, just your experience out of

18   Calico?  Let's start with that.

19   A.    As far as obeying the rules, we always obeyed the

20   rules.  Respectful of BLM officials.  We had armed guards.

21   There were only certain days we were allowed to observe

22   the roundups.  And other days we were not -- the public

23   was not available to watch them.

24         In other words, the roundups continued to go

25   continually, fairly continually, throughout late 2009 into

67

1    February 2010.  However, the public was only allowed to

2    view the roundups on certain days.  I believe it was at

3    least just a couple days every week.

4    Q.    All right.

5    A.    We could also distinguish -- you know, when the

6    horses came in and observing them, based upon our

7    viewpoint back then, we could distinguish -- we could

8    distinguish gender, we could distinguish particular

9    markings, ages, *et cetera*.  We were able to see that very

10   clearly.

11   Q.    So you were able to identify horses?

12   A.    Yes.

13   Q.    Okay.  Now, what about temporary holding at Calico,

14   were you able to identify horses there?

15   A.    Yes.  There were times -- the times that I were out

16   there, we were allowed to get very close to the fence.

17   Q.    Okay.  Very close means what?

18   A.    Right up to the -- right up to the fences.

19   Q.    All right.  And -- okay.

20         Now, what was the last roundup you went to?

21   A.    The Wassuk HMA.

22   Q.    Is that in Nevada?

23   A.    Yes, sir.

24   Q.    And how is your access --

25         THE COURT:  When was that?

68

1          MR. COWAN:  I'm sorry?

2          THE COURT:  There was no date attached or time.

3  BY MR. COWAN:

4  Q.    Okay.  What was the date of that roundup at Wassuk?

5  A.    It was November of 2012.

6  Q.    Okay.  And tell us about your access there?

7  A.    It was -- there was really no point in -- it got to

8  the point where I realized, you know, they weren't

9  allowing us to see anything.

10         I could get into detail as to how they set it up so

11  that the public couldn't see very little, based upon where

12  the viewing point was, how they set up the trap, the

13  position of the opening of the trap to the public, how far

14  away it was.

15  Q.    Well, just, please, tell the Court just a few facts

16  of why you couldn't see the roundup itself.

17  A.    Okay.  Well, the viewing point for the public was

18  at least a hundred yards up away from the trap itself, at

19  least that much.

20         Secondly, it was located -- the trap was located in

21  a wash, where there was a slope -- it was sloping up on

22  both sides.  And then the opening of the trap was on the

23  opposite side of where the public was viewing.

24         And when the horses were brought in, you could

25  barely see them because they brought them in around the

1    opposite ridges and around to the -- to where the wash

2    began.  And then they drove them in from there by

3    helicopter.

4        By the time you could view the horses, you could

5    only see them for probably 15 seconds, I'd say, 15 or 20

6    seconds.  And these -- you could only see pretty much the

7    heads bobbing up and down.  You could not distinguish

8    markings very well.  You could not distinguish colors.

9    You could not distinguish gender.  You could very rarely

10   see age in any of them.

11   Q.    Okay.  So I just want to understand this then.

12        Is it the geographical features of the mountains

13   that paralleled where the area of the trap is that

14   prevented you from seeing the horses coming in to the

15   pens?

16   A.    Not only that, but the position of the trap itself.

17   The trap itself was set up so that the opening of the trap

18   was opposite of where the public was viewing, on the far

19   side.  So actually you were looking across the trap, you

20   were having to look across the trap to see the horses

21   coming in.  So you really couldn't see the horses at all.

22   Q.    And based on your elevation versus the elevation of

23   the trap, is it roughly equal, if you know?

24   A.    The observation place was a bit above it.  I can't

25   give you exact numbers at this point.  But we were

70

1    elevated a little bit.  But at the same time you still

2    could not see.

3    Q.    And then the panels themselves that created the

4    trap itself, could you see through those panels?

5    A.    No, you could not.

6    Q.    At the -- at this roundup, Wassuk, were you able to

7    identify horses by their particular markings or gender?

8    A.    No.

9    Q.    Okay.  Now, what about at the -- did they have a

10   temporary holding out at Wassuk?

11   A.    Yes, they did.

12   Q.    Okay.  And tell us your experience about viewing

13   that as well.

14   A.    We were kept behind the line.  I am just taking a

15   guess from recollection, trying to view back to it, that

16   it was roughly 200 feet away from the pen itself.  And we

17   had to stand behind the line and take pictures from that

18   point.

19         They did allow a couple times, as I recall, for us

20   to go around to the far side of the pen.  But we were

21   still kept at a distance.  I'm trying to get -- I'm

22   thinking you would probably want a distance at that point.

23   And I'm just guessing at probably a hundred feet,

24   something along those lines.

25         There was one point where they did allow the group

71

1    to get up behind a pickup truck and view the stallions up

2    closely.  And that was when the LA Times reporter was

3    there.  I was present at that point.

4    Q.    All right.  And were these holding pens -- did they

5    have, oh, a barrier or snow fence or something in the way,

6    or could you see through the panels to see the horses?

7    A.    No, you couldn't see very clearly through the

8    panels.

9    Q.    Your observation when you had to stand,

10   quote/unquote, behind the line, could you identify

11   particular markings or identify horses or gender?

12   A.    I couldn't.

13   Q.    Okay.  When you were allowed to go around and into

14   a location of what you depicted, perhaps guessing, roughly

15   a hundred feet that -- were you able to identify

16   particular markings of horses for their gender that were

17   in those temporary holdings?

18   A.    They were closer, so there was a -- to some extent

19   you could, yes.

20   Q.    Okay.  So could you see horses, whether or not they

21   were injured or not?

22   A.    It was hard for me.  I kept trying to focus at the

23   distance on the feet, to see if there were any injuries,

24   if there was any limping.  And I had -- for me I had a

25   hard time.

72

1   Q.    Okay.  Do you have an impression of why this access

2   over time, at least in your experience, has changed?

3   A.    My impression, if I may speak freely, the roundups

4   have obviously increased.  No one can doubt that.  They

5   have increased in number, number one.  And over a short

6   period of time.

7         As a result, they're becoming more aggressive in

8   the roundups.  A lot of mistakes are being made.  These

9   are being reported regularly during the roundups.  And

10  it's very clear that they want to hide the mistakes that

11  they make.

12              MR. PETERSEN:  Objection, Your Honor.

13  Speculation.

14              THE WITNESS:  That is not speculation, sir.

15  Have you been out there, sir?

16              THE COURT:  Wait.  The objection is sustained.

17  It is speculation.

18        You can -- I will allow you to testify to your

19  personal impression.  But you can't testify to what

20  someone -- the reasons why someone else is acting.

21  BY MR. COWAN:

22  Q.    It's your impression; yes?

23  A.    Yes.

24  Q.    What you said?

25  A.    Yes.

73

1   Q.    Okay.

2         Mr. Bauer, thank you.  That's all I have.

3   A.    You're more than welcome, sir.

4             THE COURT:  Cross-examination?

5             MR. PETERSEN:  No questions, Mr. Bauer.

6             THE COURT:  All right.

7         Mr. Bauer, you may step down.  Thank you very much.

8             THE WITNESS:  Thank you, sir.

9             THE COURT:  Mr. Cowan?

10            MR. COWAN:  Your Honor, may I call Elyse

11  Gardner to the stand.

12            THE COURT:  Yes.

13

14                     **ELYSE GARDNER**,

15            called as a witness on behalf of the

16              Plaintiff, being first duly sworn,

17            was examined and testified as follows:

18

19            THE WITNESS:  Yes, I do.

20            THE CLERK:  Please be seated.

21        Would you please state your name for the record,

22  and spell your last name.

23            THE WITNESS:  My name is Elyse Gardner,

24  E-l-y-s-e G-a-r-d-n-e-r.

25            THE CLERK:  Can you please tell us your city

74

1    and state of residence.

2            THE WITNESS:  Petaluma, California.

3

4                    DIRECT EXAMINATION

5    BY MR. COWAN:

6    Q.    Good morning.  How are you?

7    A.    Good morning.  I'm well, thank you.  I'm glad for

8    this day.

9    Q.    Are you -- I guess every day it is a good day,

10   isn't it?

11           Where do you reside currently?

12   A.    I live in Petaluma, California.

13   Q.    All right.  How is it that you became connected, if

14   you did, with wild horses?

15   A.    I watched movies.  I saw the series on the Cloud,

16   PBS Cloud specials.  I started researching them and went

17   to an advisory board meeting in California that year, in

18   2009, in June, and was very concerned about some of the

19   things I was hearing and decided to attend in the Pryor

20   Mountain roundup and was invited to do so.

21   Q.    Okay.  Now, before that time, were you a horse

22   owner?

23   A.    I cared for other people's horses.  I am now.  I

24   adopted a Mustang.  I had sponsored some horses.  But I

25   was not a horse owner.

75

1    Q.    Okay.

2    A.    But I had a lot of time with horses.

3    Q.    And just a -- I forgot to get into this first.

4    I'll just do it quickly.  Just your quick background

5    professionally?

6    A.    I'm a California Certified Shorthand Reporter,

7    retired, and I am a musician.

8          I became equine science major and worked at -- I've

9    worked at two -- a ranch while I was doing my equine

10   science program.  And have worked also at a wild horse and

11   burro sanctuary.

12   Q.    And was that sanctuary here in Nevada or in

13   California?

14   A.    Very northern-most California.

15   Q.    All right.  So have you attended a BLM roundup?

16   A.    I have attended a few.

17   Q.    And what was your first experience?  Where?

18   A.    In the Pryor Mountains in 2009, September.

19   Q.    September 2009?

20   A.    Yes.

21   Q.    All right.  Can you tell us -- tell the Court,

22   please, just generally, about your experience there.

23   A.    I found myself as to be acting the role of humane

24   observer.  I had a lot of good viewing of the horses

25   coming in, along with the other members of the public.  My

76

1    position during the incoming horses was no different than

2    anyone else's.

3         However, during processing, sorting of the horses,

4    I was able to stand with other sort of select members of

5    the public at that time.

6         But everyone had pretty good viewing.  I had better

7    viewing for the first three days.  I'll get into that a

8    little bit more.  But it was really easy to see the horses

9    coming in.

10        And we had regular viewing of the horses in the

11   capture pens, daily viewing, and I think even -- if memory

12   serves, I think we even had several times when we had

13   twice-a-day tours of the pens where the horses were being

14   kept during that roundup, which was a -- they removed

15   some.

16        And they also did a major treatment with BCP, the

17   infertility drug.  And so we got to watch that.  And

18   particularly I had very close viewing.  I was probably 35

19   feet away, behind sort of a mesh fence.

20   Q.    Okay.  So viewing the wild horse roundup itself out

21   in the Pryors, how close were you the first few days to

22   the action?

23   A.    The viewing of the horses coming in -- there were

24   two -- the horses were driven through kind of a valley.

25   We were up high looking down at them.

77

1           And the press were given a spot on one side that

2     was closer and not quite as high.  And then we -- the rest

3     of the public were given -- I'd say they were about 75

4     feet, 100 feet from the -- looking down at the horses

5     behind a few little trees.

6           And then we were about 100 to 300 yards above.  I

7     have a hard time with this.  But it was pretty good

8     viewing.  It was -- you know, compared to what came later

9     at BLM roundups, this was very good viewing.  I could

10    identify individual horses.  I could identify bands.  And

11    the people who followed those horses regularly could

12    identify individuals by name.

13          We also were given the opportunity, as members of

14    the public, to be where the press had been.  And we

15    appreciated that.  And we were able to be there, as well,

16    where the press had been, when horses were released.

17    Q.    All right.  And so you were able to identify

18    certain horses by their markings and gender based on your

19    observations of seeing the horses come in; yes?

20    A.    Yes.

21    Q.    All right.  Now, and at temporary holding there at

22    the Pryors, how was the access there?

23    A.    Very, very good.

24    Q.    What's that mean?  How close?

25    A.    When I say the access is very, very good, that

78

1    means that I could see the horses, I could see their

2    condition, I could see any injuries, and I could

3    photograph and video it.

4         And I'd like to step back to the actual roundup.

5    Because I was also given the opportunity, by one of the

6    roundup contractors, to go and see the horses.  It ended

7    up being 35 minutes.  My metadata on my film, my cameras

8    told me 35 minutes after they had come in.

9         I really wanted to be able to document respirations

10   and sweat and potential injuries.  And I asked strenuously

11   that I be allowed to do that.

12        And Sue Cattoor said, "I'll probably regret this,"

13   but she took me, and I was able to film two bands that had

14   come in 35 minutes earlier.  And their respirations were

15   at 128, and their nostrils were still flaring.  They

16   were -- appeared to be exhausted.

17   Q.    Okay.  And then was your presence there -- did it

18   cause any harm or commotion with the horses?

19   A.    Not at all.

20   Q.    Did it cause injury to any BLM personnel?

21   A.    No.

22   Q.    Any member of the public injured because of your

23   presence being that close?

24   A.    No.

25   Q.    Okay.  And just to be clear, being that close, what

1   does that mean to you?  How close were you observing these

2   horses?  At temporary holding?

3    A.    At temporary holding I was able -- and I hope there

4   were photographs provided.  I was able to view the horses

5   and photograph the horses through the panels so that there

6   weren't even -- in some instances, so that there weren't

7   even the bars of the panels in the way.

8    Q.    Okay.  So were you right up to the panels?

9    A.    Yes.  And respectfully so.  You know, we were --

10   toured around with BLM.  And the horses were standing

11   quietly.  People walked quietly.  There was no drama or

12   trauma to anyone.  And the public got to see and document

13   these horses.  And they were all adopted.

14   Q.    All right.  And was there any snow fencing or any

15   barriers that was attached to that -- these panels that

16   prevented you from seeing through them?

17   A.    I reviewed my photographs from the Pryor roundup

18   recently, and I saw no snow fencing.  I could see all the

19   horses unobstructed.

20   Q.    All right.  And then you said -- did you say that

21   all of those horses were adopted?  Is that what you said?

22   A.    All of the horses that were removed from the range

23   in the Pryor Mountains were adopted.

24   Q.    All right.  Now, what was your next roundup?

25   A.    The next roundup I went to was the Calico roundup

80

1    of 2000 -- it began in December, December 28th of 2009,

2    and continued, I believe it was, until February 4th of

3    2010.  And I attended every day the public was allowed to

4    attend, which was two days a week.  I missed maybe one

5    day.

6    Q.    So let me get this straight then.  The Calico

7    roundup had occurred roughly in a two-month period; yes?

8    A.    Yes.

9    Q.    And during that time you were present at Calico, or

10   that area, that entire time?

11   A.    Yes.

12   Q.    And during that entire time, you were only allowed

13   to see roundups, did you say, two days a week?

14   A.    Yes.  This was these -- the Calico roundup, almost

15   all of the trap sites were on private land, which I found

16   very frustrating because I could not go unless BLM

17   escorted me and other members of the public.

18        But when we were there viewing -- the trap sites

19   changed as -- you know, it's a huge area, 500-acre plus

20   area.  And so the trap sites changed in order to capture

21   the horses in each area, and the viewing differed.

22        Attempts were always made to provide decent viewing

23   for us, at times sometimes better than others, when we

24   couldn't see -- when the terrain did not lend itself to

25   decent viewing where one could photograph and identify

1    horses coming in.

2         They provided a trailer, a horse trailer, for us to

3    stay in, with the admonition to be very quiet as everyone

4    was.  No one, no one I've ever been to a roundup around,

5    including myself, has ever wanted to obstruct the roundup,

6    whether or not we -- personally whether or not I want the

7    horses on the range or off the range, at that point it's

8    just going to harm the horses and possibly people.  So

9    everyone is quite cooperative at the trap sites.

10   Q.    Okay.  And so whether it was in the trailer or in a

11   viewing location in a trailer or in a viewing location

12   elsewhere, were you able to, during the roundup, see, to

13   the extent that you could identify horses by particular

14   markings, gender, that way?

15   A.    Yes.  I can't always see gender from that far, but,

16   yes.  You know, I -- I was not -- personally, I believe

17   more access was still needed in that the respirations, the

18   horses' condition, I was never given that level of access

19   again that I had in the Pryors.  And I found it more and

20   more difficult to view the horses as the roundups

21   progressed.

22   Q.    Now, how about temporary holding at Calico, how was

23   your access to horses there?

24   A.    We were able to tour around the pens, within ten

25   feet of the pens.  We could see the horses clearly,

82

1   photograph them clearly.  There was snow fencing.

2          But we were so close it wasn't the same type of

3   hindrance it is when you're held 20 yards away, 30 yards

4   away, 50 yards away, when you have to stand -- well, I'll

5   wait, I guess.  I can contrast it later.  But we were

6   able -- I was able to see the horses pretty well.

7   Q.    Okay.  To the -- pretty well meaning, what, to the

8   extent that you could identify them and their gender?

9   A.    At Calico, oh, yes.

10         I have a blog, I should say at this point.  I have

11  a lot of dedicated readers, some many subscribe, and

12  others just, you know, tune into it regularly.  And I was

13  doing a weekly update during the Calico roundup of that

14  blog.  And people were very interested in those horses.

15         Many of the horses that I noticed and began

16  displaying photographs of ended up in the Internet

17  adoption because members of the public were so interested

18  in them.

19  Q.    Okay.  So do you have a personal knowledge, then,

20  that the photographs, some of which you took occurring at

21  Calico, caused some of those horses to be adopted?

22  A.    Yes.  Definitely.

23  Q.    All right.  And for the Court's knowledge, what is

24  your blog?  What's the address?

25  A.    Humaneobserver.blogspot.com.  And it goes back to

83

1    January of 2010.

2    Q.    All right.  Now, while at Calico, did access

3    change?

4    A.    Yes.

5    Q.    Can you tell the Court about that, please.

6    A.    Specifically in January, toward the end of the

7    roundup, I -- there was a day when no roundup was going to

8    take place.  The helicopter wasn't going to fly.  But we

9    were already out there.  And while Alan Shepard and Dave

10   Cattoor were talking, they said that we could walk around

11   and take a look at the temporary holding facility.  There

12   were no horses there.

13   Q.    Who is Dave Cattoor and who is Alan Shepherd?

14   A.    Alan Shepherd is the -- was the Nevada lead for the

15   wild horse and burro program.  And Dave Cattoor is the

16   head of the Cattoor roundup.  They do some of the

17   helicopter roundups -- at that time, all of the helicopter

18   roundups.  So he was the chief of that organization.

19        I picked up some hay and was looking at the hay

20   that was being used.  I was studying equine nutrition.  I

21   was interested in the hay that they had.  And I was

22   holding it in my hand.  And it was suddenly yanked out of

23   my hand as I was talking to the wild horse and burro

24   specialist.

25        And Dave Cattoor was standing there when I turned

84

1   around, screaming at me, and throwing the hay to the

2   ground.

3          And the day after this happened, there was caution

4   tape around the temporary holding pens.  And it was a good

5   70 yards back.  And we were told we would no longer be

6   allowed to get next to the pens, to walk around and see

7   the horses.

8          And after that we've never -- the access to view

9   horses in temporary holding has always been extremely

10  limited.  And that was the turning point.

11  Q.     Okay.  And so turning point, what do you mean?

12  A.     That was the -- that was a key turning point, in my

13  experience, in the ability to walk around the temporary

14  holding pens and see and assess and identify individual

15  horses.  I could no longer do that.

16  Q.     Your impression was because you picked up some hay,

17  a handful of hay?

18  A.     Dave Cattoor, what he screamed at me was, and

19  please forgive the vernacular, but, "What are you going to

20  do with this shit, you going to eat it?"  And he threw it

21  to the ground.

22         And I later learned -- I was stunned and

23  frightened.  And I told Alan Shepherd, like, that was

24  really inappropriate.

25         And he said to me, "Yes, I'll talk to him."

85

1      And I said, "I don't know what -- why that

2  happened."  I've never -- I spoke to the man once in the

3  Pryors and actually all he said was, "You two need to

4  stand over there."  I've never had an interaction with him

5  before.

6      And Alan Shepherd informed me that there was a lot

7  of pressure on BLM because members of the public were

8  saying --

9          MR. PETERSEN:  Objection, hearsay.

10          THE COURT:  Sustained.

11          THE WITNESS:  Well, Mr. Shepherd is here.  You

12  can ask him.

13          THE COURT:  The objection's sustained.

14      Go on to your next question.

15  BY MR. COWAN:

16   Q.    And --

17   A.    It wasn't because --

18          MR. PETERSEN:  Objection, Your Honor.  There's

19  no question been posed.

20          THE WITNESS:  Okay.

21          MR. COWAN:  That's okay.

22  BY MR. COWAN:

23   Q.    So matters got tense for you?

24   A.    Yes.

25   Q.    Did it get tense for the public, as well, your

86

1    observations?

2    A.    My observation was that there weren't even any

3    horses present that day that that happened.  There was --

4    repeat your question, please.

5    Q.    Was it your observation that it became tense for

6    the public as well?

7    A.    Yes.  I felt -- I felt that the public and the

8    horses, because we didn't have access to them, I felt that

9    we were being deprived and kind of punished because the

10   photographs and narratives that the public was hearing

11   from my blog and others didn't always cast BLM in a

12   positive light.

13          And people's concern about the hay -- and there

14   were horses dying.  There were record deaths following the

15   Calico roundup.  And people were very, very disturbed over

16   this.  And access got smaller and smaller.

17   Q.    All right.  During the Calico process; yes?

18   A.    Well, at the very end.  And at the very end of the

19   Calico.

20   Q.    Okay.  Have you been to recent roundups?

21   A.    Yes.  Well, I went to --

22   Q.    I -- go ahead.  Sorry.

23   A.    Following Calico I attended the California roundup

24   at Twin Peaks.  And when I did that, I stayed, again, for

25   the duration of that long roundup.  There were 1,600

1   horses taken off the range.  Calico there were 1,922.  And

2   in Calico -- in Twin Peaks there were 1,600 horses, and I

3   believe 200 -- 160 burros removed.  And I saw most of

4   those.

5   Q.    And in your -- was there a difference in your

6   access from Calico to the Twin Peaks roundup?

7   A.    California BLM tried -- tried to provide us with

8   access.  There were times it wasn't very good.  But when

9   certain BLM were present, they really tried to help.  When

10   they weren't present, sometimes it was difficult to see.

11   Q.    Let's fast forward to the last roundup you've been

12   to.

13   A.    Yeah.

14   Q.    What was that one?

15   A.    The last one was the Calico roundup of 2012.

16   Q.    Okay.  Calico again in 2000 -- 2012?

17   A.    Yes.

18   Q.    Okay.  What time of year was that?

19   A.    That, again, was in the winter.  That was December

20   of -- started in 2011.  And they took some time off during

21   the Christmas break.  And it continued and concluded in

22   January of 2012.

23   Q.    And can you describe for the Court your access to

24   that roundup?

25   A.    It was abysmal.

88

1    Q.    Factually?

2    A.    I'm sorry.  I'm sorry.  I should know better.

3          There were times we were three-quarters of a mile

4    from the trap with trees blocking the mouth of the traps.

5    So all we could see was the Judas Horse being followed by

6    the horses that were captured.  We could not see them

7    coming.  All we could see was the helicopter bobbing,

8    bobbing, bobbing, and we could hear it droning, but we

9    could not see anything except the horses coming in.

10         That was pretty characteristic.  Sometimes --

11   Q.    Okay.

12   A.    Yeah.

13   Q.    How about this?  Were you able to identify horses

14   by markings or gender as you saw them coming in being

15   rounded up at Calico 2012?

16   A.    Too far away.  There were a couple of trap sites

17   where we could see them coming in.  I don't mean to say

18   they were all bad.  I like being accurate.  But we were so

19   far away that I could not.  And I had -- well, yeah.

20   Q.    Okay.  Now, what about the temporary holding that

21   they had at Calico 2012, how was the access to that?

22   A.    It was almost nonexistent in that it was once a

23   week on Saturday, which meant that the horses I didn't see

24   coming in off the range, I never saw.  I never saw.

25   Because those horses were brought to temporary holding,

1  stayed there for a couple of days, maybe, and then they

2  were shipped off to Palomino Valley and Broken Arrow.

3       And Broken Arrow facility is closed to the public.

4  So I don't even get to go in there and see those horses.

5  So I never saw them.  I never got to see them in temporary

6  holding because they were gone by Saturday.  So on

7  Saturday, I only got to see whatever horses were left

8  there on Saturday.

9  Q.    Do you have an impression why this change in

10  access?

11  A.    Yes.  I have several distinct -- I have -- I base

12  my impression -- my impression is that BLM was squirming

13  under the scrutiny and the objections of the public which

14  were coming in because of the reports, photographs, and

15  videos that were made public by me and others.

16       In addition, I was told by two BLM --

17            MR. PETERSEN:  Objection, hearsay.

18            THE COURT:  Sustained.

19            THE WITNESS:  I have a question.

20            MR. COWAN:  Hold on just a second.  Let me just

21  ask a question, and then maybe I'll get an objection, and

22  maybe we can get around it.

23            THE COURT:  All right.  Go ahead.

24            MR. COWAN:  If that's all right.  Thanks.

25       Just a moment, Your Honor.  I'm conferring.

1    BY MR. COWAN:

2    Q.    Did a BLM employee ever tell you --

3            MR. PETERSEN:  Objection, hearsay.

4            MR. COWAN:  Let me finish.  It might not be.

5    BY MR. COWAN:

6    Q.    Did a BLM employee ever tell you that you would

7    never have the access that you had had previously because

8    of your postings?

9            MR. PETERSEN:  Same objection.

10           THE WITNESS:  Yes.

11           THE COURT:  The objection is overruled.

12        But you need to identify who, when, and where.

13           MR. COWAN:  Okay.

14           THE WITNESS:  Okay.

15           MR. COWAN:  May I let the witness do that, Your

16   Honor?

17           THE COURT:  Yes.

18           MR. COWAN:  Okay.  Thanks.

19   BY MR. COWAN:

20   Q.    Go ahead, please.

21   A.    It was the Calico roundup of 2012.  It was Gene

22   Seidlitz, the district manager in Winnemucca.  It is his

23   district.  And the Calico roundup is his responsibility.

24        And I was -- we were discussing how bad access had

25   become.  And he was very hurt and angry.  He said to me:

1    I was very upset.  You will never have the access you had

2    at the first Calico again.  I did everything I could.  I

3    felt you personally targeted me.  I felt the public was

4    angry and singled me out, and it's not going to happen

5    again.

6    Q.    Okay.

7    A.    I -- that is not the only BLM employee that told me

8    I would have limited access.

9    Q.    Okay.  Was there another employee who said it?

10   Please tell us.

11   A.    Yes.  In the first Calico, during a tour at Broken

12   Arrow, Lily Thomas, who was in charge of the long-term

13   holding facilities, thought I had posted a video that I

14   had not posted.

15        And I was saying that I wanted to be able to

16   eventually get into long-term holding and see horses

17   there; that the public had a right to know and see how

18   they were in long-term holding.

19        And she turned and looked at me and said, "I don't

20   like you.  Nobody likes you.  You're never getting into

21   long-term holding."

22   Q.    Who is Lily Thomas?

23   A.    Lily Thomas is a BLM employee.

24   Q.    All right.  Now, have you been to Broken Arrow?

25   A.    Yes.

92

1          I have one more reason to believe, however, that

2     BLM has --

3               MR. PETERSEN:  Objection, speculation.

4               THE COURT:  Sustained.

5               THE WITNESS:  Based on a document?

6               THE COURT:  The objection's sustained.

7               MR. COWAN:  Let me just -- I'm sorry, Your

8     Honor.  I lost control.  I apologize.

9     BY MR. COWAN:

10    Q.    How about this.  Let's just start with your

11    experience at Broken Arrow.  Okay?  Just go ahead and tell

12    the Court your experience there, maybe earlier days, give

13    a date, and then make a comparison for later times.

14    A.    Okay.

15    Q.    Okay?

16    A.    During Broken Arrow, we were -- it is a private

17    facility contracted with BLM to hold up to 2,800 horses, I

18    believe.  And so tours were done at first twice a week, so

19    that we could see the horses that were coming in fresh off

20    the range in 2010 and we could follow up on them.

21          And I want to say that the public would call me and

22    ask to get me to get tag numbers for horses they saw on my

23    blog or horses that they saw who had trouble being rounded

24    up because they would identify with or feel sorry for or

25    like certain characteristics of the animal, and they

93

1   wanted to adopt some of the animals that had problems

2   getting rounded up.

3          And it was frustrating to me when I -- that BLM

4   didn't always make it -- didn't make it possible.

5              MR. PETERSEN:  Objection, Your Honor.  Could we

6   get a question and answer, rather than a narrative?

7              THE COURT:  Yes.

8              THE WITNESS:  Okay.  I apologize.

9          Do you want to reask the question.

10             MR. COWAN:  That's fair.

11  BY MR. COWAN:

12  Q.   Well, let's just talk about this.  Your viewing at

13  Broken Arrow in the beginning, how was it?  And then

14  just -- let's make a comparison.

15  A.   It was controlled but very good.

16  Q.   All right.  And very good meaning --

17             MR. PETERSEN:  Your Honor, can you please ask

18  for some temporal distinctions here?

19             THE WITNESS:  I apologize for the lack of

20  detail.

21             THE COURT:  Wait a minute.  There's an

22  objection.

23          Mr. Cowan, establish date and time and place.

24  BY MR. COWAN:

25  Q.   Could you tell us the date, the time that we're

94

1    talking about at Broken Arrow?

2    A.    Yes.  Date would be December, January -- it would

3    be January, February 2010.  Time would be twice a week.

4    Q.    During that time were you able to identify horses

5    by particular markings, gender, tags?

6    A.    Yes.

7    Q.    Okay.  And did that process; meaning your ability

8    to look at horses there, did that change over time?

9    A.    Yes.  It was reduced to once a week.

10    Q.    Okay.  When, roughly?

11    A.    Shortly after the roundup started and the reports

12    started coming in about the problems horses were having, I

13    was reporting on my blog injuries that I saw at Broken

14    Arrow, policies that were --

15             MR. PETERSEN:  Objection, Your Honor.  Vague.

16    It's impossible for us to determine what time she's

17    talking about.

18             MR. COWAN:  Just a -- let's get a --

19             THE COURT:  Rephrase, yes.

20    BY MR. COWAN:

21    Q.    So what's the timeframe we're talking about?

22    A.    Same timeframe.  January 2010.

23    Q.    Okay.

24    A.    Access was reduced to once-a-week tour.  But we

25    could still see all of the animals very well.  But it --

1    but had to limit the tour to a certain number, you know,

2    an hour and a half.

3        Many times the deputy division chief who conducted

4    the tour would extend it further.  But if he didn't do it,

5    the tours were very short but were held to the

6    one-and-a-half-hour time.

7    Q.    And then was there time where just finally access

8    ended, just stopped?

9    A.    Oh, yes, entirely.

10   Q.    Okay.  And when was that?

11   A.    After the -- it was in June of 2010, following a

12   court ruling regarding the roundup in that case.

13   Q.    Okay.  Were you able to help with adoptions in the

14   beginning or the earlier times you were able to get into

15   Broken Arrow?

16   A.    Yes.

17   Q.    Okay.  And then was your --

18   A.    And then -- I'm sorry.

19   Q.    Go ahead.  I'm sorry.

20   A.    No, I'm good.  Go ahead.

21   Q.    All right.  How many?  How many horses do you think

22   you facilitated an adoption?

23   A.    Wow.  I've never counted.  Roughly -- let me think.

24   Well, 14 or 15 from that roundup that I know of.

25   Q.    Okay.  And then the reduced access over time, did

1   that affect your ability to help facilitate adoptions?

2   A.   Yes.  I had to tell people that I couldn't help

3   them, that I can't identify that horse.

4   Q.   How many people, if you know, your best estimate,

5   did you have to turn away because you didn't know?

6   A.   Six.  Roughly.  I've had numerous inquiries about

7   one or more horses.

8   Q.   Okay.  I was just asking how many people you were

9   able -- you sent this message to, the message being:  I

10  can't give you information about this horse because I

11  can't see it?

12  A.   More than six.  And I think it's more -- it's hard

13  to quantify that because people talk to --

14            MR. PETERSEN:  Your Honor, I think the witness

15  has established that she's speculating at this point.

16            THE WITNESS:  No.  I'm trying to frame it in a

17  way it won't get an objection.

18            THE COURT:  Well, I think it's been asked and

19  answered.

20       Let's move on.

21            MR. COWAN:  Okay.  Hold on just a second.

22            THE WITNESS:  There was a group interested

23  in --

24            MR. PETERSEN:  Your Honor, there's no question

25  posed at this time.

97

1          THE WITNESS:  Okay.

2          MR. COWAN:  I'm sorry.  Just one second, Your

3    Honor.

4    BY MR. COWAN:

5    Q.    And after Broken Arrow was closed, there was no

6    access, you were not able to facilitate any adoptions for

7    Broken Arrow; true?

8    A.    True.

9    Q.    All right.  Was there ever a time you became

10   familiar --

11         THE COURT:  Can you give me a date on that?

12   When was Broken Arrow closed?

13   BY MR. COWAN:

14   Q.    I'm sorry.  When was Broken Arrow closed?

15   A.    June of 2010.  Wait.  Yes, June of 2010.

16   Q.    And to be clear, it was closed to the public, not

17   closed to horses coming in off the range?

18   A.    It was closed to the public.

19   Q.    All right.  Was there a time you became aware an

20   e-mail was circulated by Mr. Bolstad about why Broken

21   Arrow was closed?

22   A.    Yes.  Only the e-mail that had been penned by

23   Mr. Bolstad was provided.  I'm sure he didn't want --

24   well, speculating.

25   Q.    How are you aware of this e-mail?

98

1   A.    It was given to me by an advocate who had received

2   the document through the Freedom of Information Act.

3   Q.    Okay.  An advocate working for Wild Horse

4   Education?  If you know?

5   A.    I don't know.  I don't know.

6   Q.    All right.  So have you seen this e-mail before?

7   A.    I am familiar with this e-mail now, yes.

8   Q.    Okay.  There are some exhibits, I believe, that are

9   in front of you.

10   A.    I don't have any.

11   Q.    All right.

12   A.    I thought court reporting was hard.

13   Q.    Looking at the exhibit marked as Exhibit No. 5,

14   have you seen that?

15   A.    Yes.  Yes, I'm familiar.  This is the document I

16   was talking about.

17   Q.    Okay.  And is this the document that you're aware

18   of was obtained by the Freedom of Information Act?

19   A.    Yes, it is.

20   Q.    Okay.  And is the reason stated by the -- well, let

21   me back up.

22         Is the author Mr. Bolstad?

23         MR. PETERSEN:  Objection, hearsay.

24         MR. COWAN:  The question is, is the author

25   Mr. Bolstad.  That's not hearsay, Your Honor.

99

1          MR. PETERSEN:  I believe it's going to the

2     facts that involve the e-mail.  Part of the fact is who

3     the sender is.

4          THE COURT:  I'm going to allow it, subject, of

5     course, to subsequent challenge.

6          So you may inquire.

7     BY MR. COWAN:

8     Q.    So are you aware that Mr. Bolstad is the author?

9     A.    The document indicates that Dean Bolstad is the

10    author of this document, that is correct.

11    Q.    Okay.  And do you have any information that this is

12    not a true and accurate copy of its original?

13    A.    I have no idea that would indicate that this is

14    inaccurate.  This appears to be a genuine Dean Bolstad

15    document, the one that I am familiar with.

16    Q.    And, in fact, are you mentioned in this document?

17    A.    I am.

18          MR. COWAN:  Okay.  Your Honor, I would offer

19    it.

20          MR. PETERSEN:  Your Honor, to the extent that

21    the plaintiff's counsel is offering this e-mail as to the

22    truth of its content, we object that it's hearsay.

23          THE COURT:  The Court's going to reserve ruling

24    on it.  I will allow questioning on it.  And I will treat

25    it in that fashion.

1          MR. COWAN:  Okay.

2          MR. PETERSEN:  Thank you, Your Honor.

3          MR. COWAN:  And, Your Honor, would you be okay

4    if I allowed the witness to read the second and third

5    paragraph into evidence?

6          THE COURT:  Well, she's not reading it -- I'll

7    allow her to read it.  It's not necessarily going into

8    evidence.

9          MR. COWAN:  I understand.

10         THE COURT:  But subject to the government's

11   objection, I'll allow it to be read.

12   BY MR. COWAN:

13   Q.    Ma'am, could you please read the second paragraph

14   and the third paragraph.  Second paragraph beginning with,

15   "Based on my personal experiences"; and the third

16   paragraph beginning with, "I am not sensationalizing."

17   A.    Yes.  "Based on my personal experiences with phone

18   calls and e-mails from irrational individuals I am

19   becoming increasingly concerned about the safety of our

20   employees and potential terrorist acts against our

21   facilities.  I am not concerned that people who attend the

22   tours will cause the harm, but I am concerned about

23   potential actions from the irrational and emotional

24   publics that read Elyse Gardner's blogs.  There have been

25   no direct threats that we can take action against, but

1    I've had calls from individuals who are clearly mentally

2    unstable and others that express their outrage.  The

3    volume of these angry communications increases each week

4    and last week the Churchill County Sheriff's Department

5    began an investigation following a complaint alleging

6    inhumane treatment of an animal at Indian Lakes.

7         "I am not" -- new paragraph.  "I am not

8    sensationalizing this as I have experienced all of this

9    first hand after conducting the last nine Indian Lakes

10   Sunday tours and being the person that most call and

11   e-mail.  John Neill's and our veterinarian's reputability

12   is seriously being compromised by the fall out from the

13   Indian Lakes tours."

14        And I will just add Indian Lakes --

15             THE COURT:  Don't add anything here.  You've

16   been asked to read it.

17             THE WITNESS:  Okay.

18   BY MR. COWAN:

19   Q.   Okay.  And so when you saw this, what were your

20   thoughts?

21   A.   My thoughts were I wasn't surprised because it's

22   what I had suspected.  But I was outraged and

23   disappointed.  I was very disappointed in Dean Bolstad.

24   Q.   Are the blogs by Elyse Gardner to which this

25   references, are they still up on the Internet at that

1   blogspot.com address that you had given the Court earlier?

2   A.   Yes, they are.

3   Q.   Was it your intent to sensationalize that which you

4   depicted in your blog?

5   A.   Not at all.

6   Q.   And just in essence what does it depict, just

7   photographs of horses?

8   A.   My blog shows photographs and videos of horses

9   being held at the holding facility.

10   Q.   And then this caused public concern, at least as

11   far as you're aware, at least based on this e-mail,

12   Exhibit 5?

13   A.   Yes.

14          MR. COWAN:  Okay.  Thank you very much.

15          THE WITNESS:  Thank you.

16          THE COURT:  Cross-examination?

17

18                    **CROSS-EXAMINATION**

19   BY MR. PETERSEN:

20   Q.   Ms. Gardner, you stated that the Broken Arrow

21   facility was closed on June of 2010?

22   A.   Correct.

23   Q.   Have you attended any of the tours at the Broken

24   Arrow facility that have been offered by BLM since 2010?

25   A.   Yes, I have.

1    Q.    And how many of those tours have you availed

2    yourself of?

3    A.    I think I've been on two.

4    Q.    Do you know the dates of those tours?

5    A.    I can't recall.  One was -- Counsel, for all

6    intents and purposes, the facility is closed --

7    Q.    I'm sorry --

8    A.    -- to the public.

9    Q.    -- can you just answer the question that I asked

10   you?

11        Your Honor, will you, please, direct the witness to

12   answer the question?

13            THE COURT:  Answer the question, please.

14            THE WITNESS:  I'm working on it.  I'm trying to

15   remember the dates and the tours.  One was about a year

16   later.  It was in July of 2011.

17   BY MR. PETERSEN:

18   Q.    And the other?

19   A.    It was, I believe, another year later, in April or

20   July of 2012.  Somewhere in there.  That -- it was about

21   two tours a year, I believe.

22   Q.    Is that two tours a year?  So you visited in

23   approximately July of 2011 and then June to July of 2012?

24   A.    I believe so.

25   Q.    Okay.  Is that one time a year or two times?

1   A.    I did not go on both tours.  I went on one tour per

2   year.  There were maybe -- there was one --

3   Q.    So you went on two tours, one per year?

4   A.    Correct.

5             MR. PETERSEN:  Thank you.

6             MR. COWAN:  Redirect, please.

7             THE COURT:  Redirect.

8             MR. COWAN:  Thank you.

9

10                    **REDIRECT EXAMINATION**

11  BY MR. COWAN:

12  Q.    Okay.  Can you tell us about these tours compared

13  with the -- what your access was previously?  Let's start

14  with the July 2011 tour you said you went to.

15  A.    Witness laughs ironically.  The tours that are now

16  offered that have -- the tours that have been offered

17  twice a year for the last two years are virtually

18  non-tours.  I can't stop long enough to get to know a

19  horse.

20            When you walk -- these are individuals to us.  I

21  can't know these animals as individuals when I'm sitting

22  in the back of a trolly going along at about five miles an

23  hour.  And I feel uncomfortable.  I have to yell, "Can you

24  stop, please?" every time I want to look at a horse.

25  Especially when there are 10, 15 more people there.  I

1    don't know if they want to stop or not.

2         And it's a very -- it's not conducive to helping me

3    photograph and get the horses out there for adoption, to

4    identify them.  They're going by so fast, I can't see.

5    Q.    Okay.  Maybe I can speed it up faster, and that is,

6    did this same process occur, in your experience, when you

7    also were there June 2012?

8    A.    Yes.

9    Q.    For that tour?

10   A.    Yes.

11   Q.    The tour was the same process as the one in

12   July 2012?

13        MR. PETERSEN:  Asked and answered.

14        THE WITNESS:  The tours were identical in the

15   way they were conducted, with people sitting in this

16   covered wagon, essentially, and being towed around the

17   facility.

18   BY MR. COWAN:

19   Q.    And how did those tours compare to how it was

20   previously?

21   A.    The previous tours were all on foot, walking.  They

22   lasted a minimum of an hour and a half, up to four hours

23   at times.  We were able to stop and photograph and video

24   horses.  I identified several foals that -- whose mothers

25   were not anywhere to be found and who were ultimately sent

1    to another facility.  There would be no way I could do

2    that from the trolly.

3    Q.    Are you able to track -- well, let me back up.

4          How long was the trolly tour?  How long did that

5    last in July 2011 and also June 2012?

6    A.    I think it was about an hour.

7    Q.    All right.  And then are you able -- with the

8    trolly tours, the June 2012, July 2011 tours, trolly

9    tours, are you able to adequately track horses to help

10   with adoptions?

11   A.    No.

12   Q.    Are you able to follow up with any concerns that

13   you might have with horses that you might have observed?

14   A.    I'm not.

15         MR. PETERSEN:  Your Honor, objection.  I

16   believe the plaintiff's counsel's questions are going

17   beyond the scope of redirect.

18         THE COURT:  Well, I'll allow the question, as

19   long as it's confined to the trolly and her observations

20   during the trolly tours.

21   BY MR. COWAN:

22   Q.    So the question is, are you able to follow up with

23   a horse you might have concern with with this trolly-type

24   tour June 2012 and July 2011?

25   A.    No, I'm not able to follow up.  I'm not able to

1   identify individuals.  These animals are individuals to

2   me.  And I'm not able to follow up.  I can't assess them.

3   I can't introduce them to a public who is hungry, hungry

4   to know about them.  My effectiveness is greatly

5   diminished in terms of helping these horses find homes.

6   Q.    Okay.  Thank you.

7                MR. COWAN:  Thanks, Your Honor.

8                THE COURT:  Mr. Petersen?

9                MR. PETERSEN:  No other questions, Your Honor.

10  Thank you.

11               THE COURT:  All right.

12         Mrs. Gardner, you may step down.  Thank you.

13               THE WITNESS:  Thank you, sir.

14               THE COURT:  Your next witness?

15               MR. COWAN:  Your Honor, my next witness would

16  be the plaintiff, Ms. Leigh.  The question is do you want

17  to start now?

18               THE COURT:  Yes, let's go ahead and get started

19  because I'm concerned that 1:30 hearing could complicate

20  this afternoon's schedule.

21               MR. COWAN:  And, again, are we coming back --

22  will be back at 2:00?

23               THE COURT:  Be back at 2:00.  I would expect to

24  get started at 2:00.  If we can't, it will be shortly

25  afterwards.

1                      LAURA LEIGH,

2            called as a witness on behalf of the

3          Plaintiff, having been first duly sworn,

4            was examined and testified as follows:

5

6            THE WITNESS:  I do.

7            THE CLERK:  Please be seated.

8        State your full name for the record, and spell your

9    last name.

10            THE WITNESS:  My name is Laura Leigh.

11    L-a-u-r-a.  Last name Leigh, L-e-i-g-h.

12            THE CLERK:  Can you please tell us your city

13    and state of residence.

14            THE WITNESS:  Carson City, Nevada.

15            MR. COWAN:  Your Honor, I just need a little

16    bit of direction from the Court on one issue, and that is

17    on standing.  There's been some time, considerable time

18    that's gone by since we last met on this case.  And I can

19    certainly establish a whole bunch more standing that -- of

20    this witness, that has occurred since then.

21        Do I need to do that?  Or may I assume that the

22    Court recognizes Ms. Leigh's standing here today?

23            THE COURT:  Well, I certainly recognize her

24    standing and certainly the standing that she had

25    previously.  Because I don't know what you may be

1    referring to, if there's additional --

2              MR. COWAN:  Well, Your Honor --

3              THE COURT:  I mean, she's certainly qualified

4    to testify to this issue in the Court's view.

5              MR. COWAN:  Okay.  Thank you.  Thank you.

6

7                        **LAURA LEIGH**,

8              called as a witness on behalf of the

9              Plaintiff, having been first duly sworn,

10             was examined and testified as follows:

11

12                    **DIRECT EXAMINATION**

13   BY MR. COWAN:

14   Q.    Okay.  Ms. Leigh, you reside in Nevada?

15   A.    Yes, I do.

16   Q.    Okay.  And what do you do?

17   A.    I'm a journalist, photojournalist.

18         I also now have formed an organization devoted to

19   the welfare and education of the public on the wild horses

20   and burros.

21   Q.    What's that organization?

22   A.    The organization is Wild Horse Education.

23         I do a lot of things in the capacity.  I photograph

24   and document roundups.  I document field conditions.  I do

25   reports on drought this year and give -- shared those

1   reports with several different organizations and agencies.

2        I assist with adoptions.  I've assisted BLM with

3   two trap-site adoptions in the last year; one at Diamond

4   and one at Stone Cabin.

5        I've been to more roundups than 33 areas.  Was

6   sitting with a reporter the other day and we figured it

7   out that I've been to more than 400 operation days,

8   probably close to 500 operation days in the last three

9   years.

10   Q.    Do you know of anybody who has been to more

11   roundups than --

12   A.    No, not on my salary, okay.

13   Q.    BLM included?

14   A.    No.  Except for the contractors themselves

15   probably.

16   Q.    All right.  Why do you do it?

17   A.    I love wild horses.  Wild horses and burros speak

18   to my soul as an American.  I mean, they really -- I'm not

19   alone in that.  You know, they represent the pioneer

20   spirit of the American West.

21        And, I mean, the act itself passed unanimously in

22   both houses of Congress.  I have followers all over the

23   world.  I have one video that's hit two million views.

24   This is a love that's shared by many.

25   Q.    Okay.  If the Court wanted to find the video clip

1  that has over two million views, how would you tell the

2  Court how to get to it?

3  A.     It's on YouTube.  It's called "Is It Bad Enough For

4  You?  Wild Horses."

5  Q.     All right.  And can the Court or individuals see

6  that as well on Wild Horse Education's websites?

7  A.     Yes, wildhorseeducation.org or our blog or one of

8  the other venues that we've been published in.  It's been

9  mentioned in several magazines.

10  Q.     Okay.  So, what is your readership, your

11  viewership?

12  A.     Like I said, I mean, there's one video with more

13  than two million hits.  The video -- that one video itself

14  gets 5,000 hits a day.  I have a viewership all over the

15  world.

16         The majority of my viewers are in America.  But

17  I've got a huge following in Europe, you know, Africa,

18  China, Russia.  People all over the world really love the

19  American West.  When they think of America, they think of,

20  you know, cowboys and wild horses.  And they still do.

21  And so wild horses are -- like I say, are followed

22  worldwide.

23  Q.     Okay.  How many miles have you traveled in your

24  quest to document, photograph, report on wild horses?

25  A.     It's a fun statistic.  A lot of people laugh about

1    it.  I've traveled more than 200,000 miles in the last two

2    years.

3    Q.    And how many vehicles have you gone through?

4    A.    I've beaten up two vehicles pretty bad.

5    Q.    And is that all paved highway miles?

6    A.    Oh, yeah, uh-huh, right.  Really well-paved

7    highways.  Only in sunny weather.

8          About half of my miles are off-road and in extreme

9    weather conditions, either extreme heat or cold, snow.

10   It's not easy to do.  You know, you drive all night or

11   drive across the state, and often the weather is bad.

12         I mean, Nevada is a state of extremes.  And then

13   you're off-road and the terrain isn't easy.  I mean, I've

14   had one roundup where I got six flat tires.

15   Q.    All right.  So is it then difficult to travel and

16   observe a wild horse roundup personally?

17   A.    Yes.  There's a physical toll as well.  A financial

18   hardship.  And, you know, huge time commitment.

19   Q.    And that's what I was getting to, the toll on you

20   physically, emotionally.

21   A.    Yeah, there's a huge emotional toll.  This is

22   not -- you know, it's -- I mean, several of the other

23   witnesses -- and I don't even know if I'm allowed to

24   reference other testimony here -- but, you know, several

25   of the other witnesses talked about the extreme conditions

1    and the change that you see.

2         The roundups have changed.  The pace is

3    accelerated.  And the type of conduct that you see has

4    changed.  I have spent the last four days with a reporter

5    from the Today Show and NBC Nightly News, and I gave them

6    access to my video library.  And we went through and

7    looked at what I've witnessed.

8         And I'm emotionally raw from watching the type of

9    conduct that I've seen accelerate in my videos.  So it's

10   not just the -- you know, the physical marathon of

11   running, but there's an emotional marathon here as well.

12   And then the games to see access, it is increasingly

13   difficult to identify individuals.  It hurts.  Yeah, it

14   hurts.

15   Q.    So you said the games to see.  What do you mean?

16   A.    Access has -- becomes limited.  And, you know,

17   often it depends on who's standing there.  You know, one

18   wild horse and burro specialist might be in a better mood

19   than another one day, or one district will have a

20   different idea about what access is than another, and you

21   can go out.

22        And then depending, like, if I put out an image the

23   night before that doesn't portray them in a good light,

24   you know, the next day it almost feels like I'm being

25   reprimanded and I'm, you know, two miles away.  And so

1   it's this constant -- you know, there's no other way to

2   describe it than a game.

3   Q.   Are you compliant to -- with all rules --

4   A.   Always.  Always.  I don't break a rule.

5        I mean, one day I was held -- and this was at

6   Silver King.  I was held where there were no operations

7   happening at all, no chopper in the air, nothing, and they

8   told me I couldn't move.  I ended up falling asleep in my

9   car and being held there for four hours on a public road

10  when they told me I couldn't move, I couldn't go anywhere.

11  If that's not a game, I don't know what it is.

12  Q.   All right.  Have you ever been either reprimanded,

13  arrested, detained because of what BLM might refer to as

14  inappropriate or similar conduct?

15  A.   No, never for inappropriate conduct.  I mean, I've

16  been detained because they don't want me to move.  I've

17  been detained because, you know, they'll -- for one reason

18  or another.  But never because I've broken a rule.

19       I mean, you know, we're all human beings.  And I've

20  gotten to know a lot of BLM public relations people over

21  the last three years.  And it's not their fault.  I mean,

22  they're just doing their jobs.  And so we have a -- you

23  know, many people I know their personal lives.  I know

24  who's getting their kitchen redone or, you know, who is

25  looking for a new puppy.

1        I mean, we're all human beings.  And it's not their
2   fault.  I know that's their job.  And I know their
3   directive is to, you know, haul me where they're told.

4        So, no, it's never because I've broken a rule or
5   I'm aggressive or out of line.  You know, sometimes I cry
6   or I get angry about what I see.  But I'm never aggressive
7   to the other people present.

8   Q.   Okay.  We talked about roughly how many roundups
9   you've been to; yes?

10  A.   Yeah.  You know, it's somewhere between 4 and 500
11  days of operation in the last few years.

12  Q.   Okay.  And how many facilities have you visited?

13  A.   Holding facilities, like short-term holding
14  facilities?  Let's see.  Five.

15  Q.   Five.  Okay.

16  A.   But I track the horses coming off the range.  My
17  readership -- what my readership is interested in is the
18  horse.  And so I'll go from whatever range the roundup is
19  occurring at and then try to track those horses into
20  holding to tell the story of the horse.

21       You know, it's not the story of a BLM PR person's
22  job that I'm telling, it's the story of America's wild
23  horse.  And people see these horses as an individual.

24       So, for example, if a horse, you know, is rounded
25  up in Owyhee and they start going to Palomino Valley, I'll

1   go there.  If the horses then get switched over to

2   Lichfield in California, I'll go to Lichfield.  I've even

3   gone to Gunnison, which is where the horses -- the studs

4   from Silver King went to.  And I was -- I had to be

5   searched, my vehicle searched before I was allowed to go

6   into Gunnison.

7   Q.    And do you know why that is?

8   A.    You mean at Gunnison?

9   Q.    Let me back up.  What is Gunnison?

10   A.    Gunnison is a prison facility where -- it's very

11   hard to do without a visual.  Okay.  Imagine a large oval,

12   okay?  It's a fenced compound.

13        There's a wild horse and burro facility in there.

14   Then imagine prison walls as another circle inside that

15   circle.  Well, Gunnison is a prison in the second circle.

16   Q.    Okay.

17   A.    Okay.

18   Q.    All right.  And so as -- and so you had to be

19   searched, both you and your --

20   A.    Well, I had to empty out my vehicle.  Not just

21   searched.  I mean, I had to empty out my vehicle.  I'm an

22   epileptic.  They took my medication before I was allowed

23   to go in there.  They said it was contraband.

24        All I wanted to do was see a stud offload.  I had

25   seen him at the roundup, and he was agitated.  I want -- I

1    did facilitate his placement after all of this was said

2    and done.

3         But all I wanted to do was -- because he -- I was

4    concerned about his welfare.  There was some issues with

5    his health.  And I just wanted to see him offload because

6    of the -- I followed the trailer.  I asked BLM if I could

7    follow the trailer and go to Gunnison Prison.

8         And they knew I was going to Gunnison Prison.  They

9    knew I wanted to see this stud offload.  And I was held at

10   the gates by the guards being searched while that stud

11   offloaded, and I never saw him offload.

12   Q.    All right.  In -- the manner in which you report to

13   the public, are you able to facilitate adoptions?

14   A.    Yes.  As a matter of fact, the first quarter

15   statistic last year, my organization was responsible for

16   more than 30 percent of the adoptions in the state of

17   Nevada.

18   Q.    Okay.  BLM included?

19   A.    Well, BLM is -- yeah, in comparison with BLM, yes.

20   Yes.  BLM was 70 percent, or other people, and we were 30.

21   Q.    Okay.  And so the access to the horse to tell the

22   story, is that important to you to --

23   A.    It's the whole story.  It's -- that's it.  That's

24   the heart and soul of everything I do and what everyone's

25   interested in.  It's also the heart and soul of the act

1    itself, is the horse.

2    Q.    Okay.  Is your access more or less the same in

3    different places?

4    A.    Yeah.  It's -- I mean, it's diminished over time.

5    You know, it's less than it is now.  When I first began

6    observing roundups, I could identify individuals coming

7    into the trap.  I could identify them at temporary

8    holding.  I could track them to the facilities and

9    identify and facilitate their adoptions.  It's not as easy

10   anymore.

11         Also from area to area, even mood to mood, things

12   can be arbitrary.  I mean, they can seem relatively

13   arbitrary up there.  But in general my access is much less

14   today than it was when I began observing roundups.

15   Q.    And what do you attribute that to?

16   A.    It could be coincidence.  But the more I put out

17   what I see, the less my access becomes.

18   Q.    You mean, the more you put out to the public --

19   A.    Helicopter hitting a --

20         MR. PETERSEN:  Objection, Your Honor,

21   speculation.

22         THE COURT:  I'll allow the answer.  I agree

23   with this subject to a certain amount of speculation.

24         THE WITNESS:  You know, in the beginning, when

25   I first started observing wild horses and BLM handling of

119

1   wild horses, I hadn't made a statement of being an

2   advocate.  For example, at processing facilities like

3   Palomino Valley, I was literally allowed to climb on the

4   processing chutes and chute down.  They let me climb over

5   the top of the chute.  I have horse knowledge since I was

6   a child.  You know, I'm not disruptive.

7        And during the Calico roundup, I did make a very

8   bold statement of being an advocate after watching an

9   eight-month old colt's feet slough off in the -- which

10  means fall off, at the hospital pens in Broken Arrow.  And

11  after I did that, I mean, you know, there was a screaming

12  match with the facility manager, and my access was shut

13  down and has diminished since.

14  BY MR. COWAN:

15   Q.   Okay.  Can you just give us a couple of examples of

16  how access has changed, a couple of particular examples,

17  in your mind, without going through all of them, because

18  we'll be here for a long time.

19   A.   Yeah, we would.

20   Q.   So let's just get some factually.  Because all we

21  said, as far as that, well, it's changed.  And so let's --

22   A.   Well, temporary holding is a really good place to

23  begin.

24   Q.   Okay.

25   A.   Temporary holding, for example -- you've heard

1   other people say the same thing.  At Calico I was within a

2   couple of feet of the horses.  My head and shoulders were

3   literally at the panels.  I was photographing through the

4   panels.  There was no snow fencing in my way.  I could

5   easily identify individuals.  I could easily see any

6   injuries.  Now --

7            MR. PETERSEN:  Your Honor, could you ask the

8   witness to specify the time again.  We're having trouble

9   with the dates today.

10           THE WITNESS:  Well, the first Calico is

11  2009/2010.  And so we're talking January 2010.

12           But, for example, if I go to a roundup, you know,

13  at Diamond, which is what I was just at, or the one before

14  that, which was Owyhee, which we're talking, you know,

15  2013, 2012, before that was Calico, before that was

16  Wassuk.  I mean, I could go on and on and on.

17           Those roundups now at temporary holding, we don't

18  get to even -- I don't even go -- get to go down near

19  temporary holding once a day.  I don't get to ever shoot

20  through the snow fencing.  There are -- you know, a gap

21  could be left at each pen so that I could view those

22  horses in there.  There's no gap.  Those things are pulled

23  tight.  I couldn't identify individuals.

24           The public will call me.  BLM will put out a

25  report, for example, that an animal died of a pre-existing

1    condition.  Now, if an animal has a pre-existing

2    condition, that means it should be something I should be

3    able to have observed, either at temporary holding or at

4    the trap at some point in time if I'm there every day.

5         So when the public asks me, "Laura, did you see

6    this horse with this pre-existing condition?" I have to

7    say no because I cannot see the animals themselves ever

8    anymore at temporary holding.  It's completely hidden.

9         Now, BLM does something with statistics.  They have

10   animal deaths.  They sort them into categories.  For

11   example, at the roundup if an animal has a pre-existing

12   condition and it's euthanized, it's not counted in a

13   roundup-death statistic as being related to the roundup.

14        So if an animal has a pre-existing condition --

15             MR. PETERSEN:  Your Honor, I believe the answer

16   has become unresponsive at this point.

17             THE COURT:  It has.

18             THE WITNESS:  Okay.  I'm just trying to give

19   examples and why the example is pertinent.  But I will go

20   to a different example if that helps.

21   BY MR. COWAN:

22   Q.   We were talking about temporary holding and why you

23   were not able to see certain horses; yes?

24   A.   I believe, and I don't know, maybe the reporter

25   could read back the question, was that you had asked me

122

1  for examples of how access had changed?

2  Q.    Yes.

3  A.    Was that the question?

4           MR. COWAN:  Okay.  Ms. Court Reporter, could

5  you, please, read back the question?

6           THE COURT:  No.  That was the question.  Go

7  ahead.

8           THE WITNESS:  That's what I thought.  Okay.

9  That's one example of how access has changed.  Broken

10  Arrow is also another example.

11      Tracking horses from roundup to facility.  So if I

12  see something happen at a roundup and I see a horse trap

13  or a colt trap, I cannot track the animal if it goes into

14  Broken Arrow.  Eagle.  I drove to Broken Arrow.  I stood

15  outside.  So I can't track that horse into that facility.

16      There's still horses in Silver King that went into

17  Broken Arrow.  I was not able to track them when they went

18  into Broken Arrow because Broken Arrow was completely

19  closed to me.  And I was completely not able to report on

20  those horses nor help facilitate any adoptions out of --

21  you know, out of Silver King, except for the few that I

22  was able to adopt, myself and a couple of other people,

23  but I couldn't track them at all.  To this day, I still

24  can't track Silver King horses in Broken Arrow.

25

1    BY MR. COWAN:

2    Q.    All right.  I want to get back, before I forget,

3    okay, and have you look at a couple of exhibits that are

4    in front of you.

5              THE COURT:  Well, let me stop for a minute.  I

6    thought you may have strayed from temporary holding there

7    when you were talking about Broken Arrow and Silver King.

8              THE WITNESS:  Yeah, that was a different --

9              THE COURT:  Are you talking about temporary

10   holding at Silver King and Broken Arrow, or are you

11   talking about follow-up?

12             THE WITNESS:  I was talking about being able to

13   follow up, Your Honor.

14             THE COURT:  All right.  Go ahead.

15             MR. COWAN:  I'm sorry.  Okay.

16   BY MR. COWAN:

17   Q.    Maybe I interrupted you.  Were you finished with

18   your answer on that?  On following up the horse?  Being

19   able to follow up the horse?

20   A.    Well, yeah.  I believe what you had asked me for

21   were instances how access has changed.  And all I was able

22   to do was give you two.  I mean, I could sit here and list

23   several more areas, how access has changed over time.  But

24   if you want to go to another subject and have me look at

25   these pictures, I can.

1    Q.    Okay.  I do want you to -- but I need to look at

2    this -- have you look at this quickly, Exhibits 3 --

3    marked Exhibit 3 and 4 in front of you.

4    A.    The photographs?

5    Q.    Yes.

6    A.    Uh-huh.

7    Q.    Did you take these photographs?

8    A.    Yes, I remember these photographs.  These

9    photographs were the only ones that were allowed at our

10   first hearing.

11          MR. COWAN:  Well, actually, I just want to

12   bring the Court up to speed.

13          Your Honor, there was an Exhibit 1 that was entered

14   into evidence November 16th, 2010.  It was only the first

15   three pages of these photos because historical access was

16   not allowed previously.  And so the last two pages were

17   omitted.

18          These were the same two exhibits, only they have

19   Calico, those last two pages, attached to them.  And if I

20   just -- I'd just like to be able to get them admitted with

21   a couple of questions, if that's okay.

22          THE COURT:  I'll allow you to do that.  And

23   I'll take it as an entire exhibit because that's easier

24   than trying to find what you admitted back in the first

25   hearing.

1          MR. COWAN:  I pulled this off the website, Your

2    Honor, just to make sure what was there.  And I recall

3    that we had -- those last two pages were taken off.

4          THE COURT:  Okay.

5    BY MR. COWAN:

6    Q.    So Exhibits 3 and 4, did you take those pictures?

7    A.    Yes, I did.

8    Q.    Do they adequately represent that which are

9    depicted?

10   A.    Yes.

11   Q.    Okay.  And the last two pages, can you tell us

12   where those were taken?

13   A.    Those were from the Calico complex roundup in

14   January 2010.

15         MR. COWAN:  Your Honor, I would offer them.

16         THE COURT:  Any objection?

17         MR. PETERSEN:  Your Honor, the federal

18   defendants object to that evidence being introduced for

19   the same reason that we objected at the beginning of

20   today's hearing, suggesting that the only information that

21   should be coming into evidence in the federal government's

22   position with regard to other gathers would go to

23   historical access or the benefit of the public.

24         But I believe this Court had indicated that it

25   thought that those -- that information was important as it

1    went to other issues.  And so we have refrained from

2    objecting up to this point.

3              THE COURT:  All right.  I appreciate your

4    objection, and I understand it.  And the objection will

5    stand.  But the Court does overrule it because I see some

6    connection between these photographs and the issues

7    presently before the Court.

8                   (Plaintiff's Exhibit Nos. 3 and 4,

9                    received into evidence.)

10             MR. PETERSEN:  Thank you, Your Honor.

11             MR. COWAN:  Okay.  So do we have time?

12             THE COURT:  Yes.  We'll go a couple more

13   minutes.  Why don't you finish up with this exhibit, and

14   then we'll take our break.

15             MR. COWAN:  Okay.  Thank you.

16   BY MR. COWAN:

17   Q.    So tell us what the last couple of pages of

18   Exhibits 3 and 4, what do they --

19   A.    Well, the document marked 25.2, page 4 of 5 --

20   Q.    Yes.

21   A.    -- is that a good way to identify it?

22   Q.    Yes.

23   A.    Okay.  Basically it outlines some of the

24   observation that was given to the public at Calico.  At

25   one roundup, you know, they talk sometimes about their

1    being an open area and no place to hide the public.  Well,

2    this -- you know, the top photograph on page 4 of 5 is an

3    open area.  And the public was spread out and just

4    standing out in the open at that point in time.

5          Right now they wouldn't let anyone stand there,

6    even though no accidents were caused by the public being

7    there, no issues were caused by the public being there.

8    Today that would be an unacceptable location for the

9    public.  Why, I'm unclear.

10         The second photograph there is actually the trap.

11   During runs the BLM allowed us to go down and actually

12   view the horses at the trap before they were transported.

13   They don't allow that at all anymore.

14         So, for example, the record of decision in Silver

15   King takes us to the end of 2013.  So if Silver King was

16   put on the roundup for next week, because we could do a

17   roundup next week, I would not be allowed to go down to

18   the trap like this today at Silver King.  That would not

19   happen.

20         But like I said, that second picture is not

21   temporary holding.  That's the trap.  That's how close I

22   am to the trap.

23         The bottom photo is temporary holding.  I wanted to

24   get some photographs in there.  And a BLM personnel would

25   pull back the jute if it was in my way.  I mean, I

128

1   literally had my camera between the posts and taking

2   photographs of these horses.  I mean, you can see how

3   clearly I can identify every individual in there.

4   Q.    Comparison today, temporary holding --

5   A.    Oh, absolutely not.  I cannot identify individuals

6   at all at temporary holding.  Snow fencing is up.  I'm

7   kept often on ground level.  I'm not given an elevated

8   position to look from.

9         And if you're trying to look through that or

10  photograph through that snow fencing, it's impossible at

11  ground level.  I can see -- if I lay on the ground,

12  sometimes I can see feet.  And if I'm lucky that it's a

13  range where the horses that are coming off are tall, I can

14  see their ears.  And that's about it right now at

15  temporary holding.

16        I will get a walk-around.  But, again, it's at

17  ground level.  And that only occurs once a week.  It would

18  be real easy to facilitate it by creating gaps in the snow

19  fencing in each pen.  But, again, they don't even allow me

20  to walk around.

21        There were deaths at the Owyhee roundup and a

22  couple of the recent roundups that I was at.  I mean

23  just -- even just weeks ago.  Okay?  I'm always out there.

24  All right.  Where people -- BLM would report a death, and

25  the public would want information on that animal that

1    died.

2         And I would have to respond:  I can't give it to

3    you.  I never saw the horse.  I can't give you an

4    alternative perspective but the government's.  I have not

5    seen it.  I can't even give you a photograph and let you

6    make up your own mind.  I did not see it.  I know nothing.

7    That's how restricted I am now.  I can't answer.

8    Q.   Okay.  While we're on this exhibit, can you go

9    through the first three pages?

10   A.   Sure.  That's Silver King.

11   Q.   Okay.  What are we seeing on the first page?

12   A.   The first page, when we came up -- this one trap

13   was kind of interesting.  It only had snow fencing on one

14   side.  And it was the side where the public observer sat.

15        The second photograph you can see a woman kind of

16   skyline there sitting on a rock.  I had asked to sit

17   there, and I was told that I couldn't sit there, I had

18   to -- you can see where I'm taking the photo from.  I'm a

19   considerable distance away from that person.

20        That person is another member of the public.  It's

21   actually Suzanne Roy from AWHPC.  I mean, I remember that

22   day.  And I was told I couldn't go there.  And Suzanne

23   just went right up to the rock and sat down.  And she was

24   fine.  Nobody told her she couldn't go anywhere.

25   Q.   Well, what's on the other side of that hill, if you

130

1    know?

2    A.    That's the direction that the horses were being

3    driven from into that trap.

4    Q.    Okay.  So you couldn't see anything?

5    A.    I couldn't see anything.  The horses were roped

6    back there.  I couldn't see anything at all.  Nothing.

7    Q.    Next page, page 2 of 5?

8    A.    Next page, if you look at the row of cars, you can

9    kind of see right above the -- it's real funny.  I'm

10   having flashbacks.  Right above the white car, there's two

11   people standing.  One of them is Deniz Bolbol and one is

12   Chris Hanefeld.

13        I had been at this trap prior to the arrival of

14   other public observers.  I had been there for a couple of

15   days.  I had asked if I could stand on that road, to try

16   to see the horses come in.  Because where I was, I

17   couldn't see the horses in the trap pen.

18        And I was told, "Absolutely not, Laura, you can't

19   go down there."

20        Well, Deniz got there, put pressure on the public

21   relations people, and, you know -- and she was allowed to

22   immediately go down.  I wasn't.  However, I was allowed to

23   go down -- it's the next photograph, after pointing out to

24   Chris, hey, Chris, that's not fair.  And if I had walked

25   15 feet to my right, I could have seen the animals coming

1   into that trap.  But, instead, I was held at this

2   location.  And you can see, I can't see anything.  I mean,

3   nothing.

4   Q.    Okay.  Next page.

5   A.    Next page.

6   Q.    That is page 3 of 5.

7   A.    Okay.  We're still at the same trap.  That's the --

8   there's a little hill in the foreground and a little human

9   being with a blue shirt on the top.

10  Q.    On the top of it?

11  A.    Standing upright.  Okay?

12  Q.    At the top photograph?

13  A.    Yes, the top photograph.  There's a shadowy area

14  and a hill closest to you.  Not far away, but close to

15  you.  Right in the middle of the photograph.  Do you see

16  the human being?

17  Q.    Yes.

18  A.    That's BLM personnel.  He's standing upright.

19  Right now I'm crouched behind a rock being told not to

20  move, not to sneeze, not to breathe too loud because

21  horses are being driven in.  Well, the man is standing

22  skyline.

23  Q.    And in relation to you and this man, are the --

24  A.    The horses are being driven in front of that hill

25  where that man is.

1    Q.    Okay.

2    A.    Okay.

3    Q.    Second photograph down --

4    A.    Oh, the second photograph, it's just interesting.

5    That's all I could see of the whole run.  I mean, I

6    started just taking pictures of the chopper because I

7    couldn't see horses.  The trap was hidden behind a

8    hillside.  And no observation of capture occurred.  I

9    mean, I couldn't see anything.

10          The bottom picture --

11    Q.    The third picture, go ahead.

12    A.    The very bottom picture, the trap is -- see where

13    the dip is between those two hills in the distance?  Even

14    with my camera at full zoom, you couldn't even see the

15    trap.  Kind of where -- I think that's Chris Hanefeld, the

16    second person over.  It looks like his hat.  The trap is

17    kind of right by the brim of Chris Hanefeld's hat.  You

18    can't see it at all.  I mean, let alone being able to

19    identify horses, I couldn't even identify the trap, okay?

20    Q.    Do you have an estimate of how far that trap was in

21    that photograph from where you were?

22    A.    Mile and a half, mile.  Mile and a half.

23    Q.    All right.

24          MR. COWAN:  Well, I'm done with that exhibit,

25    Your Honor.  What would you like to do?

133

 1          THE COURT:  Let's go ahead and take our --

 2          MR. PETERSEN:  Your Honor, may I?  Your Honor,

 3    when we originally had envisioned today's hearing, we had

 4    estimated that it might take one morning.  And I know the

 5    Court had said it would set aside most of the time just in

 6    case.  Judging on the time today, I'm a little concerned

 7    that, based on the testimony that the plaintiffs have put

 8    forward and still have to put forward, that the federal

 9    defendants won't be able to finish their presentation of

10    evidence today.  And I ask the Court's advice on

11    availability tomorrow or --

12          THE COURT:  We can go all day tomorrow if we

13    need to.

14          MR. PETERSEN:  Okay.  Thank you, Your Honor.

15          THE COURT:  Okay.  We'll take our noon recess.

16    And I'm going to attempt to resume at 2:00.  I'd like to

17    have you here at that time.  And if we can, we will; and

18    if we can't, it will be as soon thereafter as we can.

19    Thank you.

20               (The noon recess was taken.)

21                    *    *    *    *

22

23

24

25

134

1              RENO, NEVADA, FEBRUARY 19, 2013, 2:05 P.M.

2                              --oOo--

3

4              THE COURT: Have a seat, please.

5          Mr. Cowan, go ahead, please.

6    BY MR. COWAN:

7    Q.    Okay.  Have you attended roundups where you've been

8    discriminated against in terms of your access compared

9    with others?

10   A.    Yes, I have.  It was actually several times.  There

11   was a time at the Twin Peaks roundup of 2010, and the New

12   York Times, for example, showed up.  BLM was, at that

13   time, giving different access to the press than they were

14   giving to the public.  And I became a credentialed member

15   of the press through Horseback Magazine.

16          I gave my press credentials to the people that were

17   there.  The New York Times showed up, but they were

18   given -- they were literally in the jute of the trap at

19   the drive, and I was held a considerable distance back.

20          And it was really interesting that day.  I was

21   standing -- went to a public road to stand because I

22   couldn't see the horses coming in at all.  I did not have

23   the access that the New York Times had.  And I went to

24   take a picture of the horses and the trailer being removed

25   from the trap so that I could at least identify them, and

1    I was told to move back or things could go to the next

2    level and I could be removed from the roundup.  So I did

3    go back to where the rest of the public was and never got

4    the same access as the New York Times.

5         There was another time down in -- at Paymaster

6    Montezuma, which is in the Tonopah area.  I went down

7    there.  And again, you know, media was the bar.  And I

8    presented my credentials to Tom Seley, who was the BLM

9    manager at the time running that roundup.  And he wouldn't

10   even take my press credentials out of my hands.  But he

11   allowed a member of the Las Vegas Sun down at the trap and

12   literally allowed him to put a remote controlled camera at

13   the mouth of the trap.

14        And I was actually held behind a hill and could see

15   nothing of the drive, nothing at all.  I could not

16   identify a single animal going into the trap at the exact

17   same time as a reporter from the Sun was at the trap.

18   Q.    Okay.  Any other instances?

19   A.    Those are the two most glaring incidences.

20   However, there have been occasions where BLM will

21   designate an observer for one purpose or another.

22        Recently the purpose is to create this humane care

23   protocol.  And so they've had members from the public down

24   there from, like, the AAEP, which is a pro-slaughter, you

25   know, veterinary association, and they'll have them at the

1    trap.  Or, you know, another -- someone else that's going

2    to give some kind of recommendation.  But they're members

3    of the public, not BLM employees or contract staff.  And

4    they have been down there.

5    Q.    Okay.  Has anybody from the BLM told you that you

6    can't get any closer because of safety concerns?

7    A.    That seems to be the -- you know, the most often

8    used reasoning.  However, it is -- it's arbitrary.  You

9    know, I mean, if I could have the access -- that type of

10   access at Calico, how come it's a safety restriction

11   elsewhere?  When there were no safety restrictions at

12   another roundup and no one was hurt, no animal was

13   injured, there was no issue, how can a safety restriction

14   then crop up from -- randomly from district to district?

15   And the safety restrictions seem to change depending on

16   what district I'm in.

17              MR. PETERSEN:  Objection.  Objection.

18   Speculation.

19   BY MR. COWAN:

20   Q.    Is it your --

21              THE COURT:  Sustained.

22   BY MR. COWAN:

23   Q.    Is it your impression that --

24              THE COURT:  She can testify to the different

25   restrictions, but --

1          MR. COWAN:  I'm sorry.

2          THE COURT:  Go ahead.

3          MR. COWAN:  Okay.

4    BY MR. COWAN:

5     Q.    Your impression is -- is your impression that

6    restrictions change depending on what district you're in?

7     A.    Yes.  Well, even what day in the same district

8    often as well.  You know, things --

9          MR. PETERSEN:  Objection, Your Honor.  The fact

10   that it's her impression doesn't change that it's

11   speculation.

12          THE COURT:  Sustained.  She can describe

13   different restrictions, but --

14          MR. COWAN:  Okay.

15   BY MR. COWAN:

16    Q.    Well, let's get an example of different

17   restrictions in the different districts.

18    A.    At the beginning of a roundup, for example, I could

19   be close.  I could be maybe 500 feet from the trap --

20          MR. PETERSEN:  Objection, speculation.

21          THE WITNESS:  I'll give a specific roundup

22   date.  I was at a roundup, for example, at -- we could

23   talk about Battle Mountain Stone Cabin last year, where I

24   was actually assisting on the trap-site adoption.  So

25   viewing individual animals was really, really important

138

1    for me at the time.

2         And the first day I was allowed to stand on top of

3    my vehicle at temporary holding about 30 feet so that --

4    because I couldn't photograph through the snow fencing to

5    identify animals for adoption, I was allowed to stand on

6    top of my vehicle and photograph the animals.

7         And by the next day, I was a hundred -- about a

8    hundred feet, and no lie, standing on top of my vehicle.

9    There was still an issue with that.  They pulled a trailer

10   in front of me, and my access to holding completely

11   disappeared after that first day.  So the first day there

12   was no safety concern.

13        And the second day at Stone Cabin, even though I'm

14   trying to assist in the placement of adoption of animals,

15   my access -- there were arguments that I witnessed between

16   BLM personnel and contract staff.  It seemed that the

17   contract staff was more in control of my placement than

18   BLM.

19   BY MR. COWAN:

20    Q.    Okay.  Do you generally just go where the BLM puts

21   you?

22    A.    Yeah.  I don't argue.  I mean, like I said before,

23   these people are human beings.  And I know they're

24   following whatever protocol or rules they're given by the

25   people higher up.  And for me to sit there and argue with

1   someone is pretty pointless.

2        You know, if there's a better location, I may ask.

3   But if it's denied, I don't sit there and fight.  I

4   just -- you know, my hope is that we can, you know, take

5   this through the appropriate channels and get some more

6   guidance.  And then the people on the ground will get the

7   guidance they need, and we'll get to see the horses again.

8   Q.    Okay.  How have restrictions affected your ability

9   to report to the public, those to whom you report?

10  A.    It's affected my ability to report on individual

11  horses a great deal.  Like I said in the beginning, when I

12  first began to observe roundups at Calico '09/2010, I was

13  able to identify animals coming into the trap.  I was able

14  to identify them at holding.  I could tell a story about

15  an individual animal.

16       I could then track that animal into holding.  And

17  people followed those stories.  I could track a tag number

18  for adoption.  If people had questions about the health or

19  welfare of an animal, I could answer them.  It's extremely

20  difficult to do that, for example, at holding.  If an

21  animal, say, is captured on a Tuesday and I can't identify

22  it going into the trap, I'm not allowed to approach

23  temporary holding and see it.  By Wednesday it's removed

24  from the range.  And I may get a walk-around on Saturday,

25  but that animal's been gone for days.

1          So I can no longer tell that type of story to my

2     viewers.  I can give more of an overview of kind of

3     operational procedure and the changes that I see.  But

4     that ability to tell that story of the horse, which is why

5     I'm out there, and what -- there seems to be a very

6     different psychology here.

7          My viewers and the American public at large and

8     people all over the world, you know, they'll fall in love

9     with a stallion on the range, this black stallion with an

10     incredible family, and they want to know what happens to

11     that stallion and his foals.

12          Or they'll see a baby come in that maybe was

13     exhausted when it came in.  I mean, in Owyhee there was

14     one that was draped over the saddle it was so exhausted.

15     And I have not been able to see that baby, not once since

16     it came off the range.  It's been hidden from my view.  So

17     I can't tell people how he's doing.  I cannot report like

18     I did in the beginning.  It's very, very frustrating.

19          And then there's -- I'm out there because I love

20     these horses.  These horses individually touch my soul.  I

21     can't track the baby I watched run in exhausted and draped

22     over that saddle and whisked out of my view and I never

23     see him again.  And it breaks may heart because I've

24     watched babies after roundups.  I've watched one while his

25     feet were literally falling off.  He was dying.  And I was

1  lied to about his well-being until he died 14 days later.

2  And so if I can't see it, it breaks my own heart, let

3  alone the people I'm reporting to.  And I do not have the

4  ability to do that.

5       I followed a baby from a range at Eagle that I saw

6  fall three times.  I went to Broken Arrow and begged to

7  see him again, and I was denied access to see him.  And

8  that week I read that there were three colts euthanized

9  for broken legs.  I will never know if he was one of them,

10 ever.

11 Q.    Okay.  When did that take place?

12 A.    That took -- Eagle was winter 2011.  2012.  Yes.

13 I've been viewing my footage for the last four days.  So

14 for me right now, there's this blur of roundup activity.

15 And so Eagle was in the wintertime.  It was extremely

16 cold.  I can define the trap for you.  And I'm pretty sure

17 it was November/December of 2011.

18 Q.    Okay.  And then the incident regarding a little

19 foal draped over a rider's saddle.

20 A.    That was at Owyhee 2012.  That's recent.  And I

21 have not seen him.

22 Q.    Okay.

23 A.    He went to Palomino Valley, and he's off limits.

24 He's in hospital pens that I have no access to.  I have

25 not been able to see him.

1   Q.    Okay.  And when you said --

2   A.    Little sorrel with a blaze.

3   Q.    You got a picture of him?

4   A.    Sure do.  In my heart.

5   Q.    At roundups how many pictures do you take on the

6   average, on a day?

7   A.    Two to three thousand still images at a roundup,

8   and probably about four to six hours of video daily.  And

9   then multiply that.  I mean, I have you know, four

10  two-terabyte external hard drives filled.

11  Q.    Okay.  And estimated, how many images?

12  A.    Hundreds, thousands -- over a hundred thousand.

13  Q.    Okay.

14  A.    And tens of -- about 10,000, maybe close to that,

15  of video hours.

16  Q.    Well, for you, what would you consider fair access?

17  A.    The ability to identify individual animals.  Access

18  close enough to the trap.  The thing is this is not

19  impossible.  It's been done in the past.

20        And if terrain is a -- you know, if there's an

21  issue with terrain, they brought in trailers so people

22  could see.  They set up jutes so people could see.  They

23  bring in other people that they select so they can see

24  that can identify animals.  They can do it with the

25  public.  They can do it with the media.

1        I want to be able to see individual animals

2   brought -- come into that trap.  I want to see how my --

3        MR. PETERSEN:  Your Honor, objection.  The

4   plaintiff has not established that she has any level of

5   expertise as to what appropriate level of access is.  She

6   is commenting on what she would like.

7        THE COURT:  Sustained.

8        MR. COWAN:  Okay.

9   BY MR. COWAN:

10  Q.    Can you give us your background in terms of what

11  you consider -- well, let me back up.

12        Do you have a background in what you think is

13  appropriate access as a member of the press, as a

14  credentialed press member for a magazine?

15  A.    When -- at Twin Peaks, when I was at Twin Peaks,

16  and there were some issues with access, Tom Gorey from the

17  DC office, BLM DC office, came down.  And Tom Gorey and I

18  worked on what we called an access protocol.

19        And that access protocol created, if there were

20  more than one member of the public or press that show

21  up -- and 99 percent of the time it's only me out there,

22  but if there was someone other than me, we could create a

23  rotational access.

24        I was given access to the trap where I was 100 feet

25  or closer to the trap.  And I had access close enough to

1   assess the condition of the animals coming into that trap,

2   take a respiration rate, and see the handling during

3   loading well enough to determine how it affected the

4   animals.  I did have that access at Twin Peaks.

5   Q.   Okay.  And in your experience, is that the type of

6   access that benefits you in your job and in reporting to

7   the public?

8   A.   Absolutely.  I can accurately report on what I see.

9   I can also take video and simply show it, and the public

10  can draw their own conclusion.  When I can't see that, I

11  can't show it.

12  Q.   Based on your historical experience in roundups --

13  you're going to go to some more roundups, aren't you?

14  A.   Oh, absolutely.

15  Q.   Okay.  Do you have an impression, or do you

16  perceive -- or do you have a perception, of how your

17  roundups -- future roundups, let's say at Silver King, how

18  your access would be there?

19  A.   If there were a roundup at Silver King tomorrow,

20  and it's within the realm of possibility -- you know, they

21  can round up through the end of February, and it's, you

22  know, clear through the record of decision, so if, you

23  know, they popped it on the schedule, I would imagine it

24  would be identical to the roundup I was just at, in which

25  the same district participated, which was Diamond.

1    Q.    And what was that access?

2    A.    At temporary holding.  I could not identify

3    individual animals.  The walk-around was once a week.  You

4    know, it was what it's been.  It's highly restricted

5    access.

6         I'm not close enough to really view individual

7    animals coming into the trap.  You know, I can't assess

8    their condition or handling well enough coming into the

9    trap.  And at temporary holding I -- you know, it's very

10   limited.  It's extremely limited.  It's not what it was in

11   the past.  It's not what it was at Calico.  It's not what

12   I had at Twin Peaks.  Since that time, I'm more and more

13   restricted.

14   Q.    Have you been inspired at all by some of the

15   pioneers who have gone out on the range and reported wild

16   horse roundups?

17   A.    Yeah.  There are some amazing advocates in the

18   history of the wild horse and burro crusade.  And many of

19   them went out and documented, did a lot of what I do, you

20   know, one of which was Velma Johnston, known as Wild Horse

21   Annie.  She was an advocate.  And she was key in the

22   creation of the Wild Horse and Burro Act.

23        She did go out and document.  For example, she was

24   at Stone Cabin, the first roundup done by the BLM, where

25   she was on site overseeing humane handling for wild horses

1   and burros and participated in that, you know, wrote a

2   recommendation letter to Sue Cattoor and -- you know, for

3   trying.  I mean, she was right there.

4        I read a lot of what she wrote.  And I've seen a

5   lot of the documentation that was gotten from people in

6   those very early years.

7        I have not gotten one single photograph from the --

8   with the type of access those people had.  Not one.  The

9   closest access that we heard today -- you know, if you

10  think of the Wild Horse and Burro Act, the first roundup

11  ever under the act in -- you know, in 1975 to today, Terri

12  Farley was out on the range in 2002, and the access, the

13  conditions were pretty darn close to what they were in the

14  beginning.

15       But if you look at, you know, from 2002 to today,

16  it's deteriorated so quickly it's -- it makes your head

17  spin.

18  Q.   Do you think your work is beneficial to the public?

19  A.   Absolutely.  I mean, in a democratic process, even

20  discourse is beneficial.  The public needs to comprehend

21  what their government participates in and how their

22  government handles their tax funds and manages their

23  public resource.

24       Wild horses are a public resource, a spiritual

25  public resource.  And for the American public to be able

1    to see that which the government holds -- you know, tries

2    to inhibit, is beneficial.

3         For example, you know, the first quarter of last

4    year our organization was responsible for more than 40

5    adoptions, which was more than 30 percent of adoptions in

6    the entire state.  You know, I mean, there's -- of course,

7    it's beneficial.

8    Q.    Do you think your work is beneficial to the

9    roundups themselves?

10   A.    I do.  I do think it is.  I think that when there

11   is an observer to any -- anything that's occurring,

12   whether it be someone doing paperwork or someone handling

13   animals, that they're going to be a little more mindful,

14   perhaps, about what they're doing, a little more careful,

15   perhaps, about what they're doing when they know they're

16   being watched.

17        I know that what I've put out has created great

18   conversation that's gone to Congress about humane handling

19   protocol.  The work I do on the range with -- you know,

20   statistical work and drought stuff, has gotten people

21   involved in land use planning where they didn't even know

22   land use planning existed before.

23        I think wild horses is an extraordinary window and

24   doorway to the American public to understand how their

25   public resources are managed on their public land.  And

1    wild horses, you know, not only that, are inspiring.

2         You know, when you're at the roundup and these

3    animals are losing their freedom, there's a -- you know,

4    some of it is tragic and yet beautiful at the same time.

5    These animals have an extraordinary spirit that we, as

6    Americans, once identified with.  And I think that that

7    kind of -- that reminder is also beneficial to the public.

8    I mean, I could go on and on and on.

9    Q.   Well, you've been to enough roundups to, for

10   example, hypothetically, and maybe you've done this, and

11   tell me if this is not a hypothetical, where you can go

12   down to the pens north of town, on Pyramid Highway, and

13   identify, just based on what those horses generally look

14   like out there, what area of the state of Nevada they came

15   from?

16             MR. PETERSEN:  Objection.  Confusing, leading,

17   speculative.

18             THE COURT:  And not relevant.  Sustained.

19             MR. COWAN:  All right.  I guess that's all I

20   have.  Oh, hold on.  I'm sorry, Your Honor.   I had one

21   more thing.  I apologize.

22             THE COURT:  Go ahead.

23   BY MR. COWAN:

24   Q.   Do you have before you Exhibit 5?

25   A.   Yes, I do.

1    Q.    Okay.  Are you familiar or aware of this e-mail?

2    A.    Yes, I am.

3    Q.    Can you tell me what it is, please?

4    A.    Many of us that went out to Calico and tracked the

5 horses at Broken Arrow, you know, we became very concerned

6 about the condition of the animals.  And we did put out

7 reports.

8          And, you know, public interest really peaked about

9 the type of handling that they viewed at Broken Arrow.

10 They had not seen anything like that before, a lot of the

11 images.  I mean, I put out a photograph of a foal that had

12 starved to death, born in that facility and starved to

13 death.  So BLM was under quite a bit of scrutiny, public

14 scrutiny at the time.

15          After the facility closed, we were told that the

16 facility was never intended to be open to the public.  So

17 someone who was working with me at the time, Debbie

18 Coffey, FOIA'd the contracts and all the information that

19 had to do with the contract of Broken Arrow.

20          We did get the contract.  And the contract does not

21 state that.  It actually says it's supposed to have public

22 viewing through 2015.  But in with those FOIA documents

23 was this e-mail, with Dean Bolstad's request to close

24 Broken Arrow.

25          And we were pretty surprised when we read, you

1   know, the statement that the -- that, you know, John

2   Neill's and the veterinarian's reputation is seriously

3   being compromised by the fallout from our Indian Lakes

4   tours as part of the reasoning.

5        BLM said that it was very expensive.  And in the

6   documents that were FOIA'd to the reasoning why the

7   contract -- you know, the contract itself and the

8   documents, there was never any expense log.  There was

9   never any other documentation for any other reasoning

10  except this e-mail.  That's all we were given in the FOIA.

11            MR. COWAN:  Okay.

12            MR. PETERSEN:  Is that all, Mr. Cowan?

13            MR. COWAN:  That's all I have.  Thanks.

14            THE COURT:  Cross-examination?

15

16                    **CROSS-EXAMINATION**

17  BY MR. PETERSEN:

18  Q.   Ms. Leigh, just -- could you clarify?  What was the

19  first wild horse gather that you attended?

20  A.   It was Calico --

21  Q.   The 2000 --

22  A.   2009/2010.  Yes.

23            MR. PETERSEN:  Thank you.  No more questions.

24            THE COURT:  Any redirect?

25            MR. COWAN:  None, Your Honor.  Thanks.  That

151

1    was easy.

2              THE COURT:  All right.

3         You may step down.  Thank you.

4                 (Partial transcript concluded.)

5                        *   *   *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

152

1                          -o0o-

2        I certify that the foregoing is a correct

3        transcript from the record of proceedings

4        in the above-entitled matter.

5

6        _____        7/1/13

7        Donna Davidson, RDR, CRR, CCR #318      Date
         Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25