1

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

LAURA LEIGH,

    Plaintiff,           No. 3:10-cv-597-LRH-VPC

  vs.

KEN SALAZAR, et al.,

    Defendants.

PARTIAL TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING

(Testimony of Laura Leigh)

February 19, 2013

Reno, Nevada

Court Reporter:    Donna Davidson, RDR, CRR, CCR 318
                      Certified Realtime Reporter
                      400 South Virginia Street
                      Reno, Nevada  89501
                      (775) 329-0132

```
 1   APPEARANCES:

 2   For the Plaintiff:     GORDON COWAN
                            Attorney at Law
 3                          Reno, Nevada

 4

 5   For the Defendants:    ERIK PETERSEN
                            U.S. Department of Justice
 6                          Washington, DC

 7                          NANCY S. ZAHEDI
                            Department of the Interior
 8                          Sacramento, California

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2    PLAINTIFF'S WITNESSES:                          PAGE:

3    LAURA LEIGH

4        Direct by Mr. Cowan                            4

5        Cross by Mr. Petersen                         13

```
 1           RENO, NEVADA, FEBRUARY 19, 2013, 3:00 P.M.
 2                              --o0o--
 3                       P R O C E E D I N G S
 4
 5                             LAURA LEIGH,
 6             re-called as a witness on behalf of the
 7           Plaintiff, having been previously duly sworn,
 8               was examined and testified as follows:
 9
10                         DIRECT EXAMINATION
11   BY MR. COWAN:
12    Q.    So we have three areas.  And the question is, what
13   would you consider fair access?
14    A.    You asked me some questions before.  And so I just
15   want to kind of preface, because I'm trying to get back to
16   where I was about some of the people I had followed and
17   what I had seen and why I came out.
18          Well, I saw images of wild horse roundups.  I have
19   never had that type of access ever to view wild horse
20   roundups.  People had it in the past.
21          I want it.  I want to be able to get those kinds of
22   photographs that other people got.  I want to be able to
23   report on the same kinds of things that other people saw.
24   I want to be able to tell the story of the horse.
25          And there's this funny thing here where we're
```

1  playing a game between two words, unrestricted and
2  reasonable.  And there seems to be this game.
3         What I want is an unrestricted view.  Not
4  unrestricted access.  I don't want to go down there and
5  handle the horses.  I don't want to get in the way.  I
6  don't want to be a problem.  I don't want to tell them
7  what to do while I'm there.  I don't want to do anything
8  like that.
9         I want to be able to document.  I want an
10 unobstructed view of the handling of my horses, okay?  I
11 want to see them come into the trap.  I want to be able to
12 identify them as individuals.  I want to be able to assess
13 their condition at temporary.
14        It used to be that there was no snow fencing and we
15 could walk around it and stand right next to the panel.  I
16 could stick my camera in it.  I'm not even asking for that
17 back.
18        But you could cut me a hole in the snow fence at
19 every panel and let me walk around ten feet away so I can
20 photograph through that and assess every animal.  You
21 could -- we can come up with a way that I have
22 unobstructed view, where I could see respiration rates of
23 those animals coming in so I can appropriately assess
24 whether or not they are overstressed.
25        I can't do that unless I can see them.  What I'm

1   talking about is an unobstructed view.  And it is possible
2   because it has been done in the past.  I'm not even asking
3   to be as close as people were in the past.  I'm just
4   asking that my view not be obstructed so that I can see.
5     Q.    Thank you.
6     A.    Okay.  But like you said, I can't ask the horse.  I
7   mean, I can't go to a facility and say, "How was the
8   roundup?"  I want to go to the facility as well.
9         I want to be able -- like that baby.  He was run to
10  exhaustion.  He was brought in draped over the saddle
11  limp.  I have not seen him since.
12        I want to be able to see him.  I don't see why I
13  can't.  Why can't I go to Palomino Valley and be walked
14  back there so I could see him?
15    Q.    Okay.
16    A.    You know.
17    Q.    Well, let's define, then, horses facilities,
18  holding facilities --
19    A.    Separately.
20    Q.    What -- yes.  What would you consider fair access
21  there?
22    A.    Well, to -- in the case of Broken Arrow, they
23  facilitated weekly public tours as horses were going in
24  there.  I would like to be able to see a weekly public
25  tour, minimum.  You know, not every day, you know,  but

1  weekly, you know.
2         And the public is not going to be going out there
3  in droves.  So you call -- you got to make an appointment.
4         So one Saturday nobody comes and another Saturday
5  two or three people show up that want to go in and see if
6  they can find a tagged Calico horse from three years ago.
7  Some of them are still there, okay?
8         You know, a lot of the Silver King horses, the
9  Eagle horses that I've watched rounded up over the last
10 three years are at Broken Arrow.  We want to be able to go
11 in there and identify and see if -- see if -- who is still
12 there because to us it's a who.  Okay?
13  Q.    Do you feel -- do you still think some of the
14 horses from Silver King --
15  A.    Oh, I --
16  Q.    -- are still there?
17  A.    -- know they were.  I saw some of them at the tour.
18 When I was on my little wagon, I caught a little glimpse.
19 And I couldn't stop.  I couldn't assess them.  I was
20 driven by in my bouncy little wagon.
21        And that's all I've been able to see them is twice
22 in the last two years.
23  Q.    And so you want to eliminate the wagon and do it
24 the way it was before?
25  A.    Yes.  They did it like that once before, and there

1  wasn't any problem.  The public was not an issue.
2      The interest in Broken Arrow is not going to be
3  what it was before because the Calico horses aren't being
4  loaded in there.
5      But you're going to have a few people, like myself,
6  who don't want to report to the public.  And so maybe I'll
7  show up once a month if they offer us an opportunity to
8  phone in and make an appointment to be able to go in once
9  a week to see the horses there.
10     I would love to be able to go see if my little baby
11 from Eagle, the one I saw trip that week that three babies
12 died of broken legs, I'd love to be able to go and see if
13 he's still there.  I can't the way the system is now.  But
14 basically it's just -- I just want to see them.
15 Q.   Okay.  And then how about this, how about the
16 roundup itself?  And understanding that each roundup is
17 different --
18 A.   Uh-huh.
19 Q.   -- what would you consider fair access in general
20 terms?
21 A.   Well, that's -- we had started with that in general
22 terms.  I mean -- you know, and, again, we throw around --
23 there's another word game that's happening, and it's
24 called safety restriction.
25     When we talk about public versus contractors and

1  press and -- when I first started observing roundups, the
2  bar was press credentials.  So you had to be credentialed
3  media in order to get good access.  So I got myself
4  credentialed.  And then that deteriorated really quickly.
5  And then now even credentialed media doesn't get that kind
6  of access anymore.  So I met that bar.
7           Well, there was no safety restriction to how the
8  media view roundups prior to that.  There's no record of
9  accidents where horses got hurt or people got hurt or
10 anybody got hurt.
11          Like I said, it could be coincidence, but as soon
12 as I became credentialed media the bar changed.  Okay?  So
13 I want to see what other people saw.  I want to see what I
14 saw in the very beginning.
15          I want access to identify individuals going into
16 that trap.  I want to be able to see those animals in
17 holding, and I want to be able to track them.  I want to
18 tell the story of the horse.
19          I mean, I have, like I said, 5,000 views a day on
20 YouTube.  That's just YouTube.  I have two websites.  I
21 write for two different magazines.
22          I spent four days before coming to court with USA
23 Today, The Today Show, and NBC Nightly News, I mean,
24 giving them access to my library.  This is a huge area of
25 public interest.

1     I'm not saying -- like I said, I don't need to be
2  next to the trap.  But I want to be able to see what's
3  happening in the trap.
4     They used to be able to -- they facilitated it
5  before.  When the terrain wasn't conducive, they put a
6  horse trailer and people photographed from a horse
7  trailer.  I mean, and that's kind of neat.  They could
8  just lock the door and leave the public in there, and we
9  would be no problem.
10    But that's basically, you know -- and I don't
11 understand why it's such a problem.  The one contractor
12 has -- I mean, I have pictures where I'm, you know, a
13 quarter mile away and there's a toddler standing
14 completely skylined with a whole bunch of people, and the
15 kids throwing rocks while the horses are being driven in
16 complete view of the horse, and I've got to crouch down
17 behind jute because somehow my camera is scary, but the
18 rocks the toddler's throwing aren't.
19 Q.   And how close was the toddler to the jute?
20 A.   Oh, maybe a hundred feet from the trap.
21 Q.   Okay.  And the toddler was who?
22 A.   Oh, it belongs to the -- one of the contractors.
23      There was one day that --
24         MR. PETERSEN:  Objection.  I just -- if we're
25 going to have --

1        THE COURT: Yeah, we're --
2        MR. PETERSEN: -- this testimony, it seems --
3        MR. COWAN: Okay.
4        MR. PETERSEN: -- should be limited to --
5        THE WITNESS: Okay. I'm sorry. I'm sorry,
6   Mr. Petersen.
7        MR. PETERSEN: -- what you're looking for.
8        THE COURT: Members of the public.
9        MR. COWAN: Okay.
10       THE WITNESS: Well, we could go back to that
11  closer.
12       The veterinarians often that will come in are not
13  BLM employees or contract staff, aren't there for the
14  purpose of working the horse. They're there for the
15  purpose of observing the conduct of the operation and
16  giving recommendations, for example, to the new humane
17  care policy.
18       Those are members -- for all intents and purposes,
19  members of the public that BLM has chosen to come in and
20  do an assessment or an endorsement, depending on how you
21  see it, of their handling of the animals. And then they
22  give that information to the public.
23       Well, with the current climate, the public -- if
24  BLM hand picks who watches them and which members of the
25  public go down there, the public doesn't trust it. And if

1   there's no safety issue for them down there, why is there
2   a safety issue for me?
3          I'm a member of the credentialed press.  The
4   American press goes in and covers war.  It's a chosen
5   profession.  They go in with our troops.  They go in to
6   areas of extraordinary discourse and uprising.
7          I'm photographing a wild horse roundup.  I'm not in
8   the middle of Afghanistan, okay?  But I'm a member of the
9   credentialed press.  I should be able to photograph a wild
10  horse roundup.
11         I'm sorry if that -- I am just very frustrated.
12  BY MR. COWAN:
13   Q.    And your choice of lens these days when you're not
14  able to --
15   A.    I have a 300 millimeter lens is all I can afford.
16  The reporter that I was talking to brought in a $60,000
17  lens and was able to get the shots he wanted.  But I don't
18  have $60,000 to spend on a lens.
19   Q.    Okay. Anything else to add on what you would
20  consider fair access?
21   A.    Fair access would be I want to see my horses.  And
22  I don't see what the problem is, why you can't let me see
23  my horses.
24              MR. COWAN:  Thank you, Your Honor.
25              THE COURT:  Cross-examination?

```
 1                     CROSS-EXAMINATION
 2   BY MR. PETERSEN:
 3    Q.    So as I said before, tomorrow, Ms. Leigh, my
 4   clients will present their views on this.
 5    A.    Yes.
 6    Q.    But just for today, we can talk about your views.
 7   And a few follow-up questions.
 8          You've stated that you want to be able to take good
 9   pictures of your horses.
10    A.    Yes.
11    Q.    Does everyone, every member of the public get to
12   enjoy that same standard?
13    A.    I'm a member of the press and one of those people
14   that can actually travel to the roundups.
15          The public does rely on me for those images that
16   they can't capture themselves.  So they do see this
17   through me.  And I do believe that the public has a right
18   to see that, yes.
19    Q.    So just to be clear.  So that what you are saying
20   is whatever standard that you're seeking -- and -- which
21   is, as you've stated, that you want to have
22   unobstructed -- you want to have a --
23    A.    An unobstructed view.
24    Q.    Unobstructed view, presumably at all times of --
25    A.    I'd settle for, you know, at this point Erik, half
```

1  the time, okay?
2  Q.   I guess part of the trouble is, is it seems to me
3  it's a bright-line problem, is it not?  Is that what you
4  want, this unobstructed view, that -- wouldn't that then
5  need -- is your view it would need to apply to every
6  person that managed to truck themselves out to the wild
7  horse gather to view it?
8  A.   Within reason.  I mean, Erik, the truth is 99
9  percent of the time I am the only person out there.  The
10 other one percent of the time -- well, let's see, .5
11 percent of the time there may be two other people out
12 there, and then the other .5 percent of the time, on your
13 public observation days, occasionally you'll have, you
14 know, more people than that show up.  But the truth is
15 very few people are there.
16      When I first began going to wild horse roundups,
17 the bar your client set was credentialed media for that
18 type of access.  I became credentialed media --
19 Q.   Right.
20 A.   -- and that deteriorated, yes.
21 Q.   And I understand.  And you've testified --
22 A.   So whatever that bar is that you set, the public
23 has a right to see that.  So if that bar is press, if
24 that -- if you give that access to the public, the public
25 has a right to see those -- what occurs, how the

1  government handles the horses unobstructed, yes.
2         And so I don't -- the bar used to be press.  And
3  now that doesn't exist anymore.
4  Q.    But you testified earlier today about a particular
5  horse that was in a hospital bed.
6  A.    Yes.
7  Q.    Does your view of reasonable access include you
8  being able to go see that horse in the hospital bed?
9  A.    It used to be in --
10 Q.    We're talking about going -- you're seeking relief
11 from the Court.  So your view of what you think should
12 be --
13 A.    Yes, I do believe that the public, just like the
14 horse gather itself, the public has a right to an
15 unobstructed view of the horses and to see the condition
16 of the horses.
17        My organization has actually offered to pay for
18 real-time cameras to put in if the BLM didn't want people
19 in there.  And the BLM has refused -- your client has
20 refused that as well.
21        So the public has a right to see those images,
22 regardless -- so if you want to set the bar as
23 credentialed press, we'll meet that.  If you want to set
24 it as a real-time camera, because you don't want me there,
25 we'll meet that.

1   Q.    Let me ask you this then.  If -- is it your
2   position that reasonable access is that any member of the
3   public should be able to see any wild horse that's being
4   handled by BLM, not if they're off in the wild, but any
5   wild horse at any point in the chain?
6         So you take -- you find a horse that you've seen on
7   the range that you find -- that strikes you, and you
8   want -- you've stated you want to be able to follow that
9   horse through --
10  A.    Uh-huh.
11  Q.    -- BLM's processing system.  There could be another
12  person who likes a different kind of horse and they want
13  to follow it through.  Is it your position that reasonable
14  access is that anyone who goes out to a BLM gather and
15  spots a horse has the right to know where that horse is
16  and see it --
17  A.    Yeah, all five of us, yes.
18  Q.    -- all the way through?
19        Yes or no?
20  A.    Yes.  All -- like I said --
21  Q.    Yes or no?
22  A.    But like I said --
23  Q.    You've answered.
24  A.    -- there's very few of us.  Most people rely on us
25  for that information.

1            MR. PETERSEN:  Thank you.
2            MR. COWAN:  Gosh, if I were Erik Petersen, Your
3  Honor, that last question I would have objected.  But I'm
4  not.  Thank you.
5            THE COURT:  It's part of the mix.
6            MR. COWAN:  No redirect.
7            THE COURT:  All right.
8       You may step down, Ms. Leigh.
9       All right.  Shall we adjourn for the afternoon?
10  And we'll start promptly at 9:00 in the morning.
11            MR. PETERSEN:  Thank you so much, Your Honor.
12            THE COURT:  All right.  Thank you.
13       Court will be in recess.
14            MR. COWAN:  Thank you, Your Honor.
15            THE CLERK:  Please rise.
16                 (The proceedings adjourned at
17                 3:21 p.m.)
18                      *   *   *
19
20
21
22
23
24
25

```
 1                          -o0o-

 2        I certify that the foregoing is a correct

 3        transcript from the record of proceedings

 4        in the above-entitled matter.

 5
          [signature: Donna Davidson]               7/1/13
 6        _____          _____

 7        Donna Davidson, RDR, CRR, CCR #318        Date
          Official Reporter
```